**SAMSON TUG AND BARGE CO. INC**
**V.**
**UNITED STATES OF AMERICA**
**(Case #A03-006 CV)**

**Expert Report of Ernest Nadel, PhD**

**July 20, 2007**

**LECG, LLC**
**2000 Powell Street, Suite 600**
**Emeryville CA, 94608**

## Table of Contents

**I.** Introduction and Assignment ........................................................................ 1

   A.   Introduction ............................................................................... 1
   B.   Assignment ................................................................................ 2

**II.** Executive Summary and Opinions ............................................................... 3

   A.   Samson's Allegations as the Navy's Liability ............................. 3
   B.   Samson's Allegation of the Navy's Motive ................................. 3
   C.   Samson's Damages Theory ........................................................ 4
   D.   Samson's Damages Methodology ............................................... 4
   E.   Samson's Damages Computations .............................................. 5
   F.   The Navy's Denial of the Claim.................................................. 6

**III.** Detailed Analysis .................................................................................... 8

   A.   Samson's allegations as to liability ........................................... 8

      1.   The elements of Samson's allegations .............................. 8
      2.   The cargo that was actually committed to Samson in the REQ contract.......... 9

      a.   Contractual provisions ..................................... 9
      b.   Economics of the air/sea choice............................. 9
      c.   Samson's contemporaneous explanations of what "all the cargo" meant..... 10
      d.   Samson's IDIQ and REQ volume assumptions, in FEU .............. 11
      e.   The "Strong Texan" episode ................................. 12

      3.   Allegations about the 60 FEU Minimum Space Requirement...................... 13

      a.   Samson's allegation ....................................... 13
      b.   The economic explanation in the record...................... 14
      c.   Allegations of separate, unrecovered cost for the minimum space requirement ................................. 14

      4.   Unsupported, contradictory, expected cargo level allegations ...................... 15

   B.   Alleged Motive ........................................................................ 16

      1.   Inducement to lower rates............................................ 16
      2.   The contradicting evidence ........................................... 16
      3.   In Mr. Halko's letter to MSC of August 10, 1995 he states:............ 17

C.  Samson's Damages Allegations .......................................................... 18

    1.  Samson's service.................................................................. 18
    2.  The Claim (damages) prepared by Mr. Green ................................. 18
    3.  Mr. Johnson's Expert Report.................................................... 19
    4.  Samson's damages are based on inference from income statements.............. 20

D.  Samson's Bid Documents Contradict Samson's Experts' Conclusions About
    Unrecovered Costs ...................................................................... 21

    1.  Samson's explanation to the Navy (MSC) ..................................... 21
    2.  Samson's IDIQ bid preparation................................................. 22
    3.  The development of Samson's first REQ bid................................... 24
    4.  Samson's final REQ bid still covered their anticipated costs.................... 25
    5.  The second year bid likely follows Sampson's first year methodology ......... 26
    6.  Conclusions on alleged unrecovered costs .................................... 26

E.  The Navy's Denial of the Claim...................................................... 27

F.  Samson's Damages Methodology ..................................................... 29

    1.  Samson's indirect approach to damages must fail ............................ 30
    2.  Their Income Statement modeling is "pre-determined" to show damages...... 31
    3.  Mr. Green's 20% commercial profit assumption ............................. 32
    4.  Other features from the initial claim not appearing in Mr. Johnson's Expert
        Report.............................................................................. 33
    5.  Critique of Mr. Johnson ....................................................... 34

    a.  Internal contradiction ........................................................ 34
    b.  Correcting Mr. Johnson's (and Mr. Green's) major error.............................. 35
    c.  Failure to consider Samson's pricing decisions in the "but for" world ........ 38
    d.  Johnson's lack of industry analysis to support his assumption .................... 38
    e.  The years after the contract would have been better indicators.................... 39

G.  Air Cargo Capacity ..................................................................... 40

    1.  C-141 capacity ................................................................... 40
    2.  Samson's air cargo examples are *de minimis* ................................. 41

    a.  Exhibit 13......................................................................... 41
    b.  Exhibit 18......................................................................... 42

# I.  Introduction and Assignment

## A. Introduction

My name is Ernest Nadel, and I am a Principal at LECG, LLC.  My business address is 2000 Powell Street, Suite 600, Emeryville, California  94608.  I have been asked by the United States Department of Justice to analyze the plaintiff's claims in the above-captioned matter.  These claims are set forth in the Complaint and Claim filed December 10, 2001 and in the expert report submitted by George L Johnson.

This report summarizes the opinions and conclusions that I have reached, with the following provisos:

> My analysis is ongoing.  I reserve the right to express additional opinions, to supplement or amend the opinions in this report, and to provide additional reasons for these opinions, as additional documents are produced and new facts and opinions are introduced during the trial.

> Bases for opinions.  My opinions are not based upon legal expertise.  Rather, they are based on general economics and business principles, and my knowledge of maritime economics and Samson's Adak service and Navy contract experience.

> Documents considered.  I have identified in Attachment B the documents I considered in preparing my report.  In addition to these documents, I may use other exhibits to summarize or support my opinions.  I further reserve the right to rely on exhibits introduced in connection with the testimony of any other expert or witness, or any other documents produced in this case.

I have extensive expertise in the field of economics, maritime economics, and cargo shipping by container and barge. I have been an economist for 39 years, and a maritime specialist for 32 years. My experience for addressing the specific issues raised by the plaintiffs' claims includes:

- my work for MSC in evaluating the two previous claims by Samson;
- an evaluation of the Young Brothers barge operation in Hawaii;
- preparing a Report to MSC on the Cost of Cargo Preference, which included an evaluation of the rates paid by MSC in its various contracts around the world;
- analysis of the costs of the transpacific containership service to Guam, as a diversion from the transpacific route, in a case before the U.S. Maritime Commission;
- more than 10 years of consulting to the State of Alaska, Department of Revenue and the Attorney General's Office;
- cost of service for the Guam trade in a case now before the Surface Transportation Commission; and,
- cargo forecasting.

1

My general qualifications for addressing the issues raised by the plaintiffs' claims are set forth in Attachment A, my current curriculum vitae, which includes my experience as an expert witness.

I have no financial stake in the outcome of this litigation.  I am being compensated for my work on this case at my normal hourly billing rate of $315.

## B.    Assignment

I have been retained by Counsel for the United States Government to:
- evaluate the issues raised by Samson in its Complaint and Claim;
- assist Counsel in discovery and depositions;
- attend depositions as requested;
- review the documents produced in the record, the depositions, and the exhibits;
- prepare an Expert Report concerning my findings, focusing on the allegations of damages claimed by Samson in its Complaint and Claim, and on the allegations of damages in the Expert Report of George L Johnson; and
- testify at trial if requested.

The Complaint is an Appeal, in Federal Court, of the Denial by Military Sealift Command (MSC) of a Claim by Samson against the Navy for Breach of Contract or, in the alternative, for Constructive Termination of the Contract. Samson's allegations, theory of the case, and damages calculations appear in the Appeal[1], the Claim[2], which is itself appended to the Appeal, and in an expert report prepared by George L Johnson[3]. The damages, as shown and described in the Claim, were prepared by a different expert on behalf of Samson, Mr. John Green, who, unfortunately, has since passed away. Mr. Green's results were presented when the Claim was filed, on December 10, 2001, and Mr. Johnson's Expert Report was filed April 27, 2007, and corrected on May 21, 2007.

It is my understanding that this is a contract dispute, regarding Contract No. N62387-95-D-8503[4] within a military transport context.

---

[1] Samson Tug and Barge Co., Inc. v. United States, Complaint A03-006 CV, filed January 14, 2003 ("The Complaint").
[2] Claim for Breach of Contract or in the Alternative Request for Equitable Adjustment for Constructive Partial Termination for the Convenience of the Government of Contract No. N62387-95-D-85033 (with Damages Proposal, Schedules I-V, and Exhibits 1-25), filed December 10, 2001. ("The Claim")
[3] Report of Plaintiff's Expert George L Johnson, April 27, 2007 (Corrected May 21, 2007). ("The Johnson Report")
[4] ADAK Contract No. N62387-95-D-8503, effective October 1, 1995, Exhibit 10, STB 103027-128. ("The 1995 Contract")

# II. Executive Summary and Opinions

## A. Samson's Allegations as the Navy's Liability

Samson alleges that the Navy:

- breached its contract, by not shipping "all" of the Adak cargo via Samson's barges as required by the Requirements ("REQ") contract;

- diverted cargo to the air mode instead of Samson's barges; and

- did not fill all or even a majority of the 60 FEU per sailing, per direction, that the Navy required as part of the contract.

**My opinion**:   It is my opinion that the documents in the record show that Samson's bid for this contract was based on Samson carrying initially 80%, and then 89% after a rate reduction, of the cargo volumes shown in the Request for Proposal. There is no contemporaneous evidence that they planned on carrying an amount greater than the projected amount. There is no contemporaneous evidence that Samson planned to fill any specific subset of the 60 FEU minimum space guarantee, or utilized less of that 60 FEU than they planned to. In addition, the evidence in the record of some actual air shipments that could possibly have been carried by Samson indicate cargoes of *de mimimis* volume and *de minimis* potential revenue to Samson. The amount of air cargo that the damages claims suggest were improperly diverted to air would have required extremely large numbers of air cargo flights.

## B. Samson's Allegation of the Navy's Motive

Samson alleges that both the Navy's alleged commitment not to move any cargo between Adak and Puget Sound via the air mode, and the Navy's 60 FEU minimum space requirement, were intended as an inducement to Samson to offer the Government the lowest possible rates.

**My opinion**:   It is my opinion that there is no evidence in the record that Samson based its pricing on volumes greater than those projected; the evidence is that they based their pricing on spreading their costs over only a subset of the projected volumes. Samson's revenue goal, which formed the basis for their pricing of their bid, was geared towards covering $190,000 of voyage-related costs, plus minor landside service costs eventually measured at $19,000 per sailing – and they more than covered that revenue goal at the rates they bid and over the volumes they carried.

3

## C. Samson's Damages Theory

Samson alleges it incurred damages equal to unrecovered costs in its performance under the contract, due to the diversion to air mode, resulting in Samson not earning enough revenue on the Navy contract to cover its Navy contract costs.

**<u>My opinion</u>**:   It is my opinion that Samson's damages theory is contradicted by Samson's own  Expert Mr. George L Johnson, who predicated his analysis on the fact that Samson's bid to the Navy would have provided for Samson to earn a profit based on the revenues projected in the bid at the time the bid was made. He wrote, correctly:

> It is reasonable to assume that Samson would have undertaken to carry the Government's cargo on a long term basis only if Samson expected (at the time of the undertaking) that they would receive enough revenue to allow them to recover the costs reasonably allocable to the carriage of such cargo plus a reasonable profit.[5]

His analysis went on to contradict this correct assumption.

## D. Samson's Damages Methodology

Samson's expert, Mr. Johnson, based his report on a representation by Samson's counsel that: "The available information (including disclosures provided by the Government) is materially incomplete and materially inconsistent, and is therefore not sufficient to adequately identify the specific amount and nature of the cargo diverted."[6]

As a result, Mr. Johnson and Mr. Green do not estimate the damages directly by identifying which specific cargoes were diverted.  Instead, they estimate the impact of the presumed diversion only by inference and supposition, and based only on their manipulation of expense allocations within Samson's Expense Statements. Their damages are inferred from, and based on, assumptions about the alleged profitability (for Mr. Green, 20%; for Mr. Johnson, 10.015%) of the commercial cargoes absent the alleged diversion. From this, they derive an (incorrect) reallocation of costs from Samson's commercial carriage to the Navy contract, and an alleged non-profitability and unrecovered costs of Samson's military cargoes. In their cost allocation approach, they allocate Samson's costs to the commercial and the military segments based on what they assume would have happened absent the alleged breach.

Both of plaintiff's experts find that Samson had unrecovered costs allocable to the military contract.

---

[5] The Johnson Report, p.6.
[6] The Johnson Report, p.1.

4

**My Opinion**:  It is my opinion that Samson's damages methodology is an economically irrational method of calculating the damages associated with the alleged breach. (In Mr. Johnson's variant, it is also a self-contradictory methodology.) Their indirect method fails to (and in fact does not even seek to) measure the physical amount of cargo alleged improperly diverted to air carriage and away from Samson's barges. It thus fails to measure the alleged harm.

