LeCG                                                                    ATTACHMENT A

# Ernest Nadel, Ph.D., Principal, LECG

LECG
2000 Powell Street, Suite 600
Emeryville, CA 94608
direct: (510) 450-6745
main: (510) 985-6700
fax: (510) 653-9898
email: ernie_nadel@lecg.com

**BIO/SUMMARY**

Ernest Nadel is a principal at LECG, specializing in transportation, international trade, antitrust, and oil and gas issues. He has 30 years of experience in economic consulting, mainly to the surface (ocean and rail) transportation industry and the oil and gas industry. He is a renowned expert on the economics and regulation of U.S. ocean liner transportation, covering such issues as cost of service, rate reasonableness and rate overcharges, cargo forecasting, antitrust, intra-carrier agreements, and service efficiencies. Dr. Nadel has testified on behalf of governments, shippers, ocean carriers, rail carriers, ports, pilots, and carrier conferences in over a dozen cases before the Federal Maritime Commission, the Maritime Subsidy Board, the Interstate Commerce Commission, the Surface Transportation Board, and in arbitration proceedings. He has led maritime studies on contract to the Maritime Administration, the State of Hawaii, and the Military Sealift Command (U.S. Department of Defense). On the rail side, he has led projects on rail mergers and traffic diversions, and has consulted on projects on costs and capacity to move coal, and costs and capacity to move international maritime containers. Dr. Nadel has also provided expertise on oil tanker matters, market and netback valuations of oil and natural gas, and has advised the US and Canadian governments on the design and valuation of royalty contracts. Dr. Nadel holds a BA and won the Allen Oliver Gold Medal in economics from McGill University in 1964, and holds a PhD from the University of Chicago. He was assistant professor of economics at the University of California, Berkeley, from 1968 to 1975. He was the senior economist at Manalytics, Inc. for 11 years and a principal with Barakat & Chamberlin in charge of their transportation practice for 11 years before joining LECG in spring, 1997. Dr. Nadel is fluent in French and has been published in the American Economic Review and the Canadian Economic Review.

**EDUCATION**

Ph.D., International Economics, UNIVERSITY OF CHICAGO, 1969

M.A., Economics, UNIVERSITY OF CHICAGO, 1967

B.A., Economics and Political Science, MCGILL UNIVERSITY, Montreal, Canada, 1964

**PRESENT POSITION**

LECG, 1997-present
Principal

**Areas of Specialization**

  Maritime and Rail Economics
      Policy options in regulation



ATTACHMENT A

    Regulation of rates, services, and carrier agreements
    Cost and capacity analyses
    Worldwide cargo flow analysis and forecasting
    Port feasibility analysis

Litigation Support and Economic Analysis
    Asset and business valuation, breach of contract damages, antitrust violation
    Applied microeconomic theory, forecasting, cost models, price benchmarking

Petroleum Economics
    Oil Pricing, netback models, indexed prices, royalty contracts
    Crude, product and LNG tanker economics: rates, costs, carriage

**OTHER POSITIONS HELD**

BARAKAT & CHAMBERLIN, INC., 1986-April 1997
    Principal
    Performed and directed economic analysis, litigation support, valuation, pricing and market assessment studies for public and private clients in the maritime, petroleum, cable television and other industries. Prepared and delivered expert witness testimony on U.S. maritime regulation issues, assessments of economic damages, antitrust, and valuation issues. Advised State government in the U.S. and Provincial government in Canada regarding the design and audit of petroleum royalty contracts.

MANALYTICS, INC., 1975-1986
    Manager of Economics
    International economics specialist for a firm consulting in the transportation area covering maritime and rail. Led studies in trade forecasting for public and private clients, economic and financial feasibility studies for carriers, shippers and ports. Prepared and presented expert testimony for submission before numerous administrative forums.

