JOHN0523

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

SAMSON TUG AND BARGE CO.,
INC., an Alaska Corporation,

    Plaintiff/Appellant,

vs.                                    Civil No. A03-006 CV(JWS)

UNITED STATES OF AMERICA,              IN ADMIRALTY

    acting by and through

the UNITED STATES DEPARTMENT
of the NAVY MILITARY SEALIFT
COMMAND, and UNITED STATES
DEPARTMENT OF THE ARMY
MILITARY TRAFFIC MANAGEMENT
COMMAND,

    Defendants/Appellees.

---

DEPOSITION OF GEORGE L. JOHNSON

San Francisco, California

Wednesday, May 23, 2007

Reported by:
DIANE M. GALLAGHER, RPR
CSR No. Michigan 2191

JOB No. 3-64766

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA
Page 1

*Exhibit "D"*
23

```
                        JOHN0523
 2
 3   SAMSON TUG AND BARGE CO.,
     INC., an Alaska Corporation,
 4
           Plaintiff/Appellant,
 5
        vs.                          Civil No. A03-006 CV(JWS)
 6
     UNITED STATES OF AMERICA,       IN ADMIRALTY
 7
           acting by and through
 8
     the UNITED STATES DEPARTMENT
 9   of the NAVY MILITARY SEALIFT
     COMMAND, and UNITED STATES
10   DEPARTMENT OF THE ARMY
     MILITARY TRAFFIC MANAGEMENT
11   COMMAND,

12         Defendants/Appellees.
13   ─────────────────────────────

14         Deposition of GEORGE L. JOHNSON, taken on
15   behalf of Defendants/Appellees, at 450 Golden
16   Gate Avenue, 7th Floor, Room 5395, San Francisco,
17   California, beginning at 10:15 a.m., and ending at
18   6:15 p.m., on Wednesday, May 23, 2007, before
19   DIANE M. GALLAGHER, Certified Shorthand Reporter,
20   Michigan No. 2191.
21
22
23
24
25
```

Page 2

                                                                  3

```
 1
 2   APPEARANCES:
 3
 4   For Plaintiff/Appellant:
```

JOHN0523

14  when you arrived today, but, if not, let me say my name
15  is Jeanne Franken, and I represent the interests of the
16  United States of America in an action that has been
17  brought by Samson Tug and Barge Company against the
18  United States. Do you understand that?
19          THE WITNESS: Yes, I do.
20      Q   (BY MS. FRANKEN)  Have you been asked to act
21  as an expert in this case on behalf of the Plaintiff,
22  Samson Tug and Barge?
23      A   Yes, I have.
24      Q   When were you hired?
25      A   I'd have to look in my records, but I think I

7

1   was first contacted in December or November, December of
2   2005.  That's an approximation.
3       Q   Who contacted you?
4       A   Mr. Bill Royce, R-O-Y-C-E.
5       Q   Have you worked for Mr. Royce previously?
6       A   Yes, I have.
7       Q   On how many occasions?
8       A   I don't recall, but maybe two.  Might be
9   three.  Two or three.
10      Q   Have you ever worked for the Legros,
11  L-E-G-R-O-S, Buchanan firm previously?
12      A   While that name sounds familiar, I don't recall
13  working for that firm.
14      Q   Are your fees actually being paid by Mr. Royce?
15      A   I am being paid by Samson Tug and Barge.
16      Q   Have you had contacts with attorneys at the

25

JOHN0523

2   Q   Do you know if there were other CPA's who did
3   work for Samson in the mid '90s?
4   A   As I sit here, I do not know.
5   Q   You or your firm apparently prepared four
6   drafts prior to the one that was filed with the court
7   and some kind of a thought outline and have corrected
8   quote, unquote, that report since then.
9       Do you intend at this time to make any further
10  changes, corrections, supplementations, or anything to
11  the report?
12  A   I have no known corrections, and I do not have
13  any plans to do additional work unless directed by
14  counsel.
15  Q   Is there anything that you haven't seen that
16  you think you should see in order to reach your
17  conclusions in this case?
18  A   I would love to see all of the records of all
19  of the diverted cargo.
20  Q   Why do you think there were such records?
21  A   To the extent they existed, I would like to see
22  all of the records of diverted cargo.
23  Q   What was the factual basis for your apparent
24  belief that there was diverted cargo?
25  A   I have read anecdotal information of people

87

1   that knew of lumber shipments or other cargos that were,
2   in fact, shipped by other than Samson barges, and I have
3   seen certain records of air flights, etc., that had
4   information.

