JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
NELSON P. COHEN
United States Attorney
GARY GUARINO
Chief, Civil Division
Assistant United States Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Telephone: (907) 271-5071
Telefax: (907) 271-3224
R. MICHAEL UNDERHILL
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
JEANNE M. FRANKEN
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Building
P.O. Box 36028
450 Golden Gate Avenue
San Francisco, California  94102-3463
Telephone: (415) 436-6644
Telefax: (415) 436-6632
E-mail: jeanne.franken@usdoj.gov

Attorneys for Defendant
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SAMSON TUG AND BARGE CO., INC., an Alaska Corporation<br><br>    Plaintiff/Appellant<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    acting by and through<br><br>the UNITED STATES DEPARTMENT of the NAVY MILITARY SEALIFT COMMAND, and UNITED STATES DEPARTMENT OF THE ARMY MILITARY TRAFFIC MANAGEMENT COMMAND<br><br>    Defendants/Appellees | Civil No. A03-006 CV<br><br>IN ADMIRALTY<br><br>OPPOSITION BY DEFENDANT, UNITED STATES OF AMERICA, TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE GOVERNMENT WITNESSES AND/OR PRECLUDE OTHER PROOF AT TRIAL |

UNITED STATES OF AMERICA'S
OPPOSITION MEMORANDUM    1    CIVIL NO. A03-006 CV JWS

Defendant, United States of America, opposes the motion in limine brought by plaintiff, Samson Tug and Barge Co., Inc. ("Samson"), for the reasons stated herein. The Government's opposition is based on this Memorandum, the Exhibits attached hereto, the Declaration of Jeanne Franken submitted in support hereof, and the entire file of the Court.

## FACTUAL BACKGROUND

This case arose during the closure of the United States Naval Air Station/Facility at Adak, Alaska in the mid-1990's. Plaintiff Samson had for many years contracted with the Military Sealift Command ("MSC"), part of the United States Navy, to provide ocean cargo transportation services by way of a regularly scheduled tug and barge service that ran between the Continental United States ("CONUS"), at Seattle, Washington, and Adak, Alaska. This service was just one part of the overall Defense Department's Transportation System ("DTS") whereby a military agency "customer", at Adak it was primarily the Navy, could arrange to have its cargo moved from one location to another by way of air, land and/or sea carriers, at its discretion, subject to regulatory restrictions and certain contractual exclusions. Obviously, given that Adak is an island, the only option for surface carriage was by sea. In the case of the carriage of cargo on and off Adak, the Navy historically used (1) Samson's barge, which was cheaper than air but slower, generally for large and bulky goods, equipment, vehicles, etc., the delivery of which was not generally deemed time or mission sensitive; (2) private, commercial and military planes for the carriage of perishables including food, items which service members were entitled to have accompany them such as baggage, urgently needed, mission related equipment, mail and the like; and (3) some opportune lifts. Decisions regarding modality were subject to a myriad number and complex set of federal laws and regulations, rules, policies and procedures pertaining to the various agencies involved in the DTS and on the island. Although Samson's contract was with MSC, a part of the Navy, cargo destined for its barge was actually booked through the Military Traffic Management Command ("MTMC"), a part of the Army, which in those years arranged for surface transportation to and from Adak in the DTS, including by sea. It was with the MSC and the MTMC that Samson, an ocean carrier, would have had most of its

contacts. Air cargo would have been booked otherwise through AMC.

The Government proposed changing the contract for ocean liner services at Adak in 1995 from the "requirements"-type contract which had been employed for that designated service for years, to an "indefinite delivery, indefinite quantity"-type contract (IDIQ). (See excerpts of the Deposition of Doug Anderson, attached hereto as Exhibit "A".) This proposal stemmed from the uncertainties surrounding the draw down of personnel associated with the base having been down sized from an Air Station to an Air Facility, in a base closure enviroment. Samson objected to this change in the form of the contract, even though it would have resulted in Samson receiving a guarantee of a minimum amount of cargo during the term of the contract. Samson was successful in having the solicitation amended to permit bidders to bid in the alternative, i.e. either as a requirements-type contract or as an IDIQ-type contract. Samson bid on and was eventually awarded another requirements-type contract, as it wanted.

