1    supercargo view, and certainly they're used in a lot

2    of cases because we actually have an advantage that

3    you can gain.  You can maintain cargo and check the

4    batteries and so forth.  It's very difficult to do

5    that on a tug barge service.

6  Q  We have mentioned so far, I think, three categories

7    which are typically air transport: required delivery

8    date, perishables, and passengers.

9        Any other categories?

10 A  Things like unaccompanied baggage, household goods

11    that are really susceptible to movement by either

12    mode, depending on the standard of service and any

13    impact that may happen to the service member or their

14    family so that the MILSTAMP provides for the cargo to

15    be routed as it's required based on the individual

16    circumstances.

17        Certain types of mail are moved; a lot of parts,

18    readiness parts; parts for, as you mentioned, like a

19    helicopter or an aircraft or something; obviously

20    based on quality of life, heating, whatever it might

21    be in Adak; that late availability from a vendor; the

22    availability not an issue, but when you have the

23    breakdown needing to order it and getting it moved--

24    you could have large or small pieces of equipment

25    that might be involved in that.  An operation--

```
 1        whatever decision they might make about what they

 2        need to get done.

 3   Q    You mentioned unaccompanied baggage.

 4             Define that term, please.

 5   A    That's a small portion of the overall household goods

 6        that a member moves that they can move separately

 7        from the major move, major household goods.

 8             You might have at your house-- you would have a

 9        whole house full of furniture and clothes and so on

10        and so forth.  There would be the household move and

11        then there would be a small portion of that that

12        could be carried as a separate entitlement, if you

13        will, and then a movement of that for the service

14        member.

15   Q    Is that a descriptor for baggage that one may

16        normally carry as they travel--

17   A    Well, generally sometimes going to some isolated area

18        they might arrange some sort of-- it can be moved--

19        it is normally moved really as delivered on a certain

20        date, so it doesn't have to actually be with the

21        individual.

22   Q    And unaccompanied baggage, I take it, can have a

23        required delivery date?

24   A    Yes.  The standards of service are fairly

25        straightforward on that.
```

34

1        The kind of priorities and the exemptions that

2    the individual services make for like standard

3    household goods, the movement-- there are standards

4    about what the movement pattern is.  Normally

5    household goods obviously moves on routine surface

6    transportation, but in the case if it impacts a

7    service member, family, service member issues, maybe

8    his-- maybe he is transferring to another location

9    and the movement of household goods needs to be

10   expedited going back, and therefore the decision is

11   made that they have to go by air because you have to

12   meet the requirement that the customer has.

13 Q And the customer in this discussion goes right down

14   to the individual serviceman or woman?

15 A The individual might have a particular situation that

16   the service would consider.

17       The service then has, within its personal

18   property, guidelines and policies that they utilize

19   to determine what exceptions, if you will, for like a

20   standard household goods movement that would apply.

21       You could have issues in which a service member,

22   they've made an assignment for him, and maybe they

23   need to have him transferred to some location, and

24   therefore within their policy guidelines they might

25   allow air freight in that case.

35

Byers & Anderson, Inc. - Court Reporters & Video

```
 1        subservient role because you are helping somebody

 2        else that has higher responsibility or you could be

 3        asked to assist because you actually have a superior

 4        role and you have superior knowledge.

 5             Which category was your assistance?

 6   A    I think I was asked to assist because of experience

 7        and knowledge that I had about ocean transportation.

 8   Q    Do you know who the employee was that you assisted in

 9        1993, 1994?

10   A    Well, it would have been the individuals-- there

11        would be a few individuals in there.  I don't recall

12        the exact names.  We would have to go back and look.

13   Q    Okay.  And do you recall the nature of your

14        assistance?

15   A    As I said, we were to review the performance work

16        statement, to review the requirements, to look at the

17        contract itself to see whether or not there were

18        changes that might be reasonable to make.

19   Q    Do you know if in the 1993, 1994 time period the Adak

20        contract was a requirements type contract?

21   A    Yes, to my knowledge it was.

22   Q    Is it typical that designated service contracts are

23        requirements-type contracts?

24   A    I think historically they had been requirements

25        contracts, but a lot of those contracts were
```

36

1      converted to IDIQ contracts.

2  Q   What is an IDIQ contracts?

3  A   Indefinite delivery, indefinite quantity.

4  Q   Would you define for us, first, a requirements

5      contract, and then I'll ask you to define it and

6      perhaps distinguish an IDIQ contract.

7              MS. FRANKEN:  I am going to object to

8      the extent you're calling for a legal definition, but

9      he can certainly give you his operational

10     understanding.

11             THE WITNESS:  A requirements contract

12     would be a contract in which the government provides

13     a reasonable forecast of the work that would be

14     performed, and the contractor is entitled to meet

15     those requirements as they develop, but there is no

16     guarantee of cargo, in this particular case, that

17     would be made available to the carrier or contractor

18     under the contract.

19         An IDIQ contract would be that the government

20     guarantees a minimum amount of work under the

21     contract up to a maximum, and therefore the

22     contractor does, in fact, receive the minimum under

23     the contract, whereas under a requirements contract

24     there may not be cargo that materializes.

25  Q   (By Mr. Royce)  Under a requirements contract, is it

37

*Byers & Anderson, Inc. - Court Reporters & Video*

1    correct that cargo which does materialize within the

2    scope of the requirements contract would be moved by

3    the contractor that had the requirements contract?

4  A  A contractor for ocean transportation would receive

5    the cargo that would be submitted within the contract

6    for ocean transportation.

7        Certainly as the government had ocean contract

8    requirements, it would feed those requirements to

9    that contractor.

10 Q  And if there were ocean contract requirements and

11   cargo which satisfied that definition that was

12   transported, for instance, by air, would that

13   constitute a breach of the requirements contract for

14   marine transportation?

15            MS. FRANKEN:  Objection; calls for a

16   legal conclusion, incomplete hypothetical.

17       If you understand the question, you may answer

18   the question.

19            THE WITNESS:  An ocean contract, the

20   carrier would be entitled to cargo that was

21   designated for movement by the agency's services

22   that's going to move by that mode.

23       To the extent that there was cargo that was going

24   to move by air, the carrier would not have any

25   entitlement for cargo that's moved outside the ocean

1    service that the carrier provides.

2  Q  (By Mr. Royce)  In an ocean transport requirements

3    contract, if the cargo didn't have a required

4    delivery date making it unsuitable for ocean

5    transport, if the cargo was not perishable making it

6    unsuitable, if the cargo was neither passengers nor

7    live animals or unaccompanied baggage, would you

8    expect that cargo would move by ocean transport?

9         MS. FRANKEN:  Objection; calls for a

10   legal conclusion, incomplete hypothetical.

11        If you understand the question, you can answer.

12        THE WITNESS:  The requirement to move

13   cargo by ocean transportation is made by the shipper

14   of the cargo, and in relationship to the consignee's

15   requested delivery dates and so on for the cargo.

16        If the cargo is offered up for ocean

17   transportation, then we would have it move by the

18   ocean contractor.  If the cargo is not offered up for

19   ocean transit, then it would not move by the carrier.

20 Q  (By Mr. Royce)  Who is the person or what is the

21   office that makes the decision whether to offer cargo

22   for ocean transportation or instead move it by air in

23   the Adak setting?

24 A  If you look at the standard process, the contracting

25   vehicle for ocean transportation is provided then to

39

1    the shippers in the defense transportation system.

2    To the extent that they have cargo that needs to move

3    by ocean, given the parameters of the ocean and the

4    type of cargo, then that cargo is then offered

5    through the organization that books for ocean

6    transportation, which would have been MTMC back in

7    that time frame.

8         If, in fact, it was cargo that was going by air,

9    it would have been offered up through AMC.

10  Q  I think where we're maybe having difficulty is you're

11     qualifying "cargo" by defining it as that offered for

12     marine goes by marine and that offered by air, that

13     goes by air.

14         So definitionally that would always be a truism,

15     correct?

16  A  It is true that cargo that's supposed to go on ocean

17     transportation would be offered by ocean

18     transportation, and hopefully the contractor will

19     then move it.

20  Q  What if cargo that was properly of the type suitable

21     for ocean transportation was instead moved by air,

22     would that, in any fashion, violate terms of a

23     requirements contract?

24              MS. FRANKEN:  Objection; calls for a

25     legal conclusion, incomplete hypothetical, I might

40

1          MR. ROYCE:  To his knowledge.

2          THE WITNESS:  There would be a variety

3    of areas where tug and barge service-- obviously

4    there's been tug and barge service offered to Alaska,

5    tug and barge service offered to Adak, tug and barge

6    service has been offered to Guantanamo, tug and barge

7    service to Puerto Rico, tug and barge service to

8    Andros Island, tug and barge service to Bermuda.

9         It's been now new-- there's been occasionally

10   some tug and barge business used in Hawaii, and the

11   sea certainly charges tugs and barges on occasion for

12   individual movements.

13        I think that constitutes the majority of it.

14   Q   (By Mr. Royce)  Transportation of cargo is what I was

15       focussed on.

16   A   Dry cargo.

17   Q   So it's not an unusual method of transportation

18       within the agency?

19   A   No.

20   Q   What was your first involvement with the Adak

21       contract?

22   A   My involvement in that, as I indicated earlier today,

23       was relating to assisting with the contract

24       solicitation for support of Adak service-- the ocean

25       service that runs between Pacific Northwest and Adak.

*Douglas C. Anderson, 11/30/05 - By Mr. Royce*                    97

41

1    in analyzing Samson's claim?

2  A  I did not.

3  Q  Did you supervise others who analyzed Samson's claim?

4              MS. FRANKEN:  In the earlier case?

5              MR. ROYCE:  This is in the 1993, 1995

6    contract we were talking about.

7              THE WITNESS:  That claim was filed what

8    date?

9              MR. GLUCK:  That would have been after

10   1995 because the contract--

11             THE WITNESS:  I recall being asked

12   several questions about it--

13             MS. FRANKEN:  That's as far as you're

14   going to go with him on analysis within the agency

15   regarding the submission of a claim which we all know

16   is privileged.

17  Q  (By Mr. Royce)  Did you have any role in drafting the

18   solicitation for the contract which began in 1995?

19  A  Which is the current contract?

20  Q  Yes, the last--

21  A  That this claim is based on?

22  Q  Exactly.

23  A  Yes.

24  Q  What was your role?

25  A  I was the contracting officer for a time during that

*Douglas C. Anderson, 11/30/05 - By Mr. Royce*                    127

42

 1    made during the solicitation process.

 2         Again, the questions will not focus on those

 3    aspects of the document.

 4              MS. FRANKEN:  I am going to object on

 5    the basis of authenticity then that this is not the

 6    government's solicitation.

 7  Q  (By Mr. Royce)  Mr. Anderson, can you give me an

 8    overview of your participation, if any, in drafting

 9    any content of the solicitation, Exhibit No. 6?

10  A  To the extent that this was the product from military

11    sealift command, I reviewed the document and added

12    and changed some language within the solicitation.

13  Q  Okay.

14  A  And it was issued by an individual that I supervised.

15  Q  Was the initial solicitation a requirements contract

16    or an IDIQ contract, that you recall?

17  A  I believe the solicitation was issued as an IDIQ

18    contract.

19  Q  Do you have any knowledge as to why this particular

20    contract was issued as an IDIQ contract?

21  A  The discussion on the government's requirements,

22    which were extremely uncertain, caused the government

23    to take a look at how the contract was structured.

24         One of the concerns that had been raised by the

25    incumbent contractor, Samson, is that maintaining

43

1    service when there might be little cargo on an

2    individual sailing under the requirements contract

3    structure as well as comments that we had for other

4    dedicated contract areas where similar issues occur,

5    the government made a determination that one of the

6    advantages when requirement and the government

7    forecasts are uncertain due to changes that the

8    government is making in its presence in that

9    particular location, such as the uncertainty and

10   final closure dates of our Adak installation, and

11   certainly the big variances between what was

12   originally estimated in prior contracts and what

13   actually materialized, discussion was made on how to

14   do two things: how to give a contractor who wants to

15   make an offer some basis to maintain a regularly

16   scheduled service; two, to recognize the fact that

17   the government had changes that were likely to occur

18   but the dates were unknown.

19        A contractor under a dedicated service, since

20   that is really the ocean surface line-- excuse me,

21   lifeline of that particular location, it has to

22   deliver the cargo as it's scheduled to do, regardless

23   of whether on an individual voyage the government has

24   a very small requirement or a very large requirement

25   for that particular voyage sailing.

44

1    When the government utilizes ocean carriers who

2    provide regularly scheduled service to a particular

3    area and it is commercially based and the government

4    is simply cargo that is additive to it, then that is

5    not really a concern.

6    In the case of an operation where the government

7    cargo either forms all or a large portion, the

8    carrier has a legitimate concern that they raise,

9    which is fully understood in the contract

10   solicitation process under previous contracts, but

11   there is variability as this other contract that

12   we've just talked about has, the previous exhibit

13   that you've given me, indicates that there is big

14   variance in the cargo, but the government then looks

15   at an IDIQ as providing a floor to the contractor so

16   that they know how to spread their rates, cost

17   structure, if you will, across that base of cargo to

18   maintain that regularly scheduled service, so it

19   would lower the risk to the contractor to be able to

20   provide service where there is a guarantee, unlike a

21   requirements contract where there is no guarantee.

22   It also, as I pointed out, takes into account

23   that with the government situation is very subject to

24   change because closure operations on installations

25   sometimes take extensive periods of time, sometimes

45

1   do not take extensive periods of time, sometimes the

2   decisions are made that all cargo will be taken from

3   that location, and in some cases more cargo is

4   actually brought in and facilities are built up to

5   then be turned over to folks.

6         As a result then, the review was we need steady

7   service.  We have a high probability of a much

8   reduced cargo base subject to extreme change which

9   caused a review of the contract to see if we could

10  lower the risk to the contractor and deal with what

11  really was an uncertain situation while still

12  maintaining for our installation up there the service

13  they required.

14  Q   Did you play a substantial role in the government's

15      decision to change from a requirements contract to an

16      IDIQ contract?

17  A   I would say that that's correct.

18  Q   What other individuals participated in making this

19      decision?

20  A   There would have been a discussion within military

21      sealift command, some discussion within military

22      traffic management command, so the contracting chain

23      within military sealift command, certainly some

24      discussion with the military traffic management

25      command about that different structure.

46

```
 1         Within senior operational staff within military
 2    sealift command there was probably an explanation
 3    made to them as to why it would be different than it
 4    had been before, and I think probably there was some
 5    discussion that the requiring activity-- simply to
 6    talk in general terms about why if the requirements
 7    are going to be so subject to change and we do not
 8    think that we'll have any good answers on exactly
 9    when we might close or substantially change what
10    we're doing, then this might provide a vehicle that
11    would be helpful.
12  Q  Is there an issuance date here on Exhibit No. 6?
13         Maybe you could direct me where to look--
14  A  I don't see a date-- looks like Page 3 of the
15    exhibit, not numbered where it says, "Date issued:
16    15 March 1995."
17  Q  What was the state of knowledge within-- what was
18    your state of knowledge as of March 15th, 1995
19    regarding if the Adak base was going to close?
20  A  I think all of it was uncertain.
21         That triggered changes in the length of the
22    contract, triggered different contract time.
23    Certainly there was a lot of close scrutiny put on
24    the volumes involved which were substantially reduced
25    from prior contracts.
```

47

```
 1          Our information was that it was subject to
 2     change.
 3   Q  All right.  Do you have any knowledge regarding the
 4     approximate number of personnel and families living
 5     at Adak in the 1993, 1995 time period?
 6   A  I don't recall.
 7   Q  Were you ever privy to any information that suggested
 8     that the population of Adak may ultimately reach-- of
 9     military staff, plus their families, may ultimately
10     reach approximately 10,000 people?
11   A  I don't recall that, no.
12   Q  Did you have any information regarding whether
13     material and assets had been moved to Adak to support
14     a larger population than existed at Adak in 1993
15     through 1995?
16   A  I'm aware of differing information about various
17     plans that were put forth on the size and staffing of
18     Adak.
19          I might point out that that is similar to a lot
20     of plans that are put out on most all these other
21     installations that are in these remote areas where
22     there is discussion, a plan, no actual approvable
23     plan, the plan is talked about, and then another plan
24     is proposed.
25          From that standpoint, certainly we did get
```

48

1    STATE OF WASHINGTON )    I, Terilynn Pritchard, CCR, RPR,
                         ) ss CCR # 2047, a duly authorized
2    County of Pierce    )    Notary Public in and for the State
                              of Washington, residing at
3                             Auburn, do hereby certify:

4

5         That the foregoing deposition of **DOUGLAS C.
     ANDERSON, VOL II** was taken before me and completed on
6    **December 1, 2005**, and thereafter was transcribed under my
     direction; that the deposition is a full, true and complete
7    transcript of the testimony of said witness, including all
     questions, answers, objections, motions and exceptions;

8
          That the witness, before examination, was by me
9    duly sworn to testify the truth, the whole truth, and
     nothing but the truth, and that the witness reserved the
10   right of signature;

11        That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
12   of any such attorney or counsel and that I am not
     financially interested in the said action or the outcome
13   thereof;

14        That I am herewith securely sealing the said
     deposition and promptly delivering the same to
15   Attorney **William Royce.**

16        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my official seal this 2nd day of December, 2005.

17

18

19

20   _____
     Terilynn Pritchard, CCR, RPR
21   Notary Public in and for the State
     of Washington, residing at
22   Auburn.

23

24

25

49

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SAMSON TUG AND BARGE CO., INC., an )
Alaska Corporation, )
)
            Plaintiff/Appellant )
)
            vs. )
)
UNITED STATES OF AMERICA, )
)   Case Number:
         acting by and through )   A03-006 CV Admiralty
)   JWS
THE UNITED STATES DEPARTMENT OF )
THE NAVY MILITARY SEALIFT COMMAND, )
and UNITED STATES DEPARTMENT OF )
THE ARMY MILITARY TRAFFIC )
MANAGEMENT COMMAND, )
)
            Defendants/Appellees. )

**DEPOSITION OF DOUGLAS C. ANDERSON, VOL II**

December 1, 2005

Seattle, Washington



## Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101
(206) 340-1316
(800) 649-2034

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax
scheduling@byersanderson.com
www.byersanderson.com

**25th Anniversary 1980-2005**

50

1  Q  (By Mr. Royce)  All right.  Do you know if at some

2     point the military sealift command determined to

3     offer as an alternative a requirements type of

4     contract?

5  A  Subsequently military sealift command did make a

6     determination that it would attempt to keep the small

7     business set-aside in place and allow offerors to

8     offer on either an IDIQ basis or a requirements type

9     basis under the contract.

10 Q  Mr. Anderson, I understand from your testimony

11    yesterday that you played some substantial role in

12    the consideration of implementing an IDIQ contract

13    for the marine transportation needs of Adak.  Is that

14    true?

15 A  Yes.

16 Q  Did you also participate in discussions wherein it

17    was determined to offer, as an alternative, a

18    requirements based contract?

19 A  I was involved in some of the discussions.

20 Q  Who was involved in those discussions, besides you?

21 A  There would have been a variety of contracting staff

22    within military sealift command; Lucille Ludwig;

23    there would have been discussion with Captain Jim

24    Anderson who I think was the head of contracting at

25    that point; and various other folks within--

51

CORRECTIONS TO BE NOTED TO DEPOSITION TRANSCRIPT

NAME OF DEPONENT: <u>Douglas Anderson</u>
DATE OF DEPOSITION:    <u>December 1, 2005</u>
CASE NAME: <u>Samson vs. United States of America</u>

INSTRUCTIONS: Please make changes by listing the page and line number in the
places indicated on this sheet and listing the changes to the right.

| Page # | Line # | Corrections |
|--------|--------|-------------|
| 19 | 1 | Replace "Giodorno" with "Giordano" |
| 20 | 23 | Replace "B-E-N-E-T-T-I" with "B-I-N-E-T-T-I" |
| 42 | 2 | Place a period after "contractors" |
| 42 | 3 | Capitalize "obviously" |
| 52 | 13 | Replace "is" with "was" |
| 52 | 15 | Replace "Benetti" with "Binetti" |
| 54 | 9 | Delete "in" |
| 70 | 3 | Replace "Yes" with "A Command" |
| 71 | 13 | Insert "CNB may refer to Commander, Naval Base." after period |
| 72 | 3 | Insert "CONAIR may refer to contracted airlift." after period |
| 80 | 2 | Replace "El Mendorf" with "Elmendorf" |
| 81 | 21 | Replace "bureau of personnel" with "Bureau of Naval Personnel" |
| 82 | 19 | Replace "mission" with "message" |
| 84 | 2 | Replace "populus" with "populace" |
| 86 | 13 | Replace "Chief naval operations" with "Chief of Naval Operations" and "is" with "are" |
| 86 | 14 | Insert after means, "it may refer to Commander, U.S. Pacific Fleet," |
| 86 | 21 | Delete "now" and replace "use" with "used" |
| 86 | 25 | Replace "therefor" with "therefore" |
| 87 | 1 | Replace "theatre" with "theater" |
| 87 | 14 | Replace "of" with "for" |
| 89 | 17 | Replace "Far" with "far" and insert after know. "Should be the Supply Officer." |
| 101 | 7 | Insert after officer. "It may refer to the Caretaker Site Office." |
| 107 | 8 | Replace "The" with "For" |
| 108 | 1 | Replace "world" with "worldwide" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Date: <u>17 feb 06</u>                    Signed subject to penalty of perjury

                                           Signature

52

CORRECTIONS TO BE NOTED TO DEPOSITION TRANSCRIPT

NAME OF DEPONENT: <u>Douglas Anderson</u>
DATE OF DEPOSITION:    <u>November 30, 2005</u>
CASE NAME: <u>Samson vs. United States of America</u>

INSTRUCTIONS: Please make changes by listing the page and line number in the places indicated on this sheet and listing the changes to the right.

| Page # | Line # | Corrections |
|--------|--------|-------------|
| 6 | 21 | Insert "the" before Citadel |
| 8 | 10 | Insert "the" before U.S. Army and comma after itself |
| 10 | 8 | Replace "we" with "I" |
| 13 | 21 | Insert "but in" after "guess," |
| 14 | 2 | Replace "spoke" with "spoken" |
| 14 | 8 | Insert "which" after symposiums |
| 14 | 15 | Replace "desires" with "desire" |
| 15 | 6 | Replace "list" with "less" |
| 21 | 22 | Replace "sea-land" with "Sea-Land's" |
| 25 | 16 | Replace "search" with "surge" |
| 25 | 18 | Replace "search" with "surge" |
| 27 | 17 | Insert "a wider" before geographic |
| 30 | 16 | Replace "Military Traffic Command's" with "Military Traffic Management Command's" |
| 32 | 11 | Insert "and" after "Deployment" |
| 32 | 15 | Delete "Commander" |
| 33 | 2 | Insert "operations" after "distribution" |
| 33 | 6 | Change "travelled" to "traveled" |
| 33 | 10 | Replace "decision" with "decisions" |
| 33 | 23 | Replace "apply" with "accomplish" |
| 37 | 3 | Delete "for" |
| 37 | 12 | Replace "scores" with "scored" |
| 38 | 19 | Replace "pooled" with "pulled" |
| 39 | 25 | Insert "the" after teaches |
| 41 | 8 | Replace "a" with "as" |
| 42 | 11 | Replace "than" with "contained in" |
| 43 | 15 | Delete "a" and replace "contract" with "contracts" |
| 49 | 19 | Replace "those" with "there" |
| 50 | 1 | Replace "operations" with "obligations" |
| 52 | 3 | Replace "it" with "at" |
| 53 | 15 | Replace "formally" with "formerly" |

Signed subject to penalty of perjury

Date: <u>29 June 2006</u>          _____
                                     Signature

1

53

CORRECTIONS TO BE NOTED TO DEPOSITION TRANSCRIPT

NAME OF DEPONENT: Douglas Anderson
DATE OF DEPOSITION:    November 30, 2005
CASE NAME: Samson vs. United States of America

INSTRUCTIONS:  Please make changes by listing the page and line number in the
places indicated on this sheet and listing the changes to the right.

| Page # | Line # | Corrections |
|--------|--------|-------------|
| 54 | 6 | Insert "the" before surface |
| 54 | 13 | Replace "formally" with "formerly" |
| 54 | 16 | Insert "the" before Military |
| 55 | 9 | Replace "formally" with "formerly" |
| 56 | 6 | Insert "." After responsible and capitalize "Before" and insert "," |
| 59 | 8 | Insert "covered" before what |
| 60 | 1 | Replace "served" with "sent" |
| 61 | 7 | Replace "is decided" with "decides" |
| 64 | 14 | Replace "you" with "that" |
| 65 | 15 | Replace "supercargo" with "supercargoes" |
| 65 | 17 | Replace "of" with "if" |
| 67 | 19 | Replace "as" with "to" and "delivered" with "deliver" |
| 68 | 7 | Delete ", maybe" |
| 68 | 8 | Delete "his" |
| 69 | 6 | Delete "That's really" |
| 70 | 8 | Insert "such paperwork" after see |
| 70 | 22 | Insert "more" after area |
| 73 | 24 | Replace "proposed" with "proposal" |
| 76 | 18 | Replace "jobs" with "job." |
| 78 | 17 | Insert "discussions" after obviously |
| 79 | 13 | Insert "would review and" after overwatch |
| 84 | 17 | Replace "by" with "for" |
| 92 | 18 | Insert "/" after discussions |
| 97 | 9 | Delete "been" |
| 104 | 17 | Delete "they" |
| 122 | 3 | Replace "is" with "are" |
| 122 | 13 | Replace "carrier" with "carried" |
| 123 | 18 | Insert "a" after being and a "," after contract |
| 125 | 20 | Insert "on" after give |
| 125 | 21 | Insert "," after cargo |

Signed subject to penalty of perjury

Date: 27 Jan 2006

Signature

2

54

CORRECTIONS TO BE NOTED TO DEPOSITION TRANSCRIPT

NAME OF DEPONENT:  Douglas Anderson
DATE OF DEPOSITION:    November 30, 2005
CASE NAME:  Samson vs. United States of America

INSTRUCTIONS:  Please make changes by listing the page and line number in the
places indicated on this sheet and listing the changes to the right.

| Page # | Line # | Corrections |
|--------|--------|-------------|
| 130 | 16 | Insert "and" before two |
| 131 | 23 | Replace "with" with "when" |
| 132 | 6 | Insert "that" after was |
| 133 | 5 | Replace "that" with "with" |
| 134 | 22 | Replace "approval" with "approved" |
| 135 | 3 | Insert "a" before reasonable and replace "estimates" with "estimate" |
| 139 | 22 | Insert "from" before the |
| 139 | 23 | Replace "it" with "he" |
| 140 | 4 | Replace "Charles" with "Charna" |
| 150 | 19 | Delete "was" and replace "for" with "by" |
| 152 | 16 | Replace "Accepted" with "Excepted" |
| 154 | 17 | Replace "loaded" with "load" |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Signed subject to penalty of perjury

Date: 2⁹ Jan 2006

Signature

55

1    STATE OF WASHINGTON )    I, Terilynn Pritchard, CCR, RPR,
                         ) ss CCR # 2047, a duly authorized
2    County of Pierce    )    Notary Public in and for the State
                              of Washington, residing at
3                              Auburn, do hereby certify:

4

5         That the foregoing deposition of **DOUGLAS C.**
     **ANDERSON** was taken before me and completed on **November 30,**
6    **2005,** and thereafter was transcribed under my direction;
     that the deposition is a full, true and complete transcript
7    of the testimony of said witness, including all questions,
     answers, objections, motions and exceptions;

8

9         That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
10   nothing but the truth, and that the witness reserved the
     right of signature;

11        That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
12   of any such attorney or counsel and that I am not
     financially interested in the said action or the outcome
13   thereof;

14        That I am herewith securely sealing the said
     deposition and promptly delivering the same to
15   Attorney **William Royce.**

16        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my official seal this 2nd day of December, 2005.
17

18

19

20   _____
     Terilynn Pritchard, CCR, RPR
21   Notary Public in and for the State
     of Washington, residing at
22   Auburn.

23

24

25

56    156