1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ALASKA

3    - - - - - - - - - - - - - - - - - -

4    SAMSON TUG AND BARGE CO., INC.,      )

5    an Alaska Corporation,               )

6              Plaintiff/Appellant,       )

7    V.                                   )

8    UNITED STATES OF AMERICA,            ) Case Number:

9        acting by and through           ) A03-006 CV

10   the UNITED STATES DEPARTMENT of      ) Admiralty JWS

11   the NAVY MILITARY SEALIFT COMMAND,   )

12   and UNITED STATES DEPARTMENT         )

13   OF THE ARMY MILITARY TRAFFIC         )

14   MANAGEMENT COMMAND,                  )

15              Defendants/Appellees,     )

16   - - - - - - - - - - - - - - - - -

17

18              DEPOSITION OF WILLIAM DUERDEN

19              WEDNESDAY, MAY 16, 2007

20

21              BEHMKE REPORTING & VIDEO SERVICES

22              BY:  MITCHELL THOMAS, CSR 10137

23                   1320 ADOBE DRIVE

24              PACIFICA, CALIFORNIA 94044

25                   (650) 359-3201

*Exhibit "D"*   1

```
 1                        WILLIAM DUERDEN,
 2  having been first duly sworn, testified as
 3  follows:
 4
 5                        EXAMINATION
 6  BY MR. ROYCE:
 7       Q.    Good morning.  My name is Bill Royce.  We met
 8  a moment ago.  And I understand your name is Bill
 9  Duerden and that you are in the military; is that
10  correct?
11       A.    Yes.
12       Q.    What is your rank?
13       A.    Commander.
14       Q.    Commander.  And how long have you had that
15  rank, Commander Duerden?
16       A.    Duerden.
17       Q.    Duerden.  Thank you.
18       A.    Since August of 2006.
19       Q.    All right.  And how long have you been in the
20  military?
21       A.    It will be 16 years end of this month.
22       Q.    Would you give me a brief sort of overview of
23  your progression through the military from the time you
24  first joined the service?
25       A.    I went to the Naval Academy.  Upon graduation
```

                                                                6

1   entered the submarine program which included nuclear

2   power training and then assignment to the SSBN-727 out

3   of Bangor, Washington.  I completed a JO tour after 3

4   years on the sub.

5           So, this has been about 5 years into my

6   career when I was assigned up to Adak, Alaska.

7       Q.    When was that that you were assigned to Ad

8       A.    It was spring of 2006.  And I can't remember

9   specifically the month.

10      MS. FRANKEN:  2006.

11      THE WITNESS:  I'm sorry.  1996.

12  BY MR. ROYCE:

13      Q.    There you go.  Thanks.

14      A.    Yeah.  I was assigned the position as the

15  BRAC officer, the base realignment and closure officer.

16  Did my year in Adak upon which I requested and was

17  accepted to a transfer in the civil engineer corp within

18  the Navy.

19          From there, did a tour at the Naval Medical

20  Center in San Diego on the facilities staff.  Did a tour

21  with Naval Mobile Construction Battalion 7 for 2 years

22  and went to grad school for a year.  Then, construction

23  contract management tour in ports of naval shipyard.

24          And then, to my current assignment in a

25  public works at Indian Head, Maryland.

7

1        Q.      And do I understand correctly that you're

2   about to be posted over to Japan?

3        A.      That is correct.

4        Q.      And when do you travel to Japan, Commander

5        A.      I detach from my current command on June 1:

6   and travel arrangements are still being finalized but

7   should be in Japan June 22nd.

8        Q.      And once you are posted to Japan, do you have

9   an understanding of how long you'll be at that duty

10  post?

11       A.      It will be 2 or 3 years.

12       Q.      And what will your role or duties be in the

13  Japan post?

14       A.      I will be the public works officer for Marine

15  Corp Air Station Iwakuni.

16       Q.      All right.  In the U.S. Naval Academy, did

17  you have any particular emphasis in your education?

18       A.      I got a degree in ocean engineering.

19       Q.      Okay.  And when did you graduate from the

20  Academy?

21       A.      1991.

22       Q.      We spoke just a minute before we went on

23  record.  I'm an attorney.  I practice up in Anchorage.

24  And I represent Samson Tug and Barge in a civil action

25  concerning a contract Samson Tug had with the U.S. Navy

8

1    them.

2              So, first of all if I ask any question which

3    is confusing to you, don't try to answer it.  Make me do

4    my job and ask a better question.  Once you have a

5    question that's clearly in mind, I'm asking only for

6    information which you have.  And you're not required to

7    speculate.

8              I might ask you sometimes to give me, you

9    know, some information that's -- that you reasonably

10   have, but if you don't have direct knowledge -- and

11   we'll talk about that when we get there.  But in general

12   terms, I'm not asking you to speculate or guess but just

13   give me your best recollection.  Fair enough?

14        A.   Yes.

15        Q.   All right.  If you have any questions about

16   my questions, tell me to stop and do it over.

17        A.   Okay.

18        Q.   I'd like to focus on the time that you were

19   in Adak.  And if we could go back to that.

20             You were posted up in Adak in spring of 1996

21   as the BRAC officer?

22        A.   Yes.

23        Q.   What was happening in Adak in spring of 1996?

24        A.   We were going through closure efforts.  At

25   that point, it was on a company tour.  So, the squadron

                                                          10

1  and all the general business of -- actually, I think it

2  went from a naval air station to naval air facility at

3  Adak at that point.

4      Q.    If you could tell me what that distinction -

5      MS. FRANKEN:  Could we not have -- could that be a

6  follow-up question --

7      MR. ROYCE:  Sure.

8      MS. FRANKEN:  -- and not interfere.  He was

9  explaining something to you.

10         Please finish.

11  BY MR. ROYCE:

12      Q.    Okay.  Please.

13      A.    Where -- my understanding, it goes from an

14  operational station to -- to the current situation where

15  it was undergoing closure efforts and it was a naval air

16  facility.  So, we were proceeding with the closure

17  efforts resulting from the BRAC legislation and

18  coordinating -- coordinating that process.

19      Q.    All right.  And in general terms, can you

20  tell me what the mission of the Navy was at Adak when it

21  was a naval air station?

22      MS. FRANKEN:  Objection:  Calls for speculation.

23         You can answer the question.

24  BY MR. ROYCE:

25      Q.    If you know?

11

113

1    A.    I don't know for sure.  I couldn't say.

2    Q.    Okay.  And when you were posted to Adak, it

3    had been changed to the category of a naval air

4    facility?

5    A.    Yes.  I think that that had already happened

6    by the time I got there.

7    Q.    Now, as the BRAC officer at Adak, can you

8    sort of run down sort of what your responsibilities

9    were?

10    A.    I was coordinating local closure efforts.  I

11    communicated with the Local Re-use Authority and

12    communicated with representatives from PACFLEET and from

13    EFA Northwest.

14    Q.    And, again, as you use some of these terms, I

15    will ask for definitions so a Judge will know what they

16    mean.  What is EFA?

17    A.    Engineering Field Activity, Northwest.

18    Q.    And what was the role of EFA Northwest as it

19    related to base closure?

20    A.    They are a component of NAVFAC which was

21    responsible for real -- a big portion of NAVFAC is real

22    estate actions.  As this is a large real estate action,

23    they were involved with that whole process.

24    Q.    And, again --

25    A.    NAVFAC is Naval Facilities Engineering

12

114

1    A.    NAVFAC.

2    Q.    NAVFAC.  And arrange disposal of personal

3 property?

4    A.    Correct.

5    Q.    Okay.  Any other sort of broad

6 responsibilities that you had as BRAC officer?

7    A.    Those are what come to mind.  It was kind of

8 the -- the catchall, you know, staffed up not normally

9 part of an installation organization, just to help --

10 because it's such a large undertaking to help coordinate

11 that closure process.

12    I should add with -- the Local Re-use

13 Authority was the other group that I worked with and was

14 the -- the group that had primary interests in assuming

15 operations and re-using the facility.  I worked pretty

16 closely with them to help with that process.

17    Q.    And was the Local Re-use Authority related

18 the Aleut Native Corporation?

19    A.    Yes.

20    Q.    And you had an understanding that this --

21 this asset, this base, would ultimately be transferred

22 to the Aleut Native?

23    A.    That's what we were trying to do.  That was

24 the direction we were going.

25    Q.    All right.  When you were first posted to

16

1  Adak in spring of '96, do you have a recollection of how

2  many people were on base either in active service or as

3  dependents or family of active service?

4      A.    I'm not positive in my memory, but I want to

5  say a thousand.  About a thousand.

6      Q.    Okay.  When did you end your service as a

7  BRAC officer at Adak?

8      A.    When we -- when we left the facility and

9  transferred to caretaker operations on April 1st.

10      Q.    April 1st, '97?

11      A.    '97.  1997.

12      Q.    Okay.  So, you were there right at a year?

13      A.    It was about a year, yeah.

14      Q.    Okay.

15      A.    And when I -- when I first got there, there

16  was a transition period about a month or so before I

17  took over from the incumbent BRAC officer.

18      Q.    Who was the incumbent BRAC officer?

19      A.    Lieutenant Greg Hamby.

20      Q.    Prior to your posting to Adak, had you ever

21  served in the role of a BRAC officer?

22      A.    No.

23      Q.    Had you ever had experience assisting a BRAC

24  officer or being around that activity?

25      A.    No.

17

1        THE WITNESS:  I'm sorry.  Northwest.  That was my

2   other command.

3            And Colleen Nearhoff.

4            Those were the people off island I worked

5   most with, so I believe they would have been part of

6   that discussion.

7   BY MR. ROYCE:

8        Q.    The -- the last individual you identified,

9   Colleen, could you give us a stab at spelling her last

10  name?

11       A.    Then it was N-e-a-r-h-o-f-f.  And she has

12  since married, is Colleen Butcher, B-u-t-c-h-e-r.

13       Q.    And do you know what Colleen Butcher's rank

14  is?

15       A.    She's a civilian.

16       Q.    Oh, she's civilian?

17       A.    Yeah.  With the exception of Cathy Edwards,

18  they're all civilians.

19       Q.    Okay.  Do you know if a decision was

20  ultimately made to bury vehicles in the landfill at

21  Adak?

22       A.    I think that was the decision.

23       Q.    Did you have any role in -- in carrying out

24  the burying of vehicles at Adak?

25       A.    I -- I don't think so.  I think it -- I think

29

117

1  by air.  But I don't know for sure.

2      Q.    Okay.  And in terms of your own -- your

3  personal goods, what sorts of things did you -- what

4  sorts of things left Adak at the time -- or at or about

5  the time you were posted to a station other than Adak?

6      A.    We -- we were limited to what we could bring

7  out there because it was unaccompanied 1 year tour.  So,

8  it was only the necessities that we needed to

9  comfortably live out there for a year.  Extra clothing

10 that I didn't carry with me on the plane.  My camping

11 and hiking gear.  I think I had a bike out there with

12 me.  Computer stuff.  Things of that nature.

13     Q.    Okay.  And those are the things that were

14 moved when you had your next duty assignment?

15     A.    Yes.

16     Q.    And where -- again, where did you go to from

17 Adak?

18     A.    From Adak, I -- I actually was temporarily

19 assigned in Anchorage waiting for a class to start.  I

20 can't remember -- I think it started in July of 1997.

21 And that was my next somewhat lengthy assignment was

22 that class.

23     Q.    And was that in Anchorage?

24     A.    No, the class was in Port Hueneme,

25 California.

38

118

1    involved or other real estate specialists.

2            So, there was -- there was quite a broad

3    spectrum of people within the Navy that had some

4    responsibility over one area or another of the Adak

5    closure.

6        Q.    Do you know when the squadron assigned to

7    Adak actually left that facility?

8        A.    No, I do not.

9        Q.    Was it before you got there?

10       A.    Yes.

11       Q.    As far as you know, was there any major air

12   lift of personal property off of Adak during your time

13   there?

14       A.    No.

15       Q.    As far as you know, was there any major sea

16   lift of personal property off Adak during your time on

17   the island?

18       A.    Just to clarify "major."

19       Q.    Something other than using the Samson Barge?

20       A.    No, not that I'm aware of.

21       Q.    If I understand your testimony, the focus of

22   your work was in dealing with the Local Re-use Authority

23   sometimes called the LRA in assuring them and confirming

24   that personal property that they desired to have left

25   behind for re-use was in fact left behind; is that

54

119

1    correct?

2       A.     That did take up a good portion of my

3    responsibilities.  That is correct.

4       Q.     In the course of doing your job on Adak, did

5    you prepare a video showing what personal property was

6    being left behind at the time of closure for the Local

7    Re-use Authority?

8       A.     Yes.  I -- yes.

9       Q.     Have you seen that video recently?

10       A.     Yes.

11       Q.     And, in fact, did you look at it just this

12    morning?

13       A.     Yes.

14       Q.     So, we looked at what has been previously

15    marked as Exhibit 77 to Mr. Clarke's deposition, and

16    we'll refer to it so in this deposition.  It was also

17    produced for counsel and Bates-stamped U.S. 3300

18    previous to Mr. Clarke's deposition.

19              Were you involved in making this video?

20       A.     Yes.

21       Q.     Do we actually see you on the video?

22       A.     Yes.

23       Q.     What was the purpose of the video?

24       A.     There was a lot of interest on the material

25    and equipment that would be left on the island for

                                                          55

1  re-use.  Some of the -- some of the -- even if it was a

2  small portion of the material that was actually leaving

3  the island, it received the focus of the Re-use

4  Authority.

5          And the purpose was to provide a document

6  that shows what is out there.  It wasn't a comprehensive

7  video, but it did give a better feel of the material and

8  equipment that was out at the island and that would be

9  left available for re-use.

10     Q.    Do you actually know of any personal property

11  that left the island other than the 60-ton crane?

12  Personal knowledge?

13     A.    I can't remember material actually -- I mean,

14  I know there was discussions on moving some of the

15  stuff, but I can't remember that material actually

16  leaving the island before I left.

17     Q.    So, other than the 60-ton crane, you have no

18  knowledge, is that right, of any other personal property

19  leaving at the time you left the island?

20     A.    That is correct.  I can't -- I can't recall.

21     Q.    So, even the discussions about refrigerators

22  and barracks furniture, do you know whether that stuff

23  ever actually left?

24     A.    I mean, it -- it could have, but I don't

25  remember that material getting crated up and shipped off

56

/2/

1    and leaving the island.

2        Q.    On the video, is it correct that you're shown

3    in a variety of locales on the island documenting the

4    various types of personal property that was being left

5    behind for the use of the Local Re-use Authority?

6        A.    That's correct.

7        Q.    What all as you sit here today without going

8    back through this video again do you recall were those

9    locations where you filmed personal property that was

10   being left behind?

11       A.    We toured various public workshops bases like

12   the transportation shop and the -- the maintenance

13   control division I believe is what it was called, the

14   group that basically answered service calls and did

15   repair work on the facilities.  We toured Navy exchange

16   and commissary which was used to store a large quantity

17   of furniture.  We toured the administrative facility.

18   And, again, it was -- it was an attempt to get a

19   sampling of the material that was being left available

20   for re-use.

21       Q.    Did some of those shots depict a 25-ton crane

22   that was being left behind for the use of the Local

23   Re-use Authority?

24       A.    There was a portion that dealt with a crane.

25   I can't remember the specific tonnage.  But, yes.

/22

1      Q.    As far as you know, was that crane left

2   behind?

3      A.    Yes.

4      Q.    As far as you know, was everything depicted

5   on the video still on the island when you left the

6   island?

7      A.    Yes.

8      Q.    When was the -- well, strike that.

9            The video appears to have a date on it when

10  it begins of March the 6th, 1997.  Does that seem like

11  it would be the date when you made said video?

12     A.    Yes.  I mean, it would make sense it would be

13  in that time frame.  I can't confirm that that was the

14  specific date though.

15     Q.    Why does it make sense that it would be in

16  that time frame?

17     A.    It was just ongoing dialogue with the --

18  between the -- you know, coming from the Local Re-use

19  Authority and the concerns they had with the material

20  that was -- was leaving -- or potentially or possibly

21  leaving the island.

22            And it was just -- everything was -- you

23  know, it was -- everything was being accelerated as we

24  talked about, you know, because of the closure moving

25  up, and it would just make sense that based on the

1  dialogue coming from the Local Re-use Authority we would

2  produce something to try to quell those concerns.

3       Q.    The concerns being that the Navy was taking

4  things off the island that the Local Re-use Authority

5  wanted left on the island; is that right?

6       A.    That's correct.

7       Q.    Were you -- thank you for the musical

8  accompaniment, Butch -- Butch, that's not his name -

9  Buzz.  But maybe stop it.

10           Were you personally involved in doing any

11  kind of an inventory of what was being left behind?

12       A.    I don't remember preparing an inventory.

13  do recall seeing an inventory that marked items

14  available for re-use or not.  But I don't have a lot of

15  specific memories of it.

16       Q.    Do you know who did it?

17       A.    I don't know.

18       Q.    Who was your predecessor as the base

19  realignment and closure officer for that particular

20  installation at Adak?

21       A.    Lieutenant Greg Hamby.

22       Q.    H-a-m-b-y?

23       A.    I believe so.

24       Q.    Do we see Vince Tudiocoff on the video?

25       A.    Yes, I believe that was him on the video.

59

124

1      Q.     Who else did you recognize in watching the

2  video other than Mr. Tudiocoff and yourself?

3      A.     I recognize Colleen Nearhoff.

4      Q.     She later became Colleen Butcher?

5      A.     Butcher, correct.

6      Q.     Anyone else?

7      A.     Well, I -- I recognize the Seabee -- that was

8  the gentleman doing the majority of the talking,

9  especially up front with the transportation equipment.

10  I don't remember his name though.  And aside from that,

11  I don't remember anyone else.

12      Q.     Do you know his name?

13      A.     No, I don't.

14      Q.     Is it fair to say that your intention as you

15  got closer to base closure was to leave behind as much

16  equipment and personal property as possible for the use

17  of the local authority?

18      A.     That -- that was -- that was the intent.

19      MS. FRANKEN:  Okay.  I don't think I have any other

20  questions.  Let me just take a moment to look through my

21  notes either on follow-up with you, or we'll just go off

22  the record for a moment.

23          Do you have any further?

24      MR. ROYCE:  Just a couple.

25      MS. FRANKEN:  Okay.  Go ahead.

                                                                60

125

1    that you have identified as showing up on the video,

2    were there other people involved in making the video?

3         A.    I can't remember who was -- I can't remember

4    who was making the video.  I was in front of it.

5         Q.    There was someone else actually running the

6    camera?

7         A.    Right.  And I can't remember who.

8         Q.    Was that a Navy serviceman?

9         A.    I can't remember who.

10    MR. ROYCE:  That's all I have.

11

12                    FURTHER EXAMINATION

13   BY MS. FRANKEN:

14        Q.    While you were acting as BRAC officer for the

15   installation at Adak, were you attempting to follow what

16   is called the BRIM manual?

17        A.    Yes.

18        Q.    What is the BRIM manual?

19        A.    It's the -- I may get the acronym wrong, but

20   it's the Base Re-use Implementation Manual guidance

21   on -- on following the BRAC actions to transfer the

22   facility.

23        Q.    And is there a section of the manual that ]

24   to do with the disposition of personal property?

25        A.    Yes.

63

126

NAME OF DEPONENT: William Duerden

DATE OF DEPOSITION: May 16, 2007

CASE NAME: Samson vs. United States of America

INSTRUCTIONS:  Please make changes by listing the page and line number in the places indicated on this sheet and listing the changes to the right.

| Page # | Line # | Corrections |
|--------|--------|-------------|
| 7 | 23 | "Portsmouth" vice "ports of" |
| 10 | 25 | "an unaccompanied" vice "on a company" |
| 18 | 5, 10 | "Lambert" vice "Lamberg" |
| 19 | 10 | "Lambert" vice "Lamberg" |
| 28 | 5 | "having" vice "serving" |
| 32 | 6 | "section" vice "station" |
| 57 | 11 | "works shop spaces" vice "workshops bases" |
|  |  | No Further Entries |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Signed subject to penalty of perjury

Date: Aug. 3, 2007

Signature

127

```
 1   STATE OF CALIFORNIA              )
 2                                    ) ss.
 3   COUNTY OF SAN FRANCISCO          )
 4        I hereby certify that THE WITNESS in the foregoing
 5   deposition, WILLIAM DUERDEN, was duly sworn by me to
 6   testify to the truth, the whole truth, and nothing but
 7   the truth in the within-entitled cause; that the
 8   deposition was taken at the time and place herein named;
 9   that the deposition is a true record of the witness'
10   testimony as reported by me, a duly certified shorthand
11   reporter and disinterested person, and was transcribed
12   into typewriting by computer.
13        I further certify that I am not interested
14   in the outcome of the said action, nor connected with,
15   nor related to any of the parties in said action, nor to
16   their respective counsel.
17        IN WITNESS WHEREOF, I have hereunto set my
18   hand this 30th day of May, 2007.
19
20        _____
21        MITCHELL D. THOMAS, CSR # 10137
22        STATE OF CALIFORNIA
23
24
25
```

66

128