It also fails because it seeks to measure unrecovered costs allocable to the Navy contract without first examining whether there were any such unrecovered costs. And, there were no such unrecovered costs. Since the alleged breach would not have affected the costs of either the Navy segment or the commercial segment of Samson's operations, the experts have sought to measure (indirectly) Samson's Navy contract costs (for the allegedly diverted cargoes) that a direct method of measuring Samson's Navy contract costs demonstrates did not exist.

The evidence shows that Samson incurred no unrecovered costs for the Navy contract. There is no support for the assumption, in their methodology, that but for the Navy's improper diversion, of an unknown quantity of cargo to the air mode, Samson's commercial segment of its business would have had profit rates of 20% (by Mr. Green, in the Claim) or 10.015% (in Mr. Johnson's Expert Report). Their methodology also fails because it seeks to attribute, to the Navy and to this contract, the poor overall economic performance of Samson in the commercial segment of its business in the 24 months in question, and there is no basis for that attribution.

## E. Samson's Damages Computations

In its Complaint and Claim, Samson alleges damages of $9,643,286[7]; these were apparently prepared by Mr. John Green. I refer to this figure, and the approach underlying it, interchangeably as Samson's damages or Mr. Green's damages calculations, and I refer to the approach taken in the Claim as Mr. Green's approach.

In the opinion of Samson's expert, Mr. Johnson, Samson's damages were $5,824,417.[8] Mr. Green's damages are higher than Mr. Johnson's because he assumes that Samson's commercial profit would have been 20% (rather than Mr. Johnson's 10.015%) which implied lower commercial costs and, therefore, higher unrecovered costs for the Navy contract than implied by Mr. Johnson's assumption.

**My opinion**:   It is my opinion that Samson did not have any unrecovered costs allocable to the Navy contract. I determined that Samson's actual costs including profit for this contract were about $5.8 Million, or about $223,000 per sailing for 26 sailings, as predicated explicitly on their "Revenue Goal" of $190,000 for the overwhelmingly predominant water portion of the contract. Mr. Green, in the Claim, incorrectly measured

---

[7] The Complaint, Exhibit B, p. 31; and The Claim, p. 2.
[8] The Johnson Report, p. 8.

these costs including profit at $16.8 Million, or about $637,000 per voyage; Mr. Johnson incorrectly measured these costs at $13.5 Million, or about $518,000 per voyage [See Section III.D.6.].

## F. The Navy's Denial of the Claim

The Navy denied the Claim. The Navy denied the liability claims as well as the alleged damages. The Navy's Denial Letter concluded, in part, that:

- Samson earned "…a total revenue excess of $406,429.98 or 6.25% over projection."[9] and
- "…Samson Tug and barge did not base its rate on the possibility of moving cargo outside of that described in the Government's cargo volume forecast projection."[10]

**My opinion**: It is my opinion that the economic evidence that I have reviewed and analyzed supports and significantly strengthens those two conclusions. I have found that Samson told the Navy:

> However, the total revenue generated on the cargo shipped by the Navy must still cover the relatively high percentage of fixed operating costs related to the service.
>
> In setting its rates, Samson took those costs into account. Using its commercial rates from Seattle to Dutch Harbor as a beginning reference point, Samson lowered the rates for this portion of the move and then factored in the costs of operating a tug and barge round-trip between Dutch Harbor and Adak (since there is virtually no commercial cargo for Adak, almost the entire cost of that portion of the voyage is attributable to the government). It then added its costs at Adak, and a factor for overhead and profit on the Dutch Harbor-Adak-Dutch Harbor portion of the voyage.
>
> The resulting rates per measurement ton and for ancillary services are designed to generate enough total revenue to cover the reasonable costs of Samson's service.
> …
> In setting its rates, though, Samson could not reasonably count on transporting the entire amount of cargo projected…[11] [Emphasis in the original]

It is my opinion that the Navy could reasonably infer, by finding that Samson's actual revenue exceeded its projected revenue, that Samson did not have unrecovered costs on

---

[9] Exhibit 11, p. 6.
[10] Exhibit 11, p. 6.
[11] Exhibit 62, STB 102714-715.

this contract. And, I found that Samson had a revenue excess, above its explicitly delineated costs for performing its services under the contract, that was even more than the $406,429.98 that the Navy was aware of at the time of the Denial Letter.

It is my opinion that not only did Samson not base its rate on the possibility of moving cargo outside of that described in the Government's cargo volume projection; but, in fact, all Samson documents in the record indicate that Samson based its initial rates for this requirements (REQ) contract, for the initial terms of this contract, on carrying 80%, later 89% after a rate reduction, of the Government's cargo projection.

It is my opinion that the Navy's denial of the damages portion of the claim was supported by the economic factors stated in the Denial Letter, and that Samson suffered no unrecovered costs.

# III. Detailed Analysis

## A. Samson's allegations as to liability

Samson alleges two breaches or failures that "resulted in economic losses and damages."[12]

Samson alleges a breach of contract by the Government "… by shipping a substantial volume of 'Contract Cargo' with other government entities and other private carriers,"[13] through "The failure of the Government to utilize Samson for shipment of all non 'Excepted Category' military and military sponsored 'Contract Cargo' as required by the contract…"[14] Samson alleges that "the Government shipped a large volume of 'Contract Cargo', utilizing military aircraft and civilian commercial carriers."[15]

Samson also alleges that it was a breach for the government to not fully utilize the minimum space that the contractor was required to provide. The minimum space was specified as capacity to carry "… no less than (60) 40' containers of which (1) ten spaces must be capable of accepting 40' refrigerated containers and 2,000 square feet of protected breakbulk/vehicle stowage."[16]

### 1. The elements of Samson's allegations

There are, in essence, three elements to Samson's allegations:

- The Navy breached its contract, by not shipping "all" of the Adak cargo via Samson's barges as required by the REQ contract.

- The Navy diverted cargo to the air mode instead of Samson's barges.

- The Navy did not fill all, or even a majority, of the 60 FEU per sailing, per direction, that the Navy required as part of the contract.

At its simplest, Samson alleges that some cargo (*i.e.*, all of the air cargo) was illegally and improperly **<u>diverted</u>** from carriage via Samson's barges to air carriage.

---

[12] The Complaint, p. 6, ¶ 11.
[13] The Complaint, p. 6, ¶ 11.
[14] The Complaint, p. 6, ¶ 11.
[15] The Complaint, p. 6, ¶ 12.
[16] The 1995 Contract, Section C-1.1, p. 6 (STB 103041).

2.  The cargo that was actually committed to Samson in the REQ contract

The documents in the record shed light on the cargo that was actually committed to Samson in the REQ contract.

a.  Contractual provisions

In its complaint, Samson never mentions the following contract provision, which was cited by Navy's response, on January 15, 2002, to the Claim:

C-9 Description of Basic Services and Guarantees

C-9.2  The Government agrees that it will use the Contractor's service to transport all military cargo "offered for ocean movement" in the DTS except "Excepted Category" cargo and any unit moves of military personnel and supporting equipment, which will be shipped with the Contractor at the Government's option.[17] [Emphasis in the original]

Samson filed a Claim against the Government for the two preceding contracts (1991-1993 and 1993-1995) alleging that the government's failure to properly make cargo projections. They alleged a Government error and insufficient care in making the projections, which caused the projections to be too high, and caused Samson to suffer the damage of an insufficient amount of cargo for the rates Samson bid, and consequently a revenue shortfall. Samson claimed their rates were bid based on the explicit projections by the Navy. Samson did not include any claim based on being denied potential revenue from improperly diverted air cargo in either of those two Claims.

In those two prior Contracts and Claims by Samson, Samson experienced a revenue shortfall compared to the revenue it would have earned had the cargo projections been realized.  Samson argued that it had a revenue shortfall compared to its costs for the Adak service.  I consulted to counsel for MSC on those Claims, I was asked to help with settlement of those claims and I made settlement suggestions; I was not involved in the final settlement.

In this case, however, as I detail below – and as the Navy noted in its denial of the Claim – there was no revenue shortfall. There is economic evidence, supporting statements in Samson's letters to MSC, that Samson's bid rates were structured to cover all of its costs, plus profits, at volumes lower than the projected levels.  The economic evidence is clear; there was no failure by Samson to cover all of its allocated costs for the government contract, and the plaintiff's experts' theory of unrecovered costs do not fit the economic facts in this claim.

b.  Economics of the air/sea choice

I am familiar with the economics of contracting in this market, as well as in other military markets.  Based on my review of the record revealed in discovery, I am familiar with the

---

[17] Exhibit 11, pp. 3-4.

9

negotiations between Samson and the government during the bidding process and with the actual execution of the contract and delivery of the service.

The Government has indicated, in its Claim Denial, that some cargo moved by air between Adak and CONUS (the contiguous 48 states) during the contract period. The exercise of that modal choice should not surprise anyone. Air movements are generally much more expensive than ocean movements. The large difference reflects the lower resource cost to direct and propel a vehicle through the water versus through the air, and the generally much larger size of water vessels compared to aircraft. Therefore, when cost is the dominant factor in the decision-making, it is the barge that tends to get the traffic. When other factors are important, and expediting is desired, the cargo tends to move by air.

     c.    Samson's contemporaneous explanations of what "all the cargo" meant

Mr. Halko's letter to MSC of August 10, 1995 encapsulates Samson's understanding:

> For the IDIQ alternative [the initial form of the 1995 contract] Samson relied primarily upon the cargo volumes included in the guarantee in setting its rates. Since the first firm period of the contract will occur during the winter months, when historically the least cargo has moved to Adak, Samson considered it unlikely that cargo in excess of the minimum guarantee [13 FEU per round trip, rather than the total projection of 24 FEU per round trip] would be shipped. In any event, under the IDIQ alternative, the government reserves the right under the contract to ship amounts in excess of the minimum guarantee by other means, so the carrier cannot rely on receiving all the cargo shipped by the Navy in excess of the minimums.[18]

On the next page, he goes on:

> For the requirements contract alternative, Samson assumed that the Navy would ship at least the minimum shown in the IDIQ alternative, plus <u>some</u> portion of the balance projected in Attachment 5.[19] [Emphasis added]

Mr. Halko's analysis starts with the total cargo projected in the RFP. He divides the cargo into the IDIQ minimum and the balance between that and the total cargo projection. He further divides that balance into two parts.[20] Thus, his description, correctly, identifies three segments:

1. The Infinite Delivery – Infinite Quality ("IDIQ") minimum;
2. "[S]ome of the balance" (which Samson "assumed that the Navy would ship" via Samson); and,

---

[18] Exhibit 62, STB 102714.
[19] Exhibit 62, STB 102715.
[20] Exhibit 62, STB 102714 - STB 102715.

3. The remainder of the balance, which Samson <u>did not</u> "assume that the Navy would ship" via Sampson.

Mr. Halko goes on:

> In setting its [REQ] rates, though, Samson could not reasonably count on transporting the <u>entire</u> amount of cargo projected, for several reasons. First, the RFP states that it does not guarantee the Navy will ship the entire amount projected. Second, the firm fixed 6-month initial period under the contract will occur in the winter months when traffic normally declines; the Navy is making no firm commitment to exercise the option, or to use the carrier for the option periods. Third, the Navy's previous estimates have been off by as much as 25% in the past, and the contracting officer pointed out at the pre-proposal conference that the base closure process is only increasing the uncertainty of the Navy's estimates.[21] [Emphasis in the original]

    d.    Samson's IDIQ and REQ volume assumptions, in FEU

This RFP was initially issued, in March, 1995, as an IDIQ contract, and, ultimately as either an IDIQ contract or a REQ contract. Importantly, both RFP's were predicated on <u>the same</u> cargo volume projections.

The IDIQ RFP guaranteed the carrier that the government would pay for at least 13 FEU per round trip voyage, even though the Navy was projecting 24 FEU per voyage.[22]

Samson predicated their IDIQ bid on carrying somewhat more than the minimum guaranteed; they based the bid on 15.76 FEU, later rounded up to 16 FEU.[23]

Separately, in the bid sheets for the Adak REQ bid, Samson's calculations are explicitly based on 80% of the Navy's projections which, on a container basis, adds up to 19.2 FEU.[24]

| **FEU per Voyage Bases Of Samson's Bids** | | |
|---|---|---|
| **Minimum, in the IDIQ** | **13** | **FEU** |
| **Expected, for the IDIQ** | **16** | **FEU** |
| | | |
| **Minimum, for the REQ** | **0** | **FEU** |
| **Expected, for the REQ** | **19.2** | **FEU** |
| | | |
| **Navy Projected, IDIQ & REQ** | **24** | **FEU** |

---

[21] Exhibit 62, STB 102714.
[22] The 1995 Contract, Attachment 4, p. 66 (STB 103106).
[23] Exhibit 48, STB 101497, STB102553,
[24] Exhibit 48, STB 101892.

Thus, the IDIQ and the REQ contracts differed in their expected risk/reward profiles. The REQ had a lower possible downside, but a higher expected upside.

The risk/uncertainty tradeoffs for both the government and the bidders, such as Samson, were also expressed, in part, in Samson's own suggestions to the MSC – that entertain alternative contract specifications, so as to minimize risks borne by the contractor and the Navy.  These alternatives are shown in Samson's suggestions for "Sliding Scale Bid" and "Time Volume Bid" proposals to the Navy. [25]

e.    The "Strong Texan" episode

Towards the end of the prior contract, there was a dispute – regarding southbound hospital cargo of a Navy contractor – over whether Samson should have to compete with the barge "Strong Texan" for that cargo, and whether Samson should have carried that cargo under the contract, or at what non-contract rates. For the contract at issue here, Samson was very concerned that such a competitive problem <u>with another water carrier</u> not occur in this contract. The "Strong Texan" episode had nothing to do with air carriers.

The reference to the "Strong Texan" appears in Exhibit 45 to Mr. Halko's deposition, which is subtitled "(Notes kept during the bidding of RFP N62387-94-R8530)." [26]

An entry for August 25, 1995 states, in part:

> We told them [Lucille Ludwig and Ken Allen of MSC] even though they were guaranteeing a minimum [only 13 FEU per round trip] under the this type of bid [IDIQ] we felt that because they left the option for the Navy to ship cargo via other means over the minimum, we could not base a bid on volume [the entire amount projected] other than the guarantee. Lucille said the wording is in all IDIQ contracts and they could not change it. We said we realized that may be the case but none the less we felt this could mean every time there were shipments that exceeded the minimum or Unit Moves we could either be faced with another Strong Texan or asked to lower the rates to get the move. She stated several times that the Navy had no intentions of bringing <u>in additional ships</u> and the bid was only set up to protect the carrier with a minimum guarantee. We said we could not go off this type of verbal guarantee but had to go with what was in black and white in written form.[27] [Emphasis added]

In an entry in dated September 5, 1995, Mr. Halko writes, in part:

> I told him [MSC's Ken Allen] what happened when the Strong Texan came in and moved the hospital out, that we had to fight hard politically to

---

[25] Exhibit 67, STB 101902-905.
[26] Exhibit 45, STB 102476-483.
[27] Exhibit 45, STB 102476.

12

get part of the move, then had to settle for rates below the contract we bid even though the Navy was 40% below their projections cargo wise. [28]

And, in his letter of September 13, 1995 to the Commander, MSC, wherein Samson lowered its final REQ rates, Mr. Halko writes:

> The lowered rates herein are a result of the extended firm contract period as outlined in Amendment A0014, and the various conversations between your office and ourselves concerning MSC's intentions towards their chartered <u>vessels</u> and outside carriers. You indicated that there were no intentions to bring in either of these sources of transportation for Unit Moves or Excepted Cargo but that your first preference would be to negotiate a fair and reasonable price with the contractor. We thank and commend you for taking this position. [29] [Emphasis added]

### 3.   Allegations about the 60 FEU Minimum Space Requirement

####     a.     Samson's allegation

Samson notes that the Navy did not fill all, or even a majority, of the 60 FEU per sailing, per direction, that the Navy required as a minimum space requirement part of the contract. The Claim suggests that failure to use all of the 60 FEU was a breach of contract.

At no point are Samson's damages calculated on the basis of this aspect of its claim – even though this method would have produced a fairly precise figure for damages. If Samson did believe the government had an obligation to fill all 60 FEU, it would have claimed a much higher damage. Using the Complaint figures, we get the following: since Navy cargo averaged only 25.25% [30] of these 60 FEU, the damages would be the remaining, unfilled, 74.75%; that figure is almost exactly three times the amount (25.25%) actually carried. And, so, the damages could have been estimated at about <u>3 times</u> the revenue ($6,909,568, the same figure used by the Navy in its Denial letter) that Samson actually earned – or about $20 million, instead of the $9,393,286 that was actually estimated by Mr. Green. [31]

In the alternative, Mr. Johnson could have used his 14.15% utilization figure of the 60 FEU. [32] Then the damages would be the remaining, unfilled, 84.85%; that figure is almost exactly <u>six times</u> the 14.15% carried. And, so, the damages could have been estimated by Mr. Johnson at six times the revenue ($7,653,104, by his estimate) that Samson actually

---

[28] Exhibit 45, STB 102477.
[29] Exhibit 63, STB 101352.
[30] The Claim, p. 14.
[31] 100% - 25.25% = 74.75% / 25.25% = 2.96 x $6,909,568 = $20.45 Million.
[32] The Johnson Report, Exhibit 2F. 'USN Adak- Actual MT Shipped-RT' / 'Navy's Space Reservation Requirement' = 27,193.38 / 192,125.00 = 14.15% Utilization.

earned. Instead of the $5,824,417 damages he estimated; he could have reached a damage figure of about $46 million![33]

These hypothetical calculations underscore how, even for Samson's damages experts; the 60 FEU minimum space requirement has no relevance to Samson's damages.

>    b.    The economic explanation in the record

The explanation for this space requirement is that the Navy expected significant variance, or surges, in the monthly offerings to the contractor. The actual variance is indicated in the charts that accompany the Claim and Mr. Johnson's report. More importantly, Samson understood this. Mr. Richard D. Gluck, Samson's counsel and the author of the Claim, understood that the 60 FEU had to do with the variance of individual movements. In the Complaint, in a letter dated December 10, 2001, from Mr. Gluck to Charles D. Winslow (MTMC), Mr. Gluck wrote:

>    As noted above[,] this space [60 FEU] exceeded the amount required to accommodate the cargo volumes estimated in the RFP, because the Government needed to reserve additional space to deal with fluctuations in demand, and to handle volumes of base closure related cargo that could easily exceed the estimates. [34] [Emphasis added]

Here Mr. Gluck writes that the 60 FEU had to do with variance from voyage to voyage, and with only the possibility that cargo projections could be exceeded.  Also, it would be logically impossible to both use the full amount on every voyage and deal with fluctuations from one voyage to another.

>    c.    Allegations of separate, unrecovered cost for the minimum space
>          requirement

The Claim states:

>    It was made clear to Samson at those meetings that on some voyages the Navy was planning to use much of the space it had reserved under the contract. However, the Navy never provided clear guidance about which voyages that would be, making it almost impossible for Samson to make contingency plans to book commercial cargo to fill the unused space.[35] [Emphasis in the original]

According to the Claim, two southbound voyages exceeded the 60 FEU.[36] The Johnson data states that one voyage northbound and four southbound had more than double the

---

[33] 100% - 14.15% = 84.85% / 14.15% = 6.00 x $7,653,104 = $45.89 Million
[34] The Complaint, Exhibit B, pp. 13-14.
[35] The Claim, p. 13.
[36] The Claim, p. 14, Table 1.

projected average for Contract carriage, of which two southbound were at approximately 75% of the 60 FEU level.[37]

Of course, Samson knew it had to provide that minimum space, in the event a surge of cargo materialized. It was part of, and implicit in, their bid consideration and was covered by their bid. But the failure to fill the difference between 60 FEU and the average amount carried has no economic bearing on this case.

Also, there is no evidence in the record that Samson suffered any significant opportunity cost or loss of commercial opportunities in providing this reserved capacity. According to the Claim, Samson's average utilization of its entire capacity was only 22.18%.[38] Therefore, on average, the space that was NOT reserved by the Navy was utilized at something less than 22.18%, and less than the 25.25% utilization by the Navy of the 60 FEU. On the other hand, the very low utilization of the commercial space goes some ways to explain why Samson did not perform profitably in its commercial segment during the contract period – a point I return to in discussing Mr. Johnson's failure to perform any market performance analysis to support his damages calculations.

4.  Unsupported, contradictory, expected cargo level allegations

At pages 19 to 21 in the Claim, Samson alleges three versions of the cargo they expected would be shipped and upon which their bid was allegedly based.

A. "The contract contained an estimated amount to be moved… 13,063 MT per year… Samson understood that this was the minimum volume that would be shipped outbound from NAF Adak." (p. 19)

B. "It is the conclusion of Samson that the Navy estimate was based on the minimum amount of cargo the Navy expected to ship during the contract term; the minimum space requirements [60 FEU on each leg] – as a Rated Order – reflected a reasonable forecast of the cargo volumes that could be expected to be moved during contract performance." (p. 20)

C. "Samson bid prices for various categories of cargo with the reasonable expectation that the Navy estimates were the minimum that would actually be shipped outbound from NAF Adak. (p. 21)

These allegations are self-contradictory, as well as unsupported in the business documents in the record.

Allegation A alleges a minimum of 13,063 MT from Adak, whereas projections consisted of 7,022 MT to Adak and 6,041 MT from Adak. There is no explanation for how the 6,041 MT projected from Adak in the RFP became a minimum of 13,063 MT from Adak.

---

[37] The Johnson Report, Exhibit 2.
[38] The Claim, Exhibit B, p. 15.

Allegation B states that the minimum was 60 FEU; since the 60 FEU applied to both directions, this means an alleged minimum of 60 FEU from Adak. At 47.2 MT per FEU for 13 sailings per year, this amounts to 36,816 MT per year outbound from Adak. This is 2.8 times as large as the 13,063 alleged in Allegation A. Furthermore, the 60 FEU is referred to, in self-contradicting fashion, as both the minimum projected and a reasonable expected figure.

C. Allegation C refers to the Navy's projections on cargo from Adak, which included only 6,041 MT as the expected amount from Adak. Alleging this figure as the "minimum" contradicts Allegation A.

The figure in Allegation A is more than double this 6,041 figure in Allegation C; the figure in Allegation B is more than six times this 6,041 figure in Allegation C.

And, not only are these Allegations self-contradictory; none of these allegations – regarding volume expected by Samson and regarding the volumes upon which Samson's rates were set – are supported in the record of Samson's planning, nor in the communication between Samson and MSC when the bids were filed, wherein Mr. Halko acknowledged: "…the RFP states that it does not guarantee the Navy will ship the entire amount projected."[39]

## B. Alleged Motive

### 1. Inducement to lower rates

Samson claims that the Navy promised cargo volumes higher than indicated in the projections, a preclusion of air cargo movements, and the promise of filling some or all of the difference between the 60 FEU minimum space requirement and the average projected cargo. The alleged motive was to induce lower bids by Samson, since Samson's expectation of higher cargos would lead to lower rates bid.[40]

### 2. The contradicting evidence

Samson's allegations as to the motive are contradicted by the economic evidence:

- By the definition of a REQ contract as distinguished from an IDIQ contract, the former has no guarantees as to volumes that will be shipped.

---

[39] Exhibit 62, STB 102714.

[40] The Claim, pp. 10-11, "At the same time it awarded the REQ contract to Samson, the Government renewed its contract with Alaska Airlines, and continued to ship cargo under that contract, even though the Government had contractually committed itself to ship that same cargo via Samson as an inducement to Samson to offer the Government the lowest possible rates." [Emphasis added]

- There were explicit disclaimers by the Navy which were communicated to the bidders, including Samson, that the projected volumes were not guaranteed.[41][42]

Samson's planning documents confirm the above and point to Samson NOT basing its bid on higher cargo volumes than the Navy projected; in fact, the explicit information, from Samson's computations and letters in the record of this case – is that they based their bid on the expectation of less cargo than the Navy projected, and that they calculated the rates in their bids to cover all of their fixed and variable contract-related-costs, plus profits, at those lower-than-projected volumes. As I show in section III.D.4, Samson's identified costs were fully covered (including a profit) once the volumes reached 89.4% of the projected level, and all cargo carried above that resulted in extremely high profit margins due to the absence of all but trivial marginal costs.

3.   In Mr. Halko's letter to MSC of August 10, 1995 he states:

[Comparing the current 13,831 MTONS projection in the RFP to the 47,416 MTONS projection in the RFP for the previous year] "Since the Navy is anticipating that it will ship at most only 29% of what it would ship last year…"[43] [Emphasis added]

The "at most" characterization does not support the allegation of Samson's expectation, based on the Navy suggestion, that even more than the projected volume should be expected.

Mr. Halko then goes on:

For the requirements contract alternative, Samson assumed that the Navy would ship at least the minimum shown in the IDIQ alternative, plus some portion of the balance projected in Attachment 5. In setting its rates, though, Samson could not reasonably count on transporting the entire amount of cargo projected, for several reasons. First, the RFP states that it does not guarantee the Navy will ship the entire amount projected. Second, the firm fixed 6-month initial period under the contract will occur in the winter months when traffic normally declines; the Navy is making

---

[41] Exhibit 11 ("The Denial Letter"), p. 5.

[42] The 1995 Contract, Attachment 4, STB 103108: "The projections provided are not in any way guarantees of actual cargo quantities to be lifted by the successful offeror."

[43] Exhibit 62, STB 102714. Mr. Halko's figure of 13,831 MTONS appears to include 831 MTONS of cargo that is not part of what the RFP referred to as "Ocean Transportation": 7,022 Measurement Tons Outbound and 6,041 Measurement Tons Inbound totaling 13,063 Measurement Tons and what the bid preparation worksheets refer to as "water only". Either this is an error. Or, it refers to some additional items that are low-rated items that Samson itself pays for out-of-pocket, for which Samson incurs a direct expense, and are likely part of the 6,870 MTONS the RFP referred to as ancillary services. In my analysis below of Samson's bids and its revenue requirements, I include all the cargo projected and carried and all the revenue projected and earned by Samson. Mr. Johnson's number diverges even farther from the RFP: he shows, at his Exhibit 2F, "Navy Pre-Contract Estimate" MTONS of 28,806.58 for 2 years, or 14,404.3 MTONS per year. None of these relatively small discrepancies impact my conclusions.

no firm commitment to exercise the option, or to use the carrier for the option periods. Third, the Navy's previous estimates have been off by as much as 25% in the past, and the contracting officer pointed out at the pre-proposal conference that the base closure process is only increasing the uncertainty of the Navy's estimates.[44] [Emphasis in the original]

Samson's letter, and the work papers underlying the construction of their bid, confirms that the rates they bid and the costs covered in their bid, were based on an expected volume <u>below</u> projected levels, so Samson's rates were not lowered by Samson in expectation of carrying cargoes <u>above</u> projected levels.

## C. Samson's Damages Allegations

### 1. Samson's service

Samson served two markets on its voyages: a commercial market (or segment) and the Navy market at Adak; it incurred joint costs for the two markets. Samson served Adak via an approximate 5-day round-trip[45] extension of every other sailing on their bi-weekly regular service loop during the period in question; that loop, between Seattle and Dutch Harbor, which serves several ports along the way, takes at least 36 days.[46] Thus, the extension to Adak added only 5 days of Navy service effort to at least every 72 days of commercial service effort.

To compare the revenue to the costs in the Navy market, the plaintiff's two experts took the total costs incurred and divided them between – allocated them to – costs for the commercial segment and costs for the Navy segment. Thus, for a fixed amount of cost, $1 less allocable to the commercial segment means $1 more cost allocable to the Navy segment.

### 2. The Claim (damages) prepared by Mr. Green

Samson's Claim alleges that Samson did not cover its expenses for its Military contract – and so an "Equitable Adjustment" (EA) is appropriate, and Mr. Green performed an EA as damage. The Claim, and Mr. Green's calculations and discussion, focus on Navy contract costs, alleging <u>unrecovered costs</u>. See, for example:

Section C. Development of the Damages Proposal… "Samson's Proposal for Damages [is] Based on Costs Incurred"[47]

Section D. "Assumptions Used in Developing the Request for Equitable Adjustment", point 4: "The pricing concept applicable to this claim is

---

[44] Exhibit 62, STB 102715.
[45] Exhibit 48, STB 101497.
[46] The Johnson Report, p. 2.
[47] The Claim, p. 24.

:"actual costs incurred," i.e. what were the costs that Samson incurred in being prepared to carry all Navy cargo to/from NAF Adak."[48]

Section D. "Assumptions Used in Developing the Request for Equitable Adjustment", point 5: "… Samson was <u>unable to recover much of the costs incurred in operating to/from Dutch Harbor and NAF Adak</u>, and the properly allocable share of costs for the Seattle-Dutch Harbor segment of the movement…"[49] (Emphasis added.)

Section D. "Assumptions Used in Developing the Request for Equitable Adjustment", point 6: "…Samson <u>would have recovered its costs</u> of operation and made a profit if the Navy had not breached the contract."[50] (Emphasis added.)

Mr. Green concluded that Samson "… incurred additional costs over and above the revenue received from the Navy of <u>$7,911,209</u> (after removing unallowable costs) to transport the Navy cargo which was shipped during the contract period."[51] [Emphasis in the original] He then adds $1,482,077 as an additional claim for "reasonable" profits.[52]

### 3. Mr. Johnson's Expert Report

Mr. Johnson's expert report also focuses on damages in the form of unrecovered costs. Mr. Johnson claims that his methodology to determine Samson's damages is to calculate "the difference between what was actually paid to Samson under the contract and an amount of revenue sufficient to cover the cost reasonably allocable to Samson of performing the contract plus a reasonable profit."[53]

Mr. Johnson writes, in an in-text table, that for Military Contract Revenue of $7,653,104[54], Samson had "Total costs allocable to Military Contract" of $12,252,291." As a result, Mr. Johnson alleges an "Operating Loss On Cost (before adjustment)" of $4,599,187, plus a "Reasonable Profit (10%)" of $1,225,229, for "Total Damages" of $5,824,417.

---

[48] The Claim, p. 25.

[49] The Claim, p. 26.

[50] The Claim, p. 26.

[51] The Claim, p. 27.

[52] The Claim, p. 31.

[53] The Johnson Report, p. 4.

[54] Mr. Johnson used $7, 653,104 as his measure of actual revenue. Mr. Green used $6,909,567 – the same as did the Navy in its denial letter. There are also differences between the two experts on how they measured Samson's actual carriage and the cubic measure of the 60 FEU space requirement. These discrepancies have no impact on my conclusions and opinions.

**Mr. Johnson's Computation of Damages**[55]

| | |
|---|---|
| Revenue | $7,653,104 |
| Total Cost Allocable to Military Contract | $12,252,291 |
| Operating Loss on Cost (before adjustment) | $4,599,187 |
| Reasonable Profit (10%) | $1,225,229 |
| **Total Damages** | **$5,824,417** |

4.   Samson's damages are based on inference from income statements

Both of the plaintiff's experts assumed that, but for the alleged diversion, Samson would have realized a specific rate of profitability of the commercial segment during the 24 months of the contract period, October 1, 1995 to September 30, 1997.  Mr. Green assumed a 20% profitability rate and Mr. Johnson assumed a 10.015% profitability rate.[56]

In the contract period, as presented by Mr. Johnson, Samson had, overall, revenues of $45,439,387, overall expenses of $46,872,025, and a loss overall of $1,432,638, which was a loss of 3.1% of overall expenses.[57] (Mr. Johnson also states that he believes that, before consideration of the impact of the alleged liability and diversion, Samson earned a profit on its military segment.)

Samson and Mr. Johnson assume that Samson's total costs would not have changed materially had there not been an alleged diversion. Both of the plaintiff's experts assumed that the commercial sector would have, normally, been profitable, but for the alleged breach. That is, that the commercial sector would have been profitable had the alleged diversion not occurred. Therefore, when Mr. Johnson reconstructs Samson's income statement to what he proposes it would have been if not for the breach, he finds – again, by assumption – that Samson would have earned a 10.015% profit in its commercial segment, and its commercial costs would have been less than its commercial revenue.[58]

Mr. Green does the same analyses, except he used 20% for the commercial section profitability.  Having used these assumptions about commercial profit to identify costs allocable to the commercial segment, he subtracts those costs to get the costs supposedly allocable to the Navy segment according to his methodology. By this method, he finds that the military costs purportedly exceeded the revenue, and that Samson had unrecovered costs in the execution of its Navy contract. His damages computations equal those unrecovered costs, plus a profit on the total allocable costs.

 Mr. Johnson writes that he has computed the "Total Cost Allocable to Military Contract" ($12,252,291), which he then subtracts from actual Military Contract Revenue of $7,653,104, to derive an Operating Loss on Cost of $4,599,187; he then adds a "reasonable" profit of $1,225,229, which is 10% of cost, to derive total damages of

---

[55] The Johnson Report, p. 8.
[56] The Johnson Report, p. 7.
[57] The Johnson Report, Schedule 3.
[58] The Johnson Report, Schedule 3.

$5,824,417.[59]  By a similar method, but assuming a 20% commercial profit rate, Mr. Green derives total damages of $9,393,286.[60]

In both instances, Samson's experts' damage calculations have no economical connection or linkage to the alleged liability. Samson's experts simply assume that Samson's commercial business segment must have been profitable in the contract period – at a rate equal to an inferred and unsupported historical rate [See Section III.F] – even though the facts show the opposite: that the Navy cargo was profitable. Moreover, the amount of cargo that would need to have been diverted to support the assumed revenues in Samson's experts' calculation would result in an implausible amount of air cargo. [See Section III.G.2.b.]

Nevertheless, based on the assumption of profitable commercial traffic, Johnson and Green contend that the companywide losses, and losses on the commercial business segment, were caused solely by the Navy, and that Samson, in fact, had losses on its Navy contract – in the form of unrecovered costs in the performance of that contract. However, these allegations about losses on the Navy contract are contradicted by the facts and the clear economics of Samson's bid and its business, which I detail later in this Report.

## D. Samson's Bid Documents Contradict Samson's Experts' Conclusions About Unrecovered Costs

1. Samson's explanation to the Navy (MSC)

I have reviewed the documents and exhibits that reflect Samson's preparation and submission of its REQ bid on the relevant contract. They show the planning details that underlie what Mr. Halko wrote in his letter of August 10, 1995 to the Commander, MSC, which accompanied and explained his bid on the REQ contract.[61]

Mr. Halko wrote as follows:

> However, the total revenue generated on the cargo shipped by the Navy must still cover the relatively high percentage of fixed operating costs related to the service.

> In setting its rates, Samson took those costs into account. Using its commercial rates from Seattle to Dutch Harbor as a beginning reference point, Samson lowered the rates for this portion of the move and then factored in the costs of operating a tug and barge round-trip between Dutch Harbor and Adak (since there is virtually no commercial cargo for

---

[59] The Johnson Report, p. 8.
[60] The Claim, p. 31, "Step 17".
[61] Exhibit 62, STB 102713-724: a 12-page letter including attachment dated August 10, 1995 from Mike Halko to the Commander, Military Sealift Command.  I refer to this as the "Halko Letter".

Adak, almost the entire cost of that portion of the voyage is attributable to the government). It then added its costs at Adak, and a factor for overhead and profit on the Dutch Harbor-Adak-Dutch Harbor portion of the voyage.

The resulting rates per measurement ton and for ancillary services are designed to generate enough total revenue to cover the reasonable costs of Samson's service.[62]

Samson's work papers lay out the costs they anticipated they would incur (and thus needed to cover) including provisions for profit. The same documents show the volumes they anticipated they would carry, over which they spread these costs. My review of these documents [See Section III.D.6.] show that Samson did not experience unrecovered costs on their Navy contract. Thus, Mr. Halko's verbal description is confirmed and detailed by Samson's business documents in the record, which I analyze below.

2. Samson's IDIQ bid preparation

Samson started developing its bid as early as December 1994, in response to the upcoming Adak RFP.[63] I have analyzed that bid development process, relying on the following documents:

- Exhibit 48, STB101497-501: a 5-page memo dated April 17, 1995, from Tom Ousdale, the General Manager, in Seattle, to George Baggen, in Sitka. I refer to this below as the "Ousdale memo"

- Exhibit 67, STB 101891-914: a 24-page memo from Mike Halko to File, dated November 9, 1995, on the Subject "Adak Bid N62387-95-D-8503." I refer to this below as the "AdakBid Sheets."[64] The final bids, after negotiation, are contained in "ADAKBID9", STB101906-907.

- Exhibit 62, STB 102713-724: a 12-page letter dated August 10, 1995 from Mike Halko to the Military Sea Lift, which I have discussed above. I refer to this below as the "Halko Letter"

In the Ousdale memo, Samson assumed that they would carry 15.76 FEU per Round Trip voyage,[65] rather than 13-FEU minimum guaranteed in the IDIQ or the 24 projected by the Navy.[66]

---

[62] The Halko Letter, STB 102714.
[63] Exhibit 48, STB100544.
[64] Exhibit 48, STB 101891: "Following are copies of various spread sheets and data analysis that I worked up for the contract bid. The final bid numbers were a combination of these sheets."
[65] Samson's work papers assume that 15.76 FEU is equivalent of 554 measurement tons (mt) for the Cargo NOS portion, sometimes rounded to 16 FEU in the work papers.
[66] See Halko's handwritten comments in Exhibit 48, STB101499.

Samson calculated costs of $74,233 to make the 5-day round trip for operating a tug and barge round-trip Dutch Harbor/Adak, including tug and fuel, and costs in Adak.[67] These $74,233 direct costs are then spread over 15.76 FEU per Round trip voyage, to yield $4,710 per FEU.

To this they added 35%, to cover overhead and a profit, bringing the total to $6,357.84 per FEU.

They then added an additional $3,000 per FEU of revenue to cover "Seattle [sic] to Dutch" [68]

Marine insurance for Dutch Harbor/Adak, of $127.16, bringing the total to $9,485 per FEU.

These figures allow us to compute the highest possible measure for the <u>direct costs</u> of serving Adak. These include: the insurance cost of $127.16 per FEU, allocated to 15.76 FEU per voyage, amounts to $2,000 per voyage; the $74,233 for the other Dutch Harbor/Adak voyage cost; and, at most, 35% of the latter, which equals $25,982. Adding the three components yields a total of $102,219 as the direct plus indirect cost plus some profit for serving Adak. This is the total <u>direct cost per voyage for serving Adak</u>, since Samson serves Dutch Harbor on a regular basis as part of its regular service.

Returning to the $9,485 per FEU, it equated to a rate of $200.95 per measurement ton for the major cargo type, Cargo NOS.[69] This $200.95 per mt (measurement ton) became the Cargo NOS rate in the IDIQ bid.[70] The volume expected for the Cargo NOS for the IDIQ bid was for 67% of the 9,920 mt yearly projections for that category, spread over 12 months, yielding 554mt per voyage.[71] Multiplying 554 times $200.95 yielded $111,326.30 in revenue. So, this $200.95 rate was designed, as outlined above, to ensure that, if Samson captured 67% of the cargo projection for the IDIQ contract, it would cover all of the "water-only"[72] costs associated with carrying the Adak cargo, plus overhead and profit, and also yield, in addition, an incremental profit on the "Seattle [sic]

---

[67] There are other Adak cost estimates in the record, for earlier periods. See, for example, STB 100725, 726, which show $76,000 as the average voyage cost for the Adak Military portion of the service for the 13 voyages between 10/1/93 and 03/18/94, and see page STB 100727, "SAMSON TUG AND BARGE CO., INC. SCHEDULE OF ADAK OPERATING EXPENSES BUDGET FOR THE SIX MONTHS ENDING MARCH 31, 1995", showing $84,138 as the "NET ADAK COSTS".

[68] Item number 3, the $3,000 per FEU, corresponds to what Mr. Halko referred to in the Halko Letter as "Using its commercial rates from Seattle to Dutch Harbor as a beginning reference point."
From an economist's perspective, the $3,000 per FEU charge can be considered an additional, incremental profit for Samson, since it covers a cost that Samson would have had to incur even if Samson did not serve Adak, unless there were forgone commercial cargo, for which there would be opportunity cost. However, I have seen no evidence in Samson's documents that there was any forgone commercial cargo in this period.

[69] Exhibit 48, STB 101498.

[70] The Halko Letter, STB 102717.

[71] Exhibit 48, STB 101500.

[72] Exhibit 48, STB 101499.

23

to Dutch" leg.[73] At this point in the bid evolution process, the "water only" revenue totaled $162,471.35 per sailing.[74]

### 3.  The development of Samson's first REQ bid

Samson's REQ bid was based on the assumption that they would carry only 80% of the Navy's projected amounts: 19.2 FEU or 610 mt.[75]  This 610 mt is 10.1% more than the 554 mt assumed in the IDIQ bid.  To achieve the same total revenue for Cargo NOS, Samson adjusted their Cargo NOS rate down 9.1%, to $182.86, to account for the additional cargo used in the calculation.[76]   The resulting $111,544.60, covering all of the "Water Only" costs, was the major component of achieving their stated "Goal of $190,000.00 per voyage."[77] This "Goal" was about $28,000 per sailing higher than the $162,471.35 "water only" summary on Samson's IDIQ worksheet STB 101499.

Samson's first REQ bid, "adakbid5,"[78] captured the same $190,000 per voyage goal, merely dividing the revenues differently – raising the Cargo NOS, B.B. FAK & Veh, and Reefers rates, and lowering the Vehicles rate.[79]   Nevertheless, the total, $190,000 per voyage was effectively unchanged, and thus continued to cover all of Samson's anticipated costs, as well as overhead and profit. Samson also needed to cover its landside

---

[73] I note that this worksheet of Samson's excludes the other cargo and cargo-handling items that were part of the complete bid: tanks, ancillary services, miscellaneous services, and drayage service.

[74] Exhibit 48, STB 101499; this figure covers revenue from the 4 main categories of cargo: General cargo, Breakbulk general cargo and vehicles, vehicles at a separate rate, presumably loaded in containers; and Reefer.

[75] Exhibit 48, STB 101892, "Based Upon Utilization of 80% of the Projected Cargo".  In his deposition, at page 124, Mr. Baggen brought up a new theory – that he expected 20% more cargo than was predicted in the RFP – even though he also stated, at page 123, that Mr. Halko based Samson's bid on only 80% of the projections.  There is no reflection in the bid preparation documents for the expectation of 20% more cargo than projected, and the Adak Bid Sheets are conclusively NOT based on this expectation. The historical record is that Samson carried less than was projected. In fact, for the previous two contracts, covering the immediately preceding 48 months, Samson sued the Navy because the traffic they carried was much less than what was projected by MSC.  See for example, the Halko Letter which states "We note that those [previous year] projection were at least 25% in excess of actual movements." STB 102714. It is possible that Mr. Baggen was referring to events in the past, such as the period 10/1/93 to 03/18/94 when Samson earned revenue at Adak on its "Adak Military" contract work and on other "Adak Private" work not part of the "Adak Military" contract, but a "spillover" from that contract work. (See his deposition, p. 57, 58, and STB 100726.) No such factor was included in the bid documents, and Mr. Halko stated, in the Halko letter (Exhibit 62, p. STB 102714) that "…(since there is virtually no commercial cargo for Adak, almost the entire cost of that portion of the voyage is attributable to the government.)"

[76] Exhibit 48, STB 101893 and STB 101499:  110.1% * (100%-9.1%) = 100%.  This equation can also be seen from the fact that the estimated revenue for Cargo NOS in the first stage of the REQ bid, $111,544.60 is identical (save for rounding) to the amount in the IDIQ bid, $111, 326.30

[77] Exhibit 48, STB 101893. These words appear several more times in the Adak Bid Sheets, see, STB 101895, STB 101897, and STB 101900. The "water only" portion includes Cargo NOS; Breakbulk FAK (Freight All Kinds) and vehicles – both bid at the same rate; Vehicles; and Reefers. In STB 101893, about $7,000 of revenue from Empty Tanks and Loaded Tanks is included in the list; in other sheets, these minor items are excluded – apparently as part of the fine-tuning of the eventual bid.

[78] Exhibit 48, STB 101900.

[79] Exhibit 48, STB 101900.

services, which, at 80% of the cargo projection, added costs of another about $17,000 per voyage.[80]

### 4.  Samson's final REQ bid still covered their anticipated costs

The Navy focused on Samson's submitted REQ bid rates, which had a lower total projected cost for the Navy than Samson's submitted IDIQ bid, and the Navy's selection criteria was based on lowest projected cost.[81] The Navy requested that Samson lower its REQ rates, and after negotiations, Samson agreed to lower only one component of its entire rate, the Cargo NOS rate.[82] This change lowered that rate by 15%,[83] which had the effect of lowering the water only revenue by $20,081 per voyage, or 11.8% of the revenue for all 4 cargo categories making up the "water only" revenue.[84] In effect, this lowered the weighted average of the water rates by 11.8%.

In the course of these negotiations, Mr. Halko informed the Navy that:

> "…we needed a set amount of dollars per voyage over the term of the contract and we could not lower all the rates, also that we based our bid off of what we felt the cargo shipments <u>would be</u> not against 100% of their projections. Reason for this was they have had a record of shipments lower than projections and we had to bid on <u>what we felt would be</u> shipped not what we were told would be shipped." [85] [Emphasis added]

Based on the agreed-upon reduction in rates, for Samson to achieve the equivalent of the $190,000 water only revenue goal they initially sought, they would have needed to carry approximately 111.8% of the initial 80%, which is about 89.4% of the projected cargo, rather than the 80% on which they based their initial bid.  However, because virtually all of the costs in question are fixed, the cost of shipping 80% of the projected cargo, or 89.4% of the projected cargo, or even 100% or more of the cargo, is effectively identical. Thus, although the average water rates were reduced by 11.8%, the revenue needed to cover Samson's costs (and to cover overhead and profit, as well as the "Seatle [sic] to Dutch" portion) remained the same, at $190,000 for the water only cargo, plus about $19,000[86] for their landside service, bringing their total revenue requirement to about

---

[80] These included the various additional services or equipment that were required to service the cargo moved on the barges; it included such items as drayage, stuffing and unstuffing containers, other ancillary and miscellaneous services, special temperature-controlled equipment to keep food items from freezing in the wintertime, and other equipment costs associated with tanks. Required revenue is derived by taking 80% of the projected revenue for the non-water portion of the bid, which is derived from Exhibit 11, the Denial Letter.

[81] See Exhibit 45, STB 102476.

[82] Exhibit 45, STB 102477.

[83] Exhibit 48, STB 101899 and STB 101906.

[84] $190,196.26 - $170,115.06 = $20,081.20 / $170,115.06 = 11.8%.

[85] Exhibit 45, STB 102477.

[86] With more water cargo needed, there would be more landside service required, adding 11.8% of the initial $17,000, or another about $2,000.

$209,000 per voyage, for 13 voyages per year, or about $2.7 million for the first year of the contract.[87]

### 5.   The second year bid likely follows Sampson's first year methodology

Based on my analysis of the bidding process for the first year of the contract, it is my opinion that the Samson bid was originally designed to cover all of Samson's costs, plus overhead, profit, and additional profit on the Seattle-Dutch Harbor leg, at 80% of the Navy's projections.  After making a rate concession, Samson's would reach this same point at 89.4% of the projected revenues.

For the second year, Samson and the Navy agreed on a 13.6% weighted average rate increase.[88] The record does not contain any information on the elements that went into Samson's bid construction, nor whether any rate negotiations and concessions occurred. It is reasonable to assume that Samson followed the same methodology – seeking to cover all costs (and profits) at the rates Samson bid, at 80% of the Navy volume projections. On the other hand, Samson's required share of cargo may have stayed the same, at 89.4%. Using this higher figure, it is my opinion that for the second year of the contact Samson would have fully covered its costs, and profit, at 89.4% of the projected revenues, which is 3.1 Million for the year or about $238,000 per voyage.

For the 2 years together, the costs were about $223,500 per voyage for 26 voyages, or $5.8 Million.

### 6.    Conclusions on alleged unrecovered costs

In the first year of the contract, Samson carried cargo sufficient to earn $3,597,139 in revenue.  Thus, they more than met the $2.7 million threshold to cover their costs (and earn a profit).

In the second year of the contract, Samson carried cargo sufficient to earn $3,312,428 in revenue.  Thus, they more than met my (conservatively high) estimate of a $3.1 million threshold to cover their costs (and earn a profit).

Based on these actual revenue figures (which are supported by both the Navy calculations and those made by Mr. Green) I conclude that Samson had no unrecovered costs.  Had I used the revenue figure calculated by Mr. Johnson ($7.6 million), my conclusion would only be stronger.  The additional revenue would amount to additional profit on top of the already covered costs.  Regardless of which of these two amounts one chooses as the accurate measure of Samson's actual revenue, **Samson did not incur any unrecovered costs on this Navy contract.**

---

[87] $190,000 + $19,000 = $209,000 x 13 = $2.7 Million.
[88] The projected revenue for the second year was $3,458,595, which is 13.6% higher than the $3,044,542 projected revenue for the first year, at unchanged volumes.

| ACTUAL NAVY CONTRACT COSTS AND REVENUES | | |
|---|---|---|
| Actual Costs | Actual Revenue | Unrecovered Costs |
| $5.8 MM | $6.9 MM | None |

On a per voyage basis for the 26 voyages to be performed over the two years, Samson's work papers demonstrate that Samson's total costs (plus profit), were approximately $223,000 per voyage or $5.8 Million. In sharp contrast, Mr. Green alleges that Samson's total costs, inclusive of profit, were $16.6 million or $636,648 per voyage, and Mr. Johnson alleges that Samson's total costs, inclusive of profit, were $13.5 million or $518,366 per voyage. These estimates are between 230% and 290% of the costs implicit in Samson's work papers, and thus **their estimates are overwhelmingly contradicted by the evidence in the record.**

| ACTUAL AND ALLEGED COSTS, PER SAILING | | |
|---|---|---|
| Actual Costs | Green's Allegation | Johnson's Allegation |
| $223,000 | $637,000 | $518,000 |

## E. The Navy's Denial of the Claim

The Navy denied Samson's Claim.

The Denial Letter identified, in part, the following claims by Samson: [89]

- The Navy "inflicted a substantial economic loss to Samson."
- Samson was owed an "…equitable adjustment for recovery of the costs that would have been recovered in the price of the terminated work…"
- Samson claimed "…it incurred additional costs over and above revenue received from the Navy of <u>$7,911,209</u> (after removing unallowable costs) to transport the Navy cargo which was shipped during the contract period." [Emphasis in the original]

The Denial Letter concluded, in part, that: [90]
- Samson earned "…a total revenue excess of $406,429.98 or 6.25% over projection." and
- "…Samson Tug and barge did not base its rate on the possibility of moving cargo outside of that described in the Government's cargo volume forecast projection."

---

[89] Exhibit 11, pp. 2-3.
[90] Exhibit 11, p. 6.

The economic evidence that I have reviewed and analyzed supports and significantly strengthens those two conclusions. I have found, and have detailed above, that:

- Samson did not incur costs that were not recovered in the price of the work done on the contract; [See Section III.D.6.]
- Samson had a revenue excess, above its explicitly delineated costs for performing its services under the contract, that was not merely $406,429.98, but in fact, far in excess of the $406,429.98 that the Navy identified at the time of the Denial letter;[91] and
- Not only did Samson not base its rate on the possibility of moving a cargo volume greater than that described in the Government's cargo volume projection; but, in fact, Samson based its rates by spreading costs over less projected volumes, initially basing rates on 80%, then (after a rate discount) over 89.4%, of the Government's cargo volume projection.

<u>The economic facts I have reviewed and analyzed clearly support the Navy's conclusion, when it denied the Claim, that Samson did not have any "additional costs over and above revenue received" on the Navy contract.</u>

The Navy's computation of the $406,429.98 total revenue excess was based on information that Samson called, in its bid sheets, the "Navy View". In answer to Samson's question to the Navy regarding "…how they [the Navy] would be calculating the bids…", Samson had been informed that the Navy "…would take the total projections at the rates given for each type of proposal [IDIQ and REQ] and the lowest dollar value bid would be the lowest bid.".[92] The Navy made its Revenue Projection based on 100% of the cargo projection. However, the Navy had been informed by Samson, in Mr. Halko's letter of August 10, 1995, that Samson spread its costs across a cargo volume that was less than 100% of the explicitly projected volume, but precisely how much less was not identified in that letter.

As the Samson documents show, and as I have presented above, Samson based the rates it needed to cover its costs, on carrying only 80% of the projected amount of cargo (or 89.4% after the rates were adjusted through negotiations). It is only with the benefit of discovery from Samson's records that these precise facts were revealed. Thus, the Navy's $406,429.98 "excess" revenue calculation is substantially understated.[93]

As I have shown above, Samson's "excess" of Actual Revenue over Projected Revenue was equal to the difference between $6.9 million and $5.7 million, or $1.5 million. Thus,

---

[91] Exhibit 11, Enclosure 2, Exhibit C, p. 11. $6,909,567,86 (Actual Revenue) – $6,503,137.88 (Projected Revenue) = $406,429.98 (Revenue Excess).
[92] See Exhibit 45, STB 102476.
[93] The Projected Revenue excludes potential additional revenue that Samson might earn, at no additional cost to Samson, for container minimum charges, for containers loaded with less than 47.2 MTONS per FEU. Samson's bid sheets estimate this potential at about $35,000 additional per year. See, for example, STB 101899, "Navy View, for 100% of the projection, and compare Cargo NOS revenue of $2,177,340.80 vs. "Revenue by Container of $2,212,371.40. This minimal amount does not affect the Navy's conclusions.

the Navy's conclusion that there were no unrecovered costs is correct, and it far understated the amount of Samson's revenue excess over their project costs.

My conclusion is that Samson did not suffer any unrecovered costs allocable to the Navy contract for the 24 months – October 1, 1995 to September 30, 1997. Regardless of whether any cargo was improperly diverted to air – that is, whether Samson was denied additional cargo by the improper actions of the Government (and I have seen no evidence of such improper actions), such a diversion could not have caused Samson to incur any unrecovered costs in its performance of the Navy contract, because Samson more than recovered their costs based on the cargo they did receive.

## F. Samson's Damages Methodology

In its Complaint and in its Claim, Samson alleges damages of $9,643,286, including unrecovered costs plus allowable profit as a form of cost;[94] these were apparently prepared by Mr. Green.

In the opinion of Samson's expert, Mr. Johnson, Samson's damages were $5,824,417, unrecovered costs plus allowable profit as a form of cost.

Although they use different numerical assumptions and a slightly different database, their objectives are identical: both seek to measure unrecovered costs allocable to the Navy contract.

Conceptually, Samson alleges that the Navy's breach caused Samson to incur unrecovered costs; its damages are estimated as that additional revenue needed to fully cover all of their actual costs, plus an appropriate level of profit. Mr. Green's computations are, essentially, "Equitable Adjustment" computations. Simply put – and ignoring very minor adjustments to the treatment of some "overhead" items in the category of SAGE expenses (Selling, Administration and General Expenses) – Mr. Green compared the actual Samson revenues to the revenues it would have had to earn if it had earned a 20% profit on its commercial cargos and covered all of its costs and earned a 10% profit on its military contract.

Mr. Johnson does not use that "Equitable Adjustment" terminology, but he follows the same approach as did Mr. Green. Mr. Green assumed that, but for the alleged breach, Samson's commercial cargo would have earned a 20% profit rate, whereas Mr. Johnson assumed that, but for the alleged breach, Samson's commercial cargo would have earned a 10.015% profit rate. That difference in assumption explains virtually all of the difference between the two calculations of Samson's alleged damages.

There is an irreconcilable problem – conceptual and logical – with the methodology that Samson's experts have used: it has no connection whatsoever with the alleged breach –

---

[94] The Complaint, Exhibit B, p. 32; and the Claim, p. 2.

the alleged air cargo denied to Samson. The alleged breach could not logically have caused the damages they compute. Their damages measure unrecovered costs, whereas the alleged air cargo denied to Samson could not have been associated with unrecovered costs; instead it would have resulted in profit without substantial costs. Even if Samson had carried more Navy cargo, for whatever reason, its costs would have remained virtually unchanged, and its Navy profits would have been higher.

       1.   Samson's indirect approach to damages must fail

In the Complaint and damages calculations, neither Samson nor its experts identify any actual cargoes as having been diverted.   This alleged diversion would have to be measured directly, based on some actual, diverted, air cargo movements – and the revenue that it would have produced for Samson. Direct measurement is the only valid approach to measuring the damages from the alleged breach of illegal diversion to the air mode.

Instead, they seek to measure the alleged diversion – illegally denied cargo that went by air – indirectly, in the form of unrecovered costs allocable to the alleged missing cargoes. That cannot be done; it is an improper approach.

If one seeks to measure Samson's unrecovered costs, and attribute them to something specific like the air cargo that was not carried, then one must first determine whether there were some unrecovered costs.[95]  To do that, one must first examine what Samson's actual costs were.  And in that examination, if one finds that the costs were covered, then the inquiry ends and there can be no claim of unrecovered costs.

Samson's experts did not analyze Samson's cost allocations. I did.  In my analysis I found no unrecovered costs.

The supposed absence of direct evidence is not a free pass to imagine non-existent costs. In his report, Johnson states that Samson's Counsel represented that the "available information (including disclosures provided by the Government) is materially incomplete and materially inconsistent, and is therefore not sufficient to adequately identify the specific amount and nature of the cargo diverted."[96]  Despite the claim that the air cargo evidence could not be found, Samson's documents are explicit as to their Navy-related costs.  No indirect analysis is needed to "back into" a figure which already exists in the record.

Mr. Johnson states that he followed the method he was instructed to use by counsel:

---

[95] Even if, hypothetically, one did find unrecovered costs, that finding would be necessary, but not sufficient; additional inquiry would still be needed, to ascertain the factors that contributed to those hypothetical, unrecovered costs. For this case, such additional inquiry was not needed, since there were no unrecovered costs on the Navy contract.
[96] The Johnson Report, p. 1.

> "In the absence of information sufficient to indicate the amount of business diverted by a contractor in violation of a requirements contract, the proper measure of damages is the contractor's revenue shortfall relative to the amount of revenue necessary to cover the cost of performance under the contract plus a reasonable margin" the proper method."[97]

The fact is Samson did recover its costs. Therefore, the method that Mr. Johnson was instructed to use is economically invalid; it <u>presumes</u> unrecovered costs that do not exist, and it seeks to measure damages in a way that have no relationship to the alleged harm. To reach such a conclusion requires studious avoidance of direct evidence in the record.

      2.  <u>Their Income Statement modeling is "pre-determined" to show damages.</u>

Since Samson as a company, overall, lost money in the contract years, its Experts' income statement methodology is "pre-determined" to come up with <u>some</u> alleged damage, regardless of the actual facts about Samson's operations and even regardless of whether there was or was not <u>any</u> improper diversion to the air mode.

There is only one significant fact that is necessary for their models to yield damages – and that is for Samson's actual financial results, their Profits and/or Losses in their commercial business, to be <u>lower</u> (less profitable) in the target 24 months than they presume should have arisen: Mr. Johnson's 10.015% profit rate and Mr. Green's 20%. If Samson had earned <u>any</u> amount of profit less than the assumed profit, regardless of the reason, Navy liability and damages would be inferred from their approach. Such a conclusion would be yielded by their models, even if we knew for certain that there was no diversion to air. This is simply illogical and incorrect.

Because the Navy component of Samson's business was relatively small, overall company loss rates would be primarily due to commercial segment loss rates, and company loss rates would have been caused primarily by commercial segment losses. Because the Navy component of Samson's business was profitable, especially in the 24 months at issue, overall company loss rates would be due <u>only</u> to commercial segment loss rates. Samson's alleged damages are directly correlated with overall, companywide losses.

This was actually demonstrated in this proceeding. Mr. Johnson corrected his initial Expert Report when he discovered that there was an error in his initial companywide revenue for 1997. He was missing $328,424, 75% of which is applicable to the contract period's nine months of 1997 (since the contract ended at the end of September 1997). So, he corrected his database for the $246,363 increase in companywide revenue. <u>This was a change that had nothing to do with the Navy contract</u>. Yet, as a result of this corrected data, the damages, which Mr. Johnson alleged, were reduced by almost the exact same figure– that is, by $246,311.

---

[97] The Johnson Report, p. 1.

But, of course, there is no economic logic to this. Why should about $246,000 more revenue in the commercial segment of Samson's business have caused the cargo value of the Navy's alleged diversion to be about $246,000 less?

And the answer is: there is no logical reason. The only reason this $246,000 commercial revenue increase led to $246,000 lower estimated damages is because the Samson damage models – Johnson's and Green's – attribute to the alleged diversion essentially all of Samson's marketplace problems for the period of the contract.  Their model <u>assigns</u> "damages" rather than <u>proves</u> damages.

This data "correction" is a clear demonstration of their models being "pre-determined" to produce damages, and they rely only on the simple fact that Samson did not average approximately 10% (for Johnson) overall, companywide profit, for the 24 months in question.

3.  <u>Mr. Green's 20% commercial profit assumption</u>

A major difference between Johnson's approach and Mr. Green's is that Mr. Green did not base his 20% profit rate on anything other than his "reasonable business judgment." The Claim went further than that; the Claim alleged that the Government had vetted Mr. Green's 20% figure. But that allegation is false.

Samson, in the Claim, wrote that "The Navy has previously tested the 20% profit number for non-Adak cargo and found by its own analysis that it was reasonably accurate."[98]

In Document Requests # 12 & # 13, Samson was asked for the documents that supported that statement on Page 25. Samson's response to those document requests was as follows:

> "Plaintiff will make available for inspection and copying, or has previously made available, the documents in its possession responsive to Defendant's request. Such documents include a draft written report and accompanying notes prepared by an expert for the U.S. Navy in a previously settled claim by Defendant (the "Nadel Report," attached hereto in Tab A). In addition, Plaintiff refers Defendant to Note II.b. of the attachment to its December 10, 2001 Claim entitled "Proposal Damages Based on Costs Incurred on USN Contract N62387-95-D-8503," already in Defendant's possession, which is also responsive to this Request."[99]

I am the "Nadel" referred to in the Response. I wrote the "Nadel Report" referred to, at the request of counsel for MSC at the time. I had been asked to help counsel understand the Request for Equitable Adjustment (REA) Claims that Samson had made regarding the two prior contracts, and to suggest possible approaches to settlement.

First, I have no knowledge of how this DRAFT Report came into Samson's possession.

---

[98] The Claim, p. 25.
[99] Plaintiff's Responses to Defendant's Second Request for Production, dated 4/13/2006, p. 3.

Second, I note that the Response failed to state that my report was headed "Privileged and Confidential" and "DRAFT" on every page.

Third, in my DRAFT Report, I wrote that Mr. Green prepared that 1999 REA, and based it on the 20% profit rate. He and I discussed that rate over the phone. He explained to me, as I stated in the DRAFT report, that his 20% commercial profit rate assumption was based only on his "reasonable business judgment."  In my DRAFT Report, I was merely reporting his characterization of his 20% figure.

While consulting to the Navy on the previous claims, I did not find that the 20% was "reasonably accurate" as a measure of profit for the commercial segment of Samson's market. In fact, I found, and reported, the exact opposite.

At page 21, I wrote[100]:

- "There is no support for the 20% figure", and
- The derivation of the 20% is suspicious, is not probative, and is a conclusion that cannot be derived from the underlying facts relied upon."

And, at page 34, I wrote[101]:

- "There is no support provided by Samson for 20% to be a reasonable business judgment."

I also note that Mr. Johnson, in the current case, started with, and then modified, my Table 6 from that DRAFT report as the basis for his damages study, since he relies on measures of actual and projected revenue to find the Navy profit and, based on that, the commercial profit. [102] I reject how he used my data.

    4.   Other features from the initial claim not appearing in Mr. Johnson's Expert Report

Mr. Johnson's damages study differs from that initially presented in Samson's Claim in the following additional ways:

- there is now no explicit mention of the claim being a request for Equitable Adjustment; [103]

---

[100] Plaintiff's Responses to Defendant's Second Request for Production, dated 4/13/2006, Tab A (STB 107126).

[101] Plaintiff's Responses to Defendant's Second Request for Production, dated 4/13/2006, Tab A (STB 107139).

[102] The Johnson Report, Appendix B, p. 26, item 6.

[103] The Claim, p. 26: "Assumptions Used in Developing the Request for Equitable Adjustment", point 5: "As a result of the Navy breach of contract, and failure to use the minimum space that Samson was contractually required to maintain for the Navy NAF Adak cargo, Samson was unable to recover much of the costs incurred in operating to/from Dutch Harbor and NAF Adak, and the properly allocable share of costs for the Seattle-Dutch Harbor segment of the movement…"

- the damages are now about $5.8 million (40%) lower;
- the rationale for the new profit rate is no longer "reasonable business judgment" but an application of an assumed, historically unchanging, 10% Navy profit rate; that rate was used to improperly derive, and then unjustifiably apply, an historical average for the commercial profit rate;
- the 60 FEU "reserved minimum space" is not considered part of the approach to damages, but is instead offered only as background; [104]
- Mr. Green made, and Mr. Johnson did not, references to prices charged in the Commercial sector and, in the summary, to a claim that "Samson must be made whole in damages either in terms of increased prices per MT of cargo actually shipped with Samson or in a lump sum"; [105] and
- Mr. Green did not predicate his analysis on a valid premise and then proceed to contradict it, as I show below; but Mr. Johnson did start with a valid premise, then proceeded to contradict it.

    5.    Critique of Mr. Johnson

I turn now to criticisms related mainly to Mr. Johnson's Expert Report.

    a.    Internal contradiction

There is a critical contradiction in his Report that invalidates his approach and results.

He wrote:

> It is reasonable to assume that Samson would have undertaken to carry the Government's cargo on a long term basis only if Samson expected (at the time of the undertaking) that they would receive enough revenue to allow them to recover the costs reasonably allocable to the carriage of such cargo plus a reasonable profit. [106]

In this statement, Mr. Johnson is correct. Had he actually used this assumption in his analysis, and the facts about Samson's cost allocations, I suspect there would be little divergence of opinion between his report and mine regarding unrecovered costs. However, in his analysis, Mr. Johnson ignores the critical phrase – "at the time of the undertaking."

From Samson's own work papers and the Halko letter, it is clear and obvious that Samson did just as Mr. Johnson assumes – they chose rates designed to recover their costs at the levels of cargo and the resulting revenue they estimated they would carry. Above, I have

---

[104] The Claim, p. 26: "Assumptions Used in Developing the Request for Equitable Adjustment", point 5: "As a result of the Navy breach of contract, and failure to use the minimum space that Samson was contractually required to maintain for the Navy NAF Adak cargo, Samson was unable to recover much of the costs incurred in operating to/from Dutch Harbor and NAF Adak, and the properly allocable share of costs for the Seattle-Dutch Harbor segment of the movement…"
[105] The Claim, p. 26.
[106] The Johnson Report, p. 6.

shown that Samson's analysis assumed that revenue of $190,000 of water revenue per voyage (their "Revenue Goal") was sufficient, over 13 voyages per year, to cover these costs.   This would have provided a total for the year of $2,472,551.[107]  As shown in their work papers, [See Section III.D.1.] and their written explanation to MSC,[108] this revenue goal also reflected their expectation and was enough for them, in Mr. Johnson's words, "… to recover the costs reasonably allocable to the carriage of such cargo plus a reasonable profit."[109]

Mr. Johnson's damages model contradicts his own, correct assumption.  Mr. Johnson goes through contortions to imply that Samson did NOT follow this rule.  Instead, implicitly, he has assumed that Samson submitted a final bid, such that if they received the exact amount of cargo the Navy projected, they would have fallen $5,824,417 short of the stated goal of   "allow[ing] them to recover the costs reasonably allocable to the carriage of such cargo plus a reasonable profit."[110]   This is nonsense, and relies on imagined expectation unsupported by Samson's own work papers or any business document in the record.

The only way for Mr. Johnson's conclusions about Samson's total costs (thus the unrecovered portion) to be coherent is to assume Samson acted entirely irrationally in its bidding.[111] But the record does not reveal that Samson acted irrationally.

From the perspective of tonnage, Mr. Johnson's damage model depends on his assumption that Samson expected to carry more cargo – about 76% more than they actually carried. But the facts do not show that Samson was spreading its cost across – "expecting to carry" – 76% more cargo, so Mr. Johnson's premise is violated, and his results invalidated.

In fact, Mr. Johnson never performs the essential step of any good economist: he never checks his answer for reasonableness against his own assumptions.  He assumes that Samson bid to ensure it would cover its costs.  But his cost estimate of $13.5 million is implausible in the face of Samson's actual bid. (This is essentially what the Navy found in its Denial letter.)

      b.   Correcting Mr. Johnson's (and Mr. Green's) major error

Using an indirect approach, Mr. Johnson (and similarly Mr. Green) sought to allocate Samson's expenses for the contract period into 2 portions: the Navy portion and the Commercial portion.[112] However, there was no need to make indirect cost allocations, since the required information from Samson's work papers and bid documents gives us, directly, the information he needed.

---

[107] Exhibit 48, STB 101900.  $190,196.26 x 13 voyages per year = $2,472,551 per year.
[108] The Halko Letter, STB 102714-715.
[109] The Johnson Report, p. 6.
[110] The Johnson Report, p. 6.
[111] The standard of rationality would be Mr. Johnson's standard, which he lays out at p. 6.
[112] See his Schedule 2 (Corrected), showing the Navy portion (which he termed "Portion Covered by Contract") and the Commercial portion (which he termed "Portion Not Covered by Contract").

The first two Panels of Attachment C show Johnson's allocations. The first Panel is identical to his Schedule 3 (Corrected), with an additional line to explicitly show total costs. The second Panel consolidates the minor "disallowed SAGE" amount ($273,250) into the cost allocated to the Commercial portion.[113]

As can be seen from the second Panel, Mr. Johnson has chosen – based on his incorrect and unsupported assumption that the commercial segment was allegedly profitable during these 24 months – to allocate relatively little cost to the Commercial portion.

He allocated a total cost of $34,619,733 to the Commercial portion[114], leaving an alleged profit of $3,166,550. Because he allocates so little cost to the Commercial portion, he allocates too much cost to the Navy portion – $12,252,291 (not counting foregone profit) – and therefore shows the Navy portion as having lost $4,599,187.

The loss for the Navy portion is absurd, given the facts as shown in the Denial letter and in my own analysis above. [See section III.D.6. above.]

Another demonstration of how excessive is his Navy cost allocation of $12,252,291, for 24-months of Navy service – or about $6.1 Million per year – can be seen by comparison to the allocations he himself made for the 8 years he shows on his Schedule 2. There, he derives an alleged allocated expense of $34.3 Million for 8 years, or $4.3 Million per year.[115] Using his interpretation of the historical record, and his assumption that the historical averages carry over to the contract period,[116] his cost allocation to the Navy is, merely on this factor, greatly overstated.[117]

Furthermore, in the years before the contract at issue, Samson made a sailing to Adak approximately once every 14 days or once every 17 days; for this contract, sailing frequency was reduced to only once every 28 days. Samson has acknowledged that the reduced sailing frequency reduced their costs. "Samson recognizes that the Navy has reduced the frequency of sailings from 17 days under the prior contract to 28 days under this RFP. The reduced sailing frequency offers some cost savings to the carrier."[118]

Furthermore, Mr. Johnson first makes (and first presents) his inferred cost allocation for the Commercial portion; and only afterwards, does he find the residual cost allocation to the Navy portion. This is the incorrect sequence. He should first find the actual, Navy portion cost, since that is the one known from the data in the record; and only after that should he then find the residual cost for the Commercial portion.

---

[113] Mr. Johnson followed the procedures for SAGE expense that cannot be applied in a Government contract, a condition apparently required by an "Equitable Adjustment" Methodology; nevertheless, Mr. Johnson did not identify his approach as such.

[114] $34,346,583 in cost, plus $273,250 in disallowed SAGE, equals a total cost allocation of $34,619,733.

[115] As I show just below, this historical average is higher than the proper figure for the 24 months of the contract.

[116] He used historical averages for alleged Commercial sector profitability in the contract period.

[117] I have found that the actual cost allocation to the Navy is lower still. [See section III.D.6. above.]

[118] See Halko letter, STB 102714.

I have provided the correct cost allocation in Panel 3 of Attachment C, and I have reversed Mr. Johnson's sequence of the cost allocation and data presentation. I start with the Navy cost. As I have determined, and have shown in the bottom part Panel 3, Samson's development of its bid, based on its Revenue Goal, resulted in costs that would be fully covered at approximately 89.4% of projected revenue, or $5,813,805.[119] [See Section III.D.6. above.] Subtracting that correct cost allocation from Johnson's estimate for Navy contract revenue of $7,653,104 yields a profit on the Navy contract equal to $1,839,299.[120] Thus, Samson clearly did not have any unrecovered costs, and therefore incurred no damages, on their Navy contract.

That proper cost allocation to the Navy leaves $41,058,219 as the proper cost allocation for the commercial segment. With commercial revenue of $37,786,283, Samson's commercial operations had an operating loss of $3,271,936 for those 24 months.

In Panel 4 of Attachment C, I have provided the cost allocation that Mr. Johnson's own assumption[121] required. Mr. Johnson constructed his entire analysis, and his database in his Schedule 2, on the premise that the proper allocation of cost on the Navy contract is 90.9% of the Projected Revenue.[122]

He wrote:

> It is reasonable to assume that Samson would have undertaken to carry the Government's cargo on a long term basis only if Samson expected (at the time of the undertaking) that they would receive enough revenue to allow them to recover the costs reasonably allocable to the carriage of such cargo plus a reasonable profit.[123]

That premise underlies his use of the data in Schedule 2, and is an integral part of his analysis and conclusion.

Thus, Panel 4 uses 90.9% of Projected Revenue as the measure of the allocated cost to the Navy contract. This raises allocated cost to $5,911,944; it lowers Navy profit to $1,741,160,[124] and still yields the same conclusion as above: Samson clearly did not have any unrecovered cost, and therefore incurred no damages, on their Navy contract.

---

[119] Using the rounded figure of exactly 89.4%.

[120] This profit is in addition to the provision for profit plus some incremental profit for the Seattle-Dutch Harbor segment of the voyage that Samson built into their cost.

[121] I do not agree with his 10% (on total cost) Navy profit assumption; I do not agree with any assumption that applies an unchanging Navy contract percentage profit rate for every year.

[122] He set profit equal to 10% of allocated expense, which is cost, and he set profit plus cost equal to projected revenue; therefore, the cost is 90.91% of projected revenue.

[123] The Johnson Report, p. 6.

[124] I have used Mr. Johnson's $7,653,104 figure for Contract revenue earned. Using the Navy's lower figure from the Denial letter – $6,909,567.86 – reduces the profit on the Navy contract by the difference, or by $743,536; this would still leave a profit of about $1.1 Million in Attachment C, Panel 3 and $1.0 Million in Attachment C, Panel 4, and therefore would not affect the conclusion: Samson clearly did not have any unrecovered cost, and therefore incurred no damages, on their Navy contract.

My conclusion – that <u>Samson clearly did not have any unrecovered cost, and therefore incurred no damages, on their Navy contract</u> – applies, *a fortiori,* to Mr. Green's model and damages, since he assumed a higher commercial profit rate than did Mr. Johnson; he understated the commercial portion expenses by more than did Mr. Johnson; and, he overstated the Navy contract costs by even more than did Mr. Johnson.

Furthermore, I do not agree that a simple single percentage profit rule, such as Johnson uses, can be rigidly applied to every year. One needs to look at the particulars of each year, including the competitive environment for bidding on the Navy contract that may have changed year to year, especially as the Navy volumes changed and had fallen drastically by the time of this contract. <u>It is preferable to determine the profits directly, as I have done, rather than to infer them as a simple percentage of revenue as Mr. Johnson has done.</u>

   c. Failure to consider Samson's pricing decisions in the "but for" world

Mr. Johnson (and Mr. Green) fails to take into account that Samson would have lowered its rate bids in the "but for" world – that is, had they based their Navy business on the 76% higher volume expectations he attributes to them. If they had expected more cargo than their planning documents show, they would have bid lower rates; they would have taken their starting point – the initial Goal of $190,000 in revenue per voyage – and they would have <u>spread those dollars over a now larger volume of cargo</u>, more or less proportionately, and ended up with lower rates bid per measurement ton. This rate reduction would have meant less money for Samson, in the "but for" world, than is alleged by Mr. Johnson's approach which ignores these inevitable price impacts – since he adds the alleged damages to an unchanged amount of actual revenue, instead of to a reduced amount (because of the reduced rates) of actual revenue.

This means that even if 10.015% profit rate assumption was the correct figure for commercial profits in the "but for" world – and it is not – his damages are overstated.

Interestingly, Samson's previous two Claims against the Navy, which I evaluated in my DRAFT report in 1999, were based on their asserting that they had offered <u>uneconomically lower bids based on volumes that the Navy had **explicitly** projected and which turned out to be much lower than projected;</u> their claimed their bid rates were inversely related to projected cargo levels. A similar development would likely have applied here.

   d. Johnson's lack of industry analysis to support his assumption

Mr. Johnson also incorrectly executes his inferred, indirect methodology. He simply assumes that the commercial market and profit opportunities Samson faced from 10/1/1995 to 9/30/1997 were <u>exactly</u> equal to the average situation Samson experienced from 1989 to 1996.

Mr. Johnson presents no economic or business analysis to support that assumption. He includes no evaluation of the economics of the industry, or the commercial market over time. He does not evaluate the determinants of Samson's commercial cargo demand. He does not evaluate business profitability – what demand conditions were, and how they were changing – in the industry or for Samson in particular. He does not consider what was happening to business demand, such as in the fishing, construction or tourism industries; he does not consider what was happening to Alaska State oil revenues and how that might have affected government transfer payments and indirect consumer demand for shipping service. He offers no supply side analysis, to identify what Samson's competitors were doing over this period; whether other firms were expanding or contracting; what was happening to major cost items, such as labor, fuel, and barge rental, which could make Samson's profits opportunities greater or lesser; etc.

He does not analyze what was happening within the Samson firm itself, to its management resources and strategies, and their effectiveness. He does not learn how Samson was planning to cope, or did in fact cope, with the steep decline in government revenue after 1995 and at the end of the contracts in 1997.

This absence of business analysis is especially relevant since Samson has only a 22.18% utilization of its total barge capacity during the contract period, as was stated in the Claim.[125] A proper "but for" analysis would investigate the causes for that low utilization, but Mr. Johnson does not rely upon such an analysis.

Thus, there is a complete lack of analysis of the determinants of industry and Samson profitability over time, and as applicable to the 24 months in question. Such an industry and company analysis is necessary as a matter of sound economic analysis, in order to give economic support to the assumptions underlying the damage claim. Sound economic methodology required that Mr. Johnson show that, after eliminating all other reasonably possible factors as explanations for Samson's poor economic performance, only this one explanation remains: the culprit is the alleged diversion to air cargo, and that is the only reasonably possible explanation for why Samson's commercial profitability for the 24 months in question would have been low, and lower than the average of the previous years. Mr. Johnson has failed this basic methodological test.  Instead, Johnson makes the unreasonable assumption (especially in light of the companywide low barge utilization rate), that nothing else changed in 1995-97 versus the previous boom years, and attributes all shortfalls to the Navy's alleged misconduct.

     e.    The years after the contract would have been better indicators

We do not have to engage in the difficult and unnecessary exercise of determining Samson's commercial profit rate for the contract period, because: we know the Navy cost from the evidence in the record; therefore, we know the commercial cost by simple subtraction from total cost; therefore, we know the commercial profit rate. However, if Mr. Johnson felt the need to assume a commercial profit rate for the contract period, the period after the end of the contract – when Samson had no military contracts – would be

---

[125] The Claim, p. 15.

a more appropriate, historical period for him to have used. The period after 1997 obviates the need to disentangle Samson's commercial profitability and costs from its Navy profitability and costs.[126]

I have examined Samson's income statements for the five years after the contract years in question (fiscal year ending December 31, 1998 to 2002) when there was no military contract and its performance was related only to its commercial activity.[127] Its rates of profit for those five years were 0.9%; 4.2%; -5.8%; -6.5%; and -9.2% respectively; the weighted average is -3.350%; at no point after 1997 did Samson come even close to earning a 10.015% profit on its commercial business. Substituting -3.350% for his 10.015% in his formulae would have produced an implied small Navy contract profit of $150,329 rather than the $4,599,187 loss that Mr. Johnson derived.[128] However, the correct answer, as shown in Panel 3 of Attachment C of this Report, is a Navy profit of $1.8 Million.

## G. Air Cargo Capacity

### 1. C-141 capacity

It is useful to note the capacity of cargo-carrying aircraft, and the flights implied by Samson's damages estimates regarding the amount of traffic allegedly improperly diverted to the air mode.

The following information about airplane capacity was told to me, by telephone, on April 10, 2007, by Mr. Joe Clark, who worked at Adak, is knowledgeable about these matters, and who has been deposed in this case. The C-141 is the main cargo plane for the Navy at Adak. It can be configured for only passengers, or only cargo, or some of both. The most common configuration, for these typically weekly flights, is for some passengers plus 9 pallets of cargo capacity. (The smaller C-131 has 5 pallets of cargo capacity.) Some or all of this capacity, if used, may have been used to serve other port pairs besides Adak-CONUS (the Continental US). Each pallet can hold approximately 486 cu. ft., or 12.15 MTONS. Therefore, each C-141 flight had cargo capacity for 109.4 MTONS of cargo.

Mr. Johnson's alleged damages imply 20,695.6 MTONS of cargo diverted to the air mode.[129] For a C-141 to have carried these implied, alleged 20,695.6 additional MTONS

---

[126] If a single profit rate is used, it would still suffer the infirmity of applying an average of five years to one specific 24-month period.

[127] Samson Tug & Barge Co. Financial Statements, December 31, 1998 (pp. 1-13); December 31, 1999 (pp. 1-23); December 31, 2001 (pp. 1-30); and December 31, 2002 (pp. 1-30).

[128] For the commercial portion: costs would be $39,095,999; losses of $1,309,716; and a loss rate, over costs, of 3.350%. For the Navy portion: costs would be $7,502,775 and profits would be $150,329.

[129] Mr. Johnson alleged damages of $5,824,417, or 76.1% of the $7,653,104 of revenue he claimed Samson actually earned. Mr. Johnson's Exhibit 2F shows actual cargo shipped at 27,193.38 MT. We can convert Mr. Johnson's alleged dollar damages to 76.1% of the amount of MTONS he alleges Samson actually carried. Multiplying 76.1% times 27,193.38 yields 20,695.6 MTONS.

of improperly diverted cargo would have required about 189 commonly configured C-141 flights.

Mr. Green's alleged damages were 166% of Mr. Johnson's.[130] Multiplying this percentage times the 189 flights calculated for Mr. Johnson's damages means that for a C-141 to have carried Mr. Green's implied alleged improperly diverted cargo would have required about 313 commonly configured C-141 flights.

2.  Samson's air cargo examples are *de minimis*

In its Claim, Samson presented its analysis of some documents reflecting actual and potential air cargoes moving to/from Adak and CONUS.

Samson presents the evidence, by commodity, in hundreds of thousands of pounds. When converted to MTONS, the movements they identified are extremely small, compared to what Samson carried and compared to what Samson would have had to carry to earn the alleged revenue it ought to have earned according to Samson's damages experts.

In none of the following am I suggesting that any of this volume of cargo should or should not have been carried by Samson. My analysis is intended to give an order of magnitude of the volume of air cargoes Samson has identified, and the vastly larger volumes implied by its damages allegations.

a.  Exhibit 13

Samson indicates that the Alaska Airlines flights for approximately 1 year, from October 2, 1996 to September 7, 1997, carried 259,409 pounds of cargo outbound to Adak, from CONUS, and 160,092 pounds inbound on CONUS routes, totaling 419,501 pounds for all the Alaska Airlines flights.[131] The underlying data used for that Table are in Exhibit 3.

The 419,501 pounds had a cubic measure of 32,092 cubic feet, or 802.3 MTONS (at 40 cubic feet per MTON).

The projection by the Navy was for 13,063 MTONS per year, totaling 26,126 for the 2 years of the contract.[132] Therefore, the 802.3 MTONS of cargo amounted to only 3.1% of the total cargo projection by the Navy.

Mr. Johnson's damages imply 20,695.6 MTONS of cargo diverted to the air mode.[133] Therefore, the 802.3 MTONS of actual air cargo amounted to approximately only 3.9%

---

[130] Mr. Johnson's alleged damages were $5,824,417; Mr. Green's were $9,643,286; or 66% more than Mr. Johnson's.

[131] Exhibit 13, p. 6.

[132] See Denial letter, Exhibit 11, page 9.

[133] Mr. Johnson alleged damages of $5,824,417, or 76.1% of the $7,653,104 of revenue he claimed Samson actually earned. Mr. Johnson's Exhibit 2F shows actual cargo shipped at 27,193.38 MT. We can

of the diverted cargo implied by Mr. Johnson. Consequently, in order to come up with enough diverted cargo to account for Mr. Johnson's alleged damages, it would take 26 times as many Alaska Airlines contract flights as referenced in Samson's Claim.

Mr. Green's alleged damages were 166% of Mr. Johnson's.[134] Following the analysis just above, Mr. Green's damages imply it would take about 43 times as many Alaska Airlines contract flights as referenced in Samson's Claim.[135]

      b.   Exhibit 18

In Exhibit #18, dated June 17, 1997, marked at the deposition of the Navy's Mr. Anderson, reference is made to the possible air transport of 137,500 pounds of cargo over a three-month period, using 6 flights. Assuming the same density (13.1 pounds per cubic foot) to these cargoes as to the Exhibit 13 cargoes above, this poundage would equate to 10,519 cubic feet, or 263 MTONS.  Thus, in order to come up with enough diverted cargo to equate to Mr. Johnson's alleged damages, it would take 472 flights, to generate the diverted cargo referenced in Exhibit 13, and it would take 782 flights to match Mr. Green's damages.

---

convert Mr. Johnson's alleged dollar damages to 76.1% of the amount of MTONS he alleges Samson actually carried. Multiplying 76.1% times 27,193.38 yields 20,695.6 MTONS.

[134] Mr. Johnson's alleged damages were $5,824,417; Mr. Green's were $9,643,286; or 66% more than Mr. Johnson's.

[135] 1.66 times 26 equals approximately 45.

I hold my opinions to a reasonable degree of certainty.

Executed at Emeryville, California, July 20, 2007.

_____
Ernest Nadel