UNIVERSITY OF CALIFORNIA, BERKELEY, 1968-1975
    Assistant Professor of Economics
    Instruction and research in introductory economics, international economic relations, monetary economics, and macroeconomic theory.

**PUBLICATIONS**

"International Trade and Capital Mobility." The American Economic Review, Vol. 61(3), Part 1, June 1971.
"Capital Goods, Intermediate Goods, and the Volume of Trade." The Canadian Journal of Economics. May 1971.
"Testing the Forecasters." Journal of Maritime Law and Commerce. October 1976.
"Forces Shaping International Maritime Transport." The World Economy. March 1984.
Outlook for the Liberalization of Maritime Transport. With Elliot Schrier and Bertram Rifas. London: Trade Policy Research Center, 1985.
The Cost of Cargo Preference to the DoD, June 1, 1993 to May 31, 1994, a Report for the U.S. Military Sealift Command, July 7, 1995.

**PRESENTATIONS**



ATTACHMENT A

"International Trade and Capital Mobility."  1968 meeting of the Econometric Society, Evanston, Illinois.

**EXPERT WITNESS TESTIMONY**

| | |
|---|---|
| 2003-2004 | Direct and Rebuttal testimony on behalf of the Territory of Guam in STB Docket # WCC-101, to establish a rate-setting methodology for the Domestic Offshore liner trades. |
| 2002-2003 | Affidavit on behalf of the Territory of Guam in FMC Docket No. 89-26, on the theory for, and calculation of, the reparation amounts owed by American President Lines and Sea-Land resulting from FMC's Final Decision on liability. |
| 1999-2000 | Deposition and Direct Oral testimony in a civil antitrust case in Hawaii in Federal Court regarding a tied sale in the container service of Sea-Land between California and Hawaii. (Sea-Land Service, Inc. v. Atlantic Pacific International, Inc., et al. Civil No. 98-00369 DAE, United Stated District Court for Hawaii.) |
| 1998-2000 | Written testimony on behalf of the Territory of Guam in GovGuam's successful Appeal of the ALJ's Decision in FMC Docket No. 89-26. Also prepared calculations of the reparation amounts owed by American President Lines and Sea-Land resulting from FMC's final decision on liability. |
| 1996 - 1997 | Written and Oral testimony in an Arbitration regarding breach of contract, fraud and breach of fiduciary responsibility in a dispute involving a three-year venture capital start-up of a managed health care imaging carveout. |
| 1996 | Oral testimony on behalf of the San Francisco Bay and Harbor Pilots, in a State of California Administrative proceeding concerning productivity of pilots and history of pilot actual revenues in nominal and real terms. |
| 1990-1996 | Written Direct, Rebuttal, and Oral testimony in Federal Maritime Commission Docket No. 89-26. Territory of Guam, regarding rate levels in the U.S. mainland-Guam liner trade. |
| 1985-1995 | Written Direct, Rebuttal, and Oral testimony and extensive litigation support and settlement offer analyses to the Alaska State Department of Revenue and to the Alaska State Attorney General in several administrative hearings for the State's audit of oil companies for severance tax and income tax purposes. |
| 1989 | Written testimony in FMC Docket Nos. 88-5, 88-14, 88-18, 89-12, for non-vessel-operating common carriers (NVOCCs), to measure the extra costs and lost business suffered by the plaintiffs as a result of illegal tariff discrimination by ocean liner operators. |
| 1989 | Written and Oral testimony in FMC Docket No. 88-15, on behalf of NVOCC California Shipping Lines, Inc. (CSL), regarding damages resulting from a breach of contract. |
| 1988 | Written Direct and Rebuttal testimony in Maritime Administration Docket No. S-801, on behalf of Matson navigation Company regarding a Section 805(a) application by |



ATTACHMENT A

|  |  |
|---|---|
|  | American President Lines to serve Hawaii. Testimony dealt with the public policy consequences and unfairness to Matson of approving APL's application. |
| 1983 | Written testimony in support of an application for joint liner service approval of FMC Agreement 9973-9 by Johnson ScanStar. |
| 1983 | Written testimony in Maritime Subsidy Board Docket No. S-746 Sub 1, for Ragan & Mason, representing Sea-Land Service, Inc., analyzing the cargo and capacity adequacy issues on Trade Route 29. |
| 1982 | Written testimony in FMC Docket No. 81-74, on issues involved in an application by the Japan-4 (J Line, K Line, Mitsui, and Y-S Line) for additional capacity by replacing old, small ships with new, big ships. |
| 1982 | Written testimony in FMC Docket No. 80-22, evaluating the currency adjustment factor (CAF) in the Pacific Westbound Conference tariff and evaluating the suit by International Paper (IP) claiming that the ad valorem CAF discriminates against IP. |
| 1982 | Written testimony on FMC Agreement 9973-8 regarding Johnson ScanStar (JSS) operations. Described the trades in which JSS then participated and in which it proposed to participate and analyzed the likely economic impacts and the expected transportation and public needs that the service authority modifications proposed to satisfy. |
| 1981 | Written testimony, in FMC Docket No. 81-27, on the impact on competition of the proposed joint service operations of Bank and Savill Line, Ltd., and The Shipping Corporation of New Zealand in the US Gulf-Australian liner trade. |
| 1981 | Direct, Rebuttal, and Surrebuttal testimony, in FMC Docket No. 81-10, on the appropriate rate of return for regulated carriers in the US-Puerto Rico and Virgin Island trades and on the forecasts of carrier rates of return made by other witnesses. |
| 1981 | Oral testimony for a private client, in Superior Court, County of Sacramento, Docket No. 271770, evaluating the economic cost of the delay of graduation from university. |
| 1980 | Written testimony in FMC Docket No. 78-32, on the economic effects of Pacific Westbound Conference policy regarding transshipments of Portland cargo through Seattle. |

**REGULATORY AND LITIGATION SUPPORT**

| | |
|---|---|
| 2005 | US Joint Traffic Management Organization. (JTMO) Evaluate the claims by Samson Tug and Barge, a carrier operating in the Seattle-Aleutian Islands trade; alleging damages suffered carrying military cargoes, in a contract with JTMO, due to alleged traffic diversion. |
| 2004-2005 | Province of Newfoundland. Assist in the implementation of the regulations on valuation of Terra Nova oil for royalty purposes. |
| 1998-1999 | US Joint Traffic Management Organization. (JTMO). Provided expert report evaluating the claims by Samson Tug and Barge, a carrier operating in the Seattle- |

**LECG**                                                                                        ATTACHMENT A

|  |  |
|---|---|
| | Aleutian Islands trade; alleging damages suffered carrying military cargoes, in a contract with JTMO, due to unexpectedly low cargo levels. |
| 1997-1998 | State of Hawaii, Division Consumer Advocacy. Evaluated the inter-island tug-barge service of Young Brothers, Inc. Made recommendations for improving the service so as to lower costs, raise profitability, lower rates, and improve service to shippers. |
| 1997-1998 | Confidential. Retained, in a class action litigation, to examine the operation, membership, and excess profits of a price-fixing cartel manufacturing and selling an industrial chemical in the U.S. market. |
| 1997 | U.S. Department of Defense. Retained by the Joint Traffic Management Office to evaluate alternative contractual arrangements for the pricing of international maritime container transportation services in the event of a Stage I, Stage II, or Stage III military emergency. |
| 1996 - 1997 | Province of Newfoundland. Assisted in the Province's negotiations on a royalty contract with producers, focusing on how to value the oil for use in calculating royalties for the Terra Nova project. |
| 1996 | Confidential. Assisted in settlement negotiations with several producers in a class action involving an antitrust violation among producers in a major U.S. product market, where publicly discussed damage estimates exceed $100 Million. |
| 1991-1996 | State of Alaska. Provided economic and litigation support to the Department of Law in its evaluation of the Exxon Valdez Oil Spill settlement and in its allocation of the monies in the Exxon Valdez Oil Spill Fund, which are used, in part, to provide remediation through the purchase of forest and other lands to be held free from economic development. |
| 1992 | Crowley Maritime. Provided expert support for Crowley's application for a tugboat franchise for Port Everglades, Florida. |
| 1991 | Preston, Rouvelas & Meeds. Retained to analyze and provide litigation support involving a claim in FMC Docket No. 90-16, concerning alleged discrimination against a west coast port terminal operator. |
| 1990 | Blasingame, Burch, Garrard & Bryant. Developed an estimate of market share held by a manufacturer in the sale and use of asbestos at various sites in Texas over the period 1962 to 1972 for use in the allocation of total damages among defendants. |
| 1989 | State of Alaska. Provided the Department of Law with various analyses in support of the damage claims against Exxon Corp. resulting from the Exxon Valdez oil spill of March 24, 1989. |
| 1989 | Province of Newfoundland. Assisted the Province in its negotiations on a royalty contract with producers, focusing on how to value the oil for use in calculating royalties for the Hibernia project. |
| 1989 | Alborg & Dictor. Prepared analysis and testimony in support of litigation concerning the evaluation of a railroad easement in Santa Clara County, California. |

LECG                                                                                          ATTACHMENT A

| Year | Description |
|------|-------------|
| 1987 | Barker & McKenzie. Assessed economic damages to a distributor and manufacturer of orange-juicing equipment resulting from a termination of the distributor's contract. Analyzed the manufacturer's financial records, depositions, and other discovery material, including the details of a bulk asset sale. |
| 1986 | Lempres & Wulfsberg. Retained in connection with a lawsuit filed by B&T Hydraulics, Inc. against Eaton Corporation. Prepared a critique of the plaintiff's calculation of alleged economic damage. Developed economic intelligence regarding various firms' market share and sales levels in California and the US. |
| 1986 | Lillick, McHose & Charles. Retained in the matter of Delta Steamship Lines vs. The City and County of San Francisco. Analyzed Delta's alleged economic damages suffered as a result of a pier fire, focusing on a review of the inventory of the quantity and value of the items involved. |
| 1985 | FMC Docket No. S-749. Provided litigation support for attorneys for Sea-Land Service, Farrell Lines and Prudential Lines regarding the capability of the U.S. flag liner fleet to carry forecasted levels of cargo flows on the inbound leg of Trade route 10 in 1990. |
| 1983 | FMC Docket No. 82-54. Provided litigation support for Ragan & Mason, attorneys for Sea-Land Service, Inc. on the issues in the Order of Investigation in FMC Docket No. 82-54, to determine whether seven Japanese charter and revenue pooling agreements are in compliance with the 1916 Shipping Act. |
| 1983 | United States House of Representatives. Provided support during hearings before the Committee on Judiciary Subcommittee on Monopolies and Commercial Law on a bill that eventually became the Shipping Act of 1984. Performed an economic assessment and analysis of HR 1878, 98th Congress; concluded that it offers "enhanced opportunities for efficiency and countervailing assurances of a continued pro-competitive environment in the US liner trade." |
| 1983 | Provided litigation support for Kominers, Fort, Schlefer & Boyer, representing Delta Steamship Lines, Inc., regarding liner rates in the US Gulf Coast/Brazil trade and other US foreign trades. |
| 1982 | FMC Docket Nos. 82-1, 82-10. Requested by PMA council to prepare testimony to: analyze the PMA CFS Fund Program Agreement and its economic effects on PMA employee benefit cost obligations and assessments; analyze the likely impact on the ILWU as a group and PMA as a group and on individual PMA sectors and obligations; and to review the assessment system changes since 1979 and analyzed how the CFS Program Fund Agreement relates to those changes. |