Page 78

26

JOHN0523

5  I determined that there was not sufficient data
6  for me to follow that path of analysis, if you will, so
7  I haven't gone further with them.
8      Q   Now, you mentioned anecdotal evidence. Are you
9  talking about the deposition of Mr. Mead with regard to
10 trucks driving by his house with lumber on them?
11     A   I am referring in general to that, but I would
12 state that I'm not opining regarding diversion of cargo
13 or how much or whether it, in fact, existed.
14         I am relying on statements by counsel that
15 there was significant diversion, and it is materially,
16 it is material, and there's not sufficient information
17 to quantify that, so I have not --
18     Q   Sorry?
19     A   So I have not followed that path.
20         When you asked originally what information I
21 would like to see, that is a standard method of
22 calculating lost profits under a breach or alleged
23 breach, and that's what I would like to see.
24         I don't believe that information is available
25 so we proceed down an alternative analysis.

88

1      Q   In fact, you don't personally have any
2  information about the diversion of cargo, do you?
3      A   I do not.
4      Q   And you do not consider yourself an expert on
5  that subject to give testimony on that subject, do you?
6      A   That is correct. I do not consider myself an
7  expert, and I will not be opining or testifying on that.

Page 79

27

JOHN0523

```
 8    Q   In fact, you have no background in the maritime
 9  industry or maritime rate industry, do you?
10    A   I do not.
11    Q   Do you have any background with regard to the
12  carriage of cargo by airplanes?
13    A   Well, I have -- I have no specific other cases
14  where I have calculated that.
15        I have calculated numerous lost profits cases
16  with other facts and circumstances that would be
17  calculated similarly, but I have not calculated lost or
18  diverted cargos carried by aircraft in the past.
19    Q   Do you consider yourself to have any expertise
20  in the area of government contracting, per se?
21    A   Not specifically, no.
22    Q   Do you consider yourself to have any expertise
23  in the area of the Defense Transportation System and how
24  it works?
25    A   No.
```

89

```
 1    Q   Have you ever been an employee of the United
 2  States or any of its services?
 3    A   I have been in the military.
 4    Q   Which military service were you in?
 5    A   Army.
 6    Q   And what was the nature of your service in the
 7  Army?
 8    A   I was a commissioned officer.
 9    Q   What did you as a commissioned officer in the
10  United States Army?
```

Page 80

28

JOHN0523

```
11   A   I was in the Adjutant General Corps.
12   Q   So is it true you're a lawyer?
13   A   No.  That's a Judge Advocate General.
14       The Adjutant -- excuse me -- Adjutant General
15  Corps is an administrative branch.  The Judge Advocate
16  Corps is the legal section of the Army.
17   Q   Easy for you to say.  I don't think I can
18  pronounce all of this stuff.
19       What does the Adjutant General Corps do then?
20   A   It's an administrative function.
21   Q   What did you do in this administrative section
22  as --
23   A   Commissioned as a Second Lieutenant, Fort
24  Benjamin Harrison.  I was discharged because the Vietnam
25  War was winding down.  I was in the reserves, as in,
```

90

```
1   basically in limbo, and did not do much more than that
2   following that point.
3    Q   Did you have anything to do with the
4   transportation of cargo or personnel or household goods
5   within the Defense Transportation System during your
6   career as a military officer in the United States Army?
7    A   No, I did not.
8    Q   Do you consider yourself to have any expertise
9   on the Defense Transportation System and how it works?
10   A   No, I do not.
11   Q   Do you understand that the Adak facility was a
12  Naval Air Facility?
13   A   That's my understanding, yes.
```

Page 81

29

JOHN0523

```
14    Q   Do you understand that the contract that is the
15 basis for this lawsuit between Samson initially, and the
16 Military Sealift Command, which is part of the United
17 States Navy?
18    A   I believe that's correct.
19    Q   Do you understand that at some time
20 administration of that contract moved over to the
21 Military Traffic Management Command, which is part of
22 the United States Army?
23    A   I believe that it had changed.  I didn't
24 realize that was part of the Army, but I believe that's
25 correct, that it had changed.
```

                                                                91

```
 1    Q   Do you have any knowledge about how decisions
 2 are made pursuant to regulations and procedures within
 3 the Navy for moving cargo?
 4    A   I do not.
 5    Q   Are you familiar with the regulations that
 6 apply to the movement of cargo within the Defense
 7 Transportation System?
 8    A   No, I'm not.
 9    Q   Are you familiar with the agency regulations --
10 strike regulations -- with the agency internal
11 procedures and policies of the United States Navy for
12 the movement of cargo under the Defense Transportation
13 System?
14    A   No.
15    Q   Or Military Traffic Management Command?
16    A   No.
```

30

JOHN0523

17  Q  Or the Air Mobility Command?

18  A  No.

19  Q  Or within the Air Force?

20  A  No.

21  Q  What does the phrase "diversion of cargo" even

22  mean to you?

23  A  It's my understanding that Samson and the US

24  Government had a requirements contract in which any and

25  all cargo fit to be carried on barge would, in fact, be

92

1  provided to Samson for their carrying on their barges,

2  and that certain cargo that to the extent cargo was

3  eligible for marine transport and it was required to be

4  given to Samson for carrying, and it was sent by other

5  methods or quote, unquote, diverted, then that's what I

6  am referring to when I talk about diversion of cargo,

7  that would have otherwise gone to Samson.

8  Q  And, if I understand the facts upon which you

9  form some belief that in fact a diversion took place,

10  was some anecdotal evidence from a deposition where

11  lumber of some kind was seen going to the airport; is

12  that right, that is one basis?

13  A  No.  I think what I said was I did not develop

14  an opinion.

15      You asked what information I had.  I had

16  information.  I have heard anecdotal information

17  regarding different things, but I have not developed an

18  opinion or used that anecdotal information in any way.

19      I have relied, as stated under overview of the

JOHN0523

20  engagement, there are three points. One of those
21  relates to the fact that the available information,
22  including disclosures, is materially incomplete and
23  inconsistent, and is therefore not sufficient to
24  adequately identify the specific amount and nature of
25  the cargo diverted. I have not developed an opinion to

93

1   calculate that.
2       Q   The absence of evidence of a diversion in your
3   mind means there was a diversion, but there's no
4   evidence, is that right?
5       A   No. That's not what I said.
6       Q   Isn't it as likely that there being a lack of
7   evidence of a diversion, that no diversion took place?
8       A   I think that's to be shown at trial, but I
9   don't have an opinion as to whether there was or wasn't
10  a diversion, or whether there's sufficient information
11  to prove that there was.
12      Q   Or wasn't. You understand, don't you, that
13  the United States denies that there was anything like a
14  diversion of cargo that should have gone on the Samson
15  barge in this case, correct?
16      A   I haven't seen that denial, but I understand
17  that they are contesting it.
18      Q   And isn't it true that in reaching your
19  conclusions you assume there was a diversion because
20  counsel told you so?
21      A   It's necessary typically in doing a damage
22  calculation to assume that liability is going to be

Page 84

32

# Errata Sheet

**Pg/Ln**                                    **Correction**

62/18   Change from: Scribner
        Change to: Scrivener

80/8    Change from: past
        Change to: passed

18A/6   Change from: FEY 6
        Change to: ?? Question as transcribed is not intelligible

203/6   Change from: I did not do ....
        Change to: I do not know ....

231/12  Change from: John
        Change to: George

234/11  Change from: Joe
        Change to: George

___/___ Change from: [struck through]
        Change to:

___/___ Change from:
        Change to:

___/___ Change from:
        Change to:

___/___ Change from:
        Change to:

___/___ Change from:
        Change to:

___/___ Change from:
        Change to:

___/___ Change from:
        Change to:

Signature: George Johnson    Date: 6/20/07    33

```
 1    STATE OF CALIFORNIA     )
                              : ss
 2    COUNTY OF MARIN         )

 3            I, the undersigned, a Certified Shorthand
 4    Reporter of the State of Michigan, and Notary Public of
 5    the State of California, do hereby certify:
 6            That the foregoing proceedings were taken
 7    before me at the time and place herein set forth; that
 8    any witnesses in the foregoing proceedings, prior to
 9    testifying, were placed under oath; that a verbatim
10    record of the proceedings was made by me using machine
11    shorthand which was thereafter transcribed under my
12    direction; further, that the foregoing is an accurate
13    transcription thereof.
14            I further certify that I am neither financially
15    interested in the action nor a relative or employee of
16    any attorney of any of the parties.
17            IN WITNESS WHEREOF, I have this date subscribed
18    my name.
19            JUN 07 2007
20    Dated: _____
21
22            _____
              DIANE M. GALLAGHER, RPR
23            CSR (Mich) No. 2191
              Notary Public No. 1419258 County of Marin
24            State of California
              My commission expires:  5-20-2007
25
```

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

SAMSON TUG AND BARGE CO.,
INC., an Alaska Corporation

        Plaintiff/Appellant,

vs.      Civil No. A03-006 CV (JWS)

UNITED STATES OF AMERICA, IN ADMIRALTY
Acting by and through
THE UNITED STATES DEPARTMENT OF
THE NAVY MILITARY SEALIFT COMMAND,
And THE UNITED STATES DEPARTMENT
OF MANAGEMENT COMMAND,

        Defendants/Appellees.



DEPOSITION OF GEORGE JOHNSON
Taken on behalf of the Defendants/Appellees
November 16, 2007

- - -

      BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of George Johnson was taken before Kathleen McKee, a Certified Shorthand Reporter, #3115, and a Notary Public for the State of Washington, on November 16, 2007, commencing at the hour of 10:09 a.m., the proceedings being reported at the offices of Garvy, Schubert & Barer, 1191 Second Avenue, Seattle, Washington.

35

```
 1   SEATTLE, WASHINGTON;
 2   FRIDAY, NOVEMBER 16, 2007
 3   10:09 A.M.
 4   GEORGE JOHNSON,
 5   having been first duly sworn, was examined and testified as
 6   follows:
 7   EXAMINATION
 8   BY MS. FRANKEN:
 9        Q.   Please state your full name for the record.
10        A.   My name is George L. Johnson, J-O-H-N-S-O-N.
11        Q.   Mr. Johnson, we are here on round two of your
12   deposition and let me just say that you understand that you
13   have been sworn again here today.  Is that right?
14        A.   Yes.
15        Q.   I won't go through any of the background
16   information because I know you have done this many times and
17   you've already done it once with us.  So let's just try to
18   pick up sort of from where we left off quite a while ago and
19   make this as quick and efficient as possible.  Have you
20   brought any materials with you here today in response to the
21   deposition notice?
22        A.   Yes.
23        Q.   And what have you brought?
24        A.   I brought three boxes behind me, which are
25   segregated into the documents before my deposition and post
```



800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Naegeli Reporting Corporation

Portland, OR    Seattle, WA    Spokane, WA    Coeur d'Alene, ID
503.227.1544   206.622.3376   509.838.6000   208.667.1163

Court Reporting   Trial Presentation   Videoconferencing   Videography

36

```
 1   Bates number one that I had before and I received a copy of
 2   Bates number one for some reason from counsel I put it in
 3   box 3 as well.
 4        Q.   Do you believe there's anything in boxes 1 and 2
 5   that you did not produce at your prior deposition?
 6        A.   I don't believe so.
 7        Q.   Is everything that you think that would be new to
 8   me in box 3 of 3?
 9        A.   I believe so.
10        Q.   It's my understanding that you have written
11   another report; is that true?
12        A.   I've written an analysis, yes.
13        Q.   Call it what you will, why did you do that?
14        A.   I was asked by counsel in response to comments
15   made by Dr. Nadel at his deposition to do an analysis and I
16   did that analysis.
17        Q.   Do you have a copy for me today of your new
18   analysis?
19        A.   I have a copy in my file.  I didn't -- I believe a
20   copy was sent to you so I did not bring copies for
21   deposition purposes.
22        Q.   I received something by e-mail, apparently arrived
23   in my e-mail box late last Friday but I have been out
24   traveling.  So although I have taken a quick look at it,
25   I've marked on it and I don't have one.  I'd like one if I
```



Naegeli Reporting Corporation

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR       Seattle, WA       Spokane, WA       Coeur d'Alene, ID
503.227.1544       206.622.3376      509.838.6000      208.667.1163

Court Reporting    Trial Presentation    Videoconferencing    Videography

```
 1  can, please, that's signed.  I presume it is signed?
 2       A.   I keep in my file a document with a Post-it note
 3  on it that says "clean copy."  What I -- what I would like
 4  to do is to maintain this for the same purpose in the file
 5  and to make copies if you'd -- if you'd like.  It is -- it
 6  is the -- I'll use the word original guardedly, but it is
 7  the original and I certify that that is a copy of the
 8  report.
 9       Q.   Okay, well maybe we could have the office here
10  make us a copy of somebody's version.  Can we do that?
11            MR. ROYCE:  Yeah, sure.
12            MS. FRANKEN:  Okay, so let's go off for a minute
13  while that's done.
14            (Whereupon, copies of the analysis were made.)
15       Q.   Tell me generally again what is in box 3.
16       A.   Box 3 has documents and analysis of work that's
17  been performed since my May 23rd deposition.
18       Q.   Why did you do additional analysis?  Just because
19  you were asked to?
20       A.   Dr. Nadel at his deposition made a statement that
21  the magnitude of damages calculated by myself and my firm
22  would require approximately 20,600 measurement tons and
23  inferred that that was not feasible.  And the analysis that
24  I did was in response to that to show in fact that it was in
25  fact feasible.
```



Naegeli Reporting Corporation
800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX
Portland, OR 503.227.1544   Seattle, WA 206.622.3376   Spokane, WA 509.838.6000   Coeur d'Alene, ID 208.667.1163
Court Reporting   Trial Presentation   Videoconferencing   Videography
38

```
 1      A.   I'm not sure if you said metric or measurement but
 2 it's 20,600 measurement tons.
 3      Q.   Well, do you understand my question?
 4      A.   I believe I understand your question.  I believe
 5 that that is correct, that that's what he has inferred, and
 6 that's basically what I analyzed.  I mean, he also said --
 7 obviously said a lot of other things but -- but that was one
 8 of his points that it was not feasible and I was asked to
 9 look at that and I did.
10      Q.   So after doing all this work and looking at
11 another box of material you've come up with a conclusion
12 that it would have been possible to put 20,600 measurement
13 tons of cargo on the planes for which there's record of
14 calling on Adak during that period; is that right?
15      A.   That's correct.
16      Q.   And that's all you've concluded; is that right?
17      A.   Well, I think in the report there are three
18 conclusions.  And I know those copies haven't come back yet
19 but I can just read from the copy which I have at the end.
20 Excuse me.  It says, I've concluded, based on the foregoing
21 analysis that -- there's three different bullet points.
22 Bullet point one is:  "Sufficient air cargo capacity was in
23 fact available to have carried considerably more cargo than
24 Dr. Nadel suggests is necessary to support my estimate of
25 Samson's loss."  Bullet point two:  "A large volume of cargo
```


Naegeli Reporting Corporation

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR       Seattle, WA      Spokane, WA     Coeur d'Alene, ID
503.227.1544      206.622.3376    509.838.6000     208.667.1163

Court Reporting    Trial Presentation    Videoconferencing    Videography

39