After the base closure of Adak was announced, a possibility existed that a large amount of Government owned personal property, vehicles, scrap metal, etc., would have to be removed from the island to return it to a more pristine condition. This, however, did not occur. Instead, a Local Reuse Authority ("LRA") was formed by the Aleut Corporation, and the base and almost everything on it was subsequently turned over to the LRA for use in redeveloping the island. The base closed in the Spring of 1997, and operations on it were turned over to the Government's caretaker contractor.

Samson's barge contract expired at the end of September of 1997, six months after base closure. If the unauthenticated letters allegedly sent by Samson beginning in the summer of 1997 to a few branches of the Navy and later the Army requesting documents pursuant to the Freedom of Information Act ("FOIA"), which letters are attached as Exhibit 2 to its motion in limine, are to be believed, Samson was apparently anticipating litigating the contract months before it had even expired, although, as Samson has admitted (see Samson's Response to Request for Admission No. 1, attached hereto as Exhibit "B"), the Government's cargo forecasts had been met and there would thus be no possibility of

UNITED STATES OF AMERICA'S
OPPOSITION MEMORANDUM                      3                      CIVIL NO. A03-006 CV JWS

Samson showing the Government had entered into the contract in bad faith.

Subsequently, in late 2001, Samson filed a claim, as required under the Contracts Disputes Act, 41 U.S.C. §601, et seq., and it was, thereafter, denied. On January 14, 2003, Samson brought the present action in federal court, under the reservation of federal jurisdiction for maritime Government contract claims in 41 U.S.C. §603, asserting at various time during the course of the litigation a variety of alleged contractual breaches by the United States, apparently including that the Government had improperly diverted some unspecified amount of contract cargo to another ocean carrier or carriers, to military transports, or to air, resulting in a loss of revenue by Samson; that under the last contract Samson had somehow become entitled to carry all military or military sponsored cargo to and from Adak, including cargo which had always moved by air pursuant to regulation; that the Government lacked discretion to designate the mode of transportation for its cargo, i.e. to define its own "requirement" for surface carriage between the Puget Sound area in CONUS and Adak; and that it lacked discretion to decide what it would leave behind on Adak for reuse by the LRA.

The present motion in limine by Samson persists in stating —without support — that a cargo diversion to air actually occurred and further that it was substantial (Pg 2 of Samson's memorandum), as though these are established or agreed upon facts. They are not, and the Government strongly denies they occurred. Samson offers no evidence in support of these contentions in its motion, undoubtably because none exists, despite the extensive testimony and document production which have taken place in this long pending matter.[1]

Indeed, Government witnesses have testified to the exact contrary: there was no Berlin-type airlift off Adak; no other ocean carriers were utilized to ship material off the

---

[1] More than forty boxes of material related to Adak have been located at sites around the United States, in archives, warehouses, computer files, and sometimes the personal files of former service members and federal employees. (See the Declaration of Jeanne Franken submitted in support hereof.) Responsive and potentially relevant documents were identified and produced by the Government, and a number of knowledgeable witnesses were also made available for deposition regarding the contract, events on Adak and issues related to the transportation of cargo during the relevant period.

UNITED STATES OF AMERICA'S
OPPOSITION MEMORANDUM           4           CIVIL NO. A03-006 CV JWS

island; and the policy and practice was to leave almost everything behind for the use of the LRA. (See excerpts of the Depositions of Robert Clarke and William Duerden, sattached hereto as Exhibit "C" and "D".) Government flight data records which have been produced show that "substantial" material simply did not leave the island by air, and a video made during closure shows the significant equipment, furniture, personal property and vehicles which were left behind for use by the LRA. (See the Franken Declaration and excerpts of the Depositions of Robert Clarke and William Duerden, attached hereto as Exhibits "C" and "D".) Numerous inventories made after closure also show the large numbers of vehicles and personal property on the island after the period of the barge contract, undermining Samson's assertion that some kind of airlift took place.

      Samson also states, again without providing any evidence, that documentary records which would have supported its conclusions were known to have existed at one time. (Pg 1 of Samson's memorandum). The flights which landed at Adak consisted of a mix of commercial, military and private planes; and it was also a refueling location. There has not been probative evidence that cargo manifests for all of the flights ever existed; that such documentation, assuming it once existed, would even have been maintained beyond the conclusion of the flights; or that some part of the United States Government would have received and maintained copies of such records, let alone what preservation period would have been applicable to them in that event. Efforts to locate flight manifests by Government counsel in this case, although extensive, have not been productive beyond the flight data print outs which Samson concedes were provided and which do contain cargo information. (See the Franken Declaration submitted I support hereof.)

      Samson suggests that something like cargo manifests should have existed for each and every flight on and off the island at one time, and that should have been in the Government's possession, and that they would have shown some huge amount of cargo being transported by air, contrary to the testimony of knowledgeable witnesses to the contrary regarding what was actually happening on the island at the time. (See the excerpts of Depositions of Robert Clarke, William Duerden and Michael Gragen, attached hereto as Exhibits "C","D" and "E".)

UNITED STATES OF AMERICA'S
OPPOSITION MEMORANDUM       5      CIVIL NO. A03-006 CV JWS

## DISCUSSION

**I. Samson's motion is based only on supposition and conjecture, not evidentiary proof, and must be denied in its entirety.**

The assertions of fact in Samson's motion in limine are baseless. There is no support for its contention that a "material diversion of cargo from the mode contractually required did occur", or that some kind of records showing such a diversion existed at one time (Pg 4 of Samson's memorandum), or that the proper agencies of the United States had notice of the need to preserve whatever flight data existed because it might relate to potential litigation someday. This is all mere argument by Samson.

Samson offers no declaration or affidavit regarding any of the salient facts which are included in its motion, and only three Exhibits, none of which have been properly authenticated.

Exhibit 1 is only a truncated version of the Supplemental Notice of F.R.C.P. 30(b)(6) Depositions Samson actually served on the United States several years ago. (A complete and true copy of that Notice is attached hereto as Exhibit "F".)

Samson's Exhibit 2 consists of a series of letters by a paralegal from the firm which represents it in the present action, which letters were purportedly sent by her to the federal agencies involved with Samson, the Navy and the Army, but notably not sent to agencies such as the Air Mobility Command ("AMC") or the Air Force which might actually have been involved in air shipments and had some relevant documents at one time.[2] Interestingly, the letters were supposedly sent in the summer of 1997, while the contract was still in effect.

Finally, Samson's Exhibit 3 appears to be a document Samson itself created for illustrative purposes, possibly during the claim's process.

---

[2]/   The early FOIA letters in 1997 ask only for cargo documents in the possession of the particular agency to which the request is addressed.

UNITED STATES OF AMERICA'S
OPPOSITION MEMORANDUM                    6                    CIVIL NO. A03-006 CV JWS

None of the Exhibits attached to Samson's motion are properly authenticated by way of appropriate sworn affidavits or declarations, nor are the documents self authenticating. Local Court Rule 7.1(d)(1) provides that where documents offered in support of a motion are not properly authenticated, as required by Local Rule 7.1(a)(3), this acts as an admission that the motion is meritless. This should be the case with regard to Samson's motion in limine.

In addition, Samson never identified the paralegal who drafted the letters as being a potential witness on its behalf in any of its disclosures in this case, and the Government consequently did not depose her to verify the authenticity of the letters and inquire into the circumstances of her requests, including identifying any agency contacts she might have had and any conversations which may have taken place to limit and/or restrict the scope of the requests at the time they were allegedly made. Obviously, this too is prejudicial to the United States.

## II. The Government Never Refused To Produce Witnesses On Noticed Subjects, And Remains Willing To Do So.

When read in its entirety, Samson's Supplemental F.R.C.P. 30(b)(6) Notice of Deposition, a full copy of which is attached as Exhibit "F" hereto, is obviously extremely broad and burdensome. It led to ongoing discussions between counsel for the parties about the possibility of narrowing its ambit and the production of responsive witnesses. (A copy of one early letter from Government counsel to attorneys for Samson about how to proceed is attached hereto as Exhibit "G".) In response to the first and Supplemental Notices, the United States produced a number of witnesses in various locations around the country, until such time as Samson's attorneys expressed a desire to stop taking further 30(b)(6) depositions. (See the Declaration of Jeanne Franken submitted in support hereof.) As recently as the end of last year, when Samson surprised Government counsel by indicating that it might bring motions based on the supposed failure of the Government to produce responsive F.R.C.P. 30(b)(6) witnesses on certain of the myriad remaining subjects included

Case 3:03-cv-00006-JWS   Document 76   Filed 04/15/2008   Page 8 of 12

in its Supplmental Notice, counsel for the United States again offered to produce witnesses on any subject Samson had previously noticed. (See the Government's Statement Regarding Trial Readiness, Docket No.69.)  Samson never responded to that overture.  Significantly, Samson never convened a Deposition to make a record that the Government was refusing to produce a witness on any subject upon which it had requested testimony and wanted to go forward, for the simple reason that the United States was always prepared to proceed with those depositions [3]/.  Samson also never moved to compel the production of any witness(es) or documents by the Government in this case.  Instead, Samson simply did not pursue taking testimony on most of the areas included in its exceedingly broad Supplemental Notice, although identifying and locating potentially responsive witnesses on so many diverse subjects from such a large number of federal agencies and services, especially given the passage of a decade of time, had been no small task for the Government's attorneys.  Nevertheless, it was simply not within the power of counsel for the United States to force Samson to proceed with depositions on more of the noticed subjects, when Samson had communicated that it did not wish to do so. [4]/

---

[3]/ For its part, when Samson refused to produce witnesses in response to the Government's F.R.C.P. 30(b)(6) Notice, and did not seek a protective order, the United States actually convened the deposition, as it had advised Samson it would, and made a record of Samson's failure to produce any witness in response to any of the subjects included in that Notice. (See the Franken Declaration submitted in support of the Government's Motions in Limine, and the Exhibits thereto.)

[4]/ It should be noted that, although the Government was and is prepared to produce one or more witnesses with regard to the general rules, policies and procedures attendant to decision making regarding what modality was to be used when moving cargo to and from Adak in the DTS in the mid-1990s, as well as individuals who were involved in arranging the movement of such cargo off the island, it cannot produce a witness on the supposed "decision to ship barge-suitable cargo by air" (Pg 2 of Samson's memorandum) because the Government has found no evidence that this actually

OPPOSITION MEMORANDUM                          8                          CIVIL NO. A03-006 CV JWS

III. Samson Offers No Proof That The Government Has "Spoliated" Relevant, Necessary Evidence; But Even Were Samson To Somehow Prevail On This Issue At Trial, The Remedy Properly Would Be To Shift The Burden Of Proof, Not To Limit Proof or Strike Defenses.

As stated above, there is no support for the proposition (Pg 8 of Samson's memorandum) that documents are "missing". No testimony has been obtained that contemporaneous records, such as flight manifests, actually existed for all flights on and off Adak for the pertinent two year period in the mid-1990s, or that any such documents, assuming some did once exist, would likely have been retained after the flights were concluded, or that they would have been in the possession of the Government for commercial or private planes, or that any such documents that might have been in the possession of the United States were destroyed after notice was obtained that Samson might be initiating litigation regarding its contract. When the Government first received such notice is also in dispute, as discussed supra. Samson's FOIA letters in mid-1997 raise more questions than they answer; they were not even addressed to those agencies most likely to have had air data, such as AMC or the Air Force. Supplemental FOIA requests were not sent by Samson until 2000-2001, three to six years after the flights would have occurred in 1995-1997, likely well past the applicable retention periods for the types of documents Samson would like to have found, assuming such items existed at some time.

A trier of fact may draw an adverse inference from a proven destruction of evidence by a party which is shown to have been on notice of its potential relevance for litigation. *Akiona v. United States*, 938 F.2d 158 (9th Cir. 1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1567, 118 L.Ed.2d 212 (1992). This means that a District Court has discretion to shift the burden of proof in an appropriate case where spoliation is shown, based on the rationales behind the doctrine which are said to be either evidentiary or deterrent. However, in the

---

transpired. The United States cannot produce a witness regarding something that does not appear to have happened.

present case, there is no proof that documents of the sort Samson says it sought existed at all, let alone for any significant period of time after the conclusion of the flights; or that copies of any such documents would have been given to and/or retained by the United States, other than those data print outs which were in fact produced during the pendency of this case. Neither has it been shown that the pertinent federal agencies had timely notice of the potential relevance of any such materials to potential litigation by Samson; or that anything at all was destroyed by the Government after it had such notice.

Samson does not appear to be advancing the proposition that the alleged destruction was made in bad faith. The Ninth Circuit has held that the absence of bad faith may be a relevant factor in a District Court's determination about whether to shift the burden of proof once spoliation is otherwise proven. See, e.g. *Millbourn v. Marriott*, 67 F.3d 307 (9th Cir. 1995)(clarifying earlier cases).

The obvious explanation for why more documentation of the small amount of cargo carried by air has not been found is that it either never existed and/or was not retained once the flights were over, or was never in the possession of federal agencies, or was destroyed in the normal course by agencies which were unaware of Samson's alleged FOIA requests in 1997. Really Samson is just saying they have found no evidence of a diversion to air of what they define as barge-appropriate cargo, and conclude the Government destroyed such evidence. Of course, the far more probable explanation is that there simply was no diversion, and thus no evidence of one, as the Government witnesses have testified.

Finally, even if spoliation were somehow to be proven by Samson, the consequence is to shift the burden of proof, not to preclude the Government from putting on evidence on the subject, thereby essentially striking part of its defense, a far more severe sanction. See, e.g., *Hickman v. Carnival Corp.*, 2005 A.M.C. 1872 (S.D.Fla. 2005) (not otherwise reported) (a showing of bad faith would be required to impose such a severe sanction).

## CONCLUSION

After five years of discovery, there is simply no proof that a significant air lift occurred to clear equipment, vehicles, scrap, etc. off Adak when the Navy left the island. No one has testified, and no documents have been found, to support the notion that significant cargo, which looked like barge appropriate cargo,[5]/ left the island in some way other than by the Samson barge. To the contrary, the evidence actually shows that the Government erred on the side of leaving everything behind which could possibly and properly be reused by the LRA in its redevelopment plans for the island.

For the foregoing reasons, Samson's motion in limine, which seeks to limit the evidence the United States may seek to introduce at trial, should be denied in its entirety.

Dated: 4/15/08

                          JEFFREY S. BUCHOLTZ
                          Acting Assistant Attorney General
                          NELSON P. COHEN
                          United States Attorney
                          GARY GUARINO
                          Chief, Civil Division
                          Assistant United States Attorney
                          R. MICHAEL UNDERHILL
                          Attorney in Charge, West Coast Office
                          Torts Branch, Civil Division

                          s/Jeanne M. Franken
                          _____
                          JEANNE M. FRANKEN
                          Trial Attorney
                          Torts Branch, Civil Division
                          U.S. Department of Justice

                          Attorneys for Defendant
                          United States of America

---

[5]/ It must be emphasized that the Government contends that at all times it legally had the discretion to define its "requirement" for ocean transportation between Adak and CONUS, and thus to determine how cargo would be transported in the DTS, whether by surface means or air, in order to meet the operational needs of the customer agency on Adak, primarily the Navy. This means that even had there been a large amount of cargo carried by planes, that would have been within the purview of the Government not Samson.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 4/15/08, a copy of the foregoing UNITED STATES OF AMERICA'S OPPOSITION MEMORANDUM WITH EXHIBITS, was served electronically on:

Richard D. Gluck, Esq.
Garvey Schubert Barer

William G. Royce, Esq.
Law Office of William G. Royce

Attorneys for Plaintiff/Appellant
Samson Tug and Barge Company, Inc.

s/Jeanne M. Franken
_____
JEANNE M. FRANKEN