IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

SAMSON TUG AND BARGE CO., INC.,　　　)
an Alaska Corporation　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　Plaintiff/Appellant　　　　　　　　　)　　Case Number:　A03-006 CV
　　　　　　　　　　　　　　　　　　　　)　　　　　　　　　　Admiralty JWS
　　　vs.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　Defendant/Appellee.　　　　　　　　　)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION IN LIMINE

Plaintiff, Samson Tug and Barge Co., Inc. ("Samson") hereby opposes the motions in limine of Defendant, United States of America ("the Government"), seeking to preclude or limit the testimony at trial of certain witnesses, as is more fully discussed below.

The Government presents three discrete in limine theories, which Samson will deal with below in order.

1.　　Motion In Limine Regarding Plaintiff's Disclosure of Additional Witnesses.

By April 27, 2007, the deadline for disclosure of potential trial witnesses, each side had disclosed several dozen witnesses.  Neither side sought to depose any witnesses based on their inclusion on the other's witness list.

Some months later, Plaintiff became aware of two additional potential trial witnesses and, on November 26, 2007, served a supplemental disclosure, well before a trial date had been set by the Court, now scheduled for September 30, 2008, almost six months hence.

2.　　Motion In Limine Regarding Government's 30(b)(6) Deposition.

The Government in its motion attempts to portray a situation where Plaintiff, without justification, simply did not show up for a properly noticed 30(b)(6) deposition on July 27, 2007

in Seattle, Washington. Based on that portrayal, the Government seeks to preclude Plaintiff from

presenting testimony at trial on the subject matters identified in the 30(b)(6) notice, which

include most of the core issues in this case, and which, therefore, probably would or at least very

well might lead to the Government prevailing, regardless of the merits, on the sole basis of its

requested sanction.

A widening of the lens however, makes it clear that the Government's portrayal is a

complete distortion of the pertinent facts, as the Government well knew.

By way of context, Samson is a small, family owned business. It is not a large entity

where the identities of witnesses with knowledge of pertinent facts and the authority to bind the

entity to the facts testified about could not be readily known to the party seeking discovery, the

kind of situation for which Rule 30(b)(6) was primarily devised. Consequently, without the

Government having to resort to Rule 30(b)(6) Samson cooperated to arrange the depositions of

the persons the Government said it wanted to depose, four then current and former Samson

employees with knowledge of the facts and circumstances pertaining to this case. To that end,

the Government deposed the following four persons:

- George Baggen – Deposed on September 6, 2006. President of Samson. In
  charge of the day-to-day operations of the Company at all times pertinent to
  this case.

- Michael Halko – Deposed on July 14, 2006, continuing on September 6, 2006.
  At the time of his depositions he was no longer employed by Samson and had
  not been for several years. At times pertinent to this case he was employed by
  Samson as a Vice-President.

- John Mead – Deposed on September 7, 2006. He was a Samson employee at
  the time of his deposition and had been Samson's terminal manager at Adak,
  Alaska at the time of the contract in question in this case.

- Cory Baggen – Deposed on July 13, 2006. George Baggen's daughter,
  employed full-time in the business dealing with financial matters.

The Government's 30(b)(6) notice which is at issue in this motion purported to identify two broad areas of inquiry broken down into six numbered paragraphs. Exhibit A to Government's motion. Paragraphs 1, 2, 3 and 6 were what could be characterized as "contention" topics, i.e. portending an inquiry into the factual basis for Samson's core contentions in this case as reflected in the Complaint.[1] Paragraphs 4 and 5 identified as areas of inquiry the factual basis for and amount of Samson's claim for attorneys' fees and costs under EAJA.

When Samson received the Government's 30(b)(6) notice, Samson's counsel sent Government counsel a letter on July 20, 2007. Exhibit 1. In that letter counsel made two points.

First, counsel pointed out that the only current Samson employees who might be in a position to testify about the "contention" areas of inquiry had already been deposed and that the Government had been free to inquire, and in fact did inquire at length, into the subject matters set forth in the 30(b)(6) notice.[2] Moreover, the Government inquired into these subject matters in the depositions of Michael Halko, who was not employed by Samson at the time of the 30(b)(6) deposition and who, therefore, could not have been produced by Samson in response thereto.

Second, as to the inquiry into the basis for an amount of fees and costs allegedly recoverable under EAJA, counsel told the Government that there was no one at Samson "in a position to testify meaningfully as to the basis for Samson's entitlement to fees and costs under EAJA. In any event, such an exploration is clearly premature at this time. In the event that

---

[1]  See Exhibit "A"-1 to Government's Motion. See, e.g. paragraph 1 ("The factual basis for your contention that a diversion of what you call 'contract cargo' in your complaint to some other carriage than Samson Tug and Barge actually occurred.")

[2]  Rule 30(a)(2)(A)(ii) requires leave of court to depose a witness who has already been deposed in a case.

Samson prevails in this case, I would expect that a petition for fees and costs pursuant to EAJA would be filed with the Court and such matters would be addressed at that time."[3]

Based on the foregoing, the Government was informed that the 30(b)(6) deposition was improper and that Plaintiff would not appear. Plaintiff did not move for a protective order. Neither did the Government move to compel. Instead, the Government convened the deposition, noted Plaintiff's absence and waited until now to move to eliminate testimony on behalf of Plaintiff as to most of the core issues in the case.

Such a draconian sanction should not be countenanced. The Government has suffered no conceivable prejudice. It has had a full opportunity to depose all the witnesses that would have been designated on the very subjects identified. The Government should not be allowed to use the 30(b)(6) device to depose those witnesses twice.

    3.    The Motion In Limine Regarding the Testimony of Plaintiff's Expert George Johnson.

The Government's theory on this aspect of its in limine motion is twofold. First, the Government contends that Plaintiff's damages expert, George Johnson ("Johnson"), should be precluded from offering testimony as to "the carriage of cargo by air to and from Adak", based on the precepts of Federal Rule of Evidence 702 and the line of cases stemming from Daubert v. Merrill, Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993) as further explained in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167 (1999).

Second, the Government seeks to preclude testimony as to matters contained in Johnson's November 9, 2007 report entitled "Analysis Relating to Certain Elements of July 20, 2007 Report Prepared by Defendant's Expert Ernest Nadel, PhD" based on alleged un-timeliness. Exhibit E to Government's motion.

---

[3]  Rule 54(d)(2) F.R.Civ.P. contemplates that the issue of attorneys' fees and costs be made by motion after the entry of judgment.

Addressing these contentions in reverse order, once again the Government has, through portraying the facts selectively and without regard to their context, presented a distorted picture.

The structure to be followed for expert discovery in this case was as follows: Plaintiff's expert would produce a report and would then be deposed. After Plaintiff's expert was deposed, Defendant's expert would produce a report and would then be deposed. In due course, Plaintiff's expert timely produced a report.[4] The report was presented solely on the issue of damages. Given Plaintiff's theory of damages, i.e. that they be calculated by a computation of the fully allocated direct and indirect costs of Plaintiff's having performed the allegedly breached contract, plus a reasonable profit, Plaintiff selected Johnson, an expert with extensive litigation experience in the realm of damage calculations, whose primary substantive expertise pertinent to this case was in cost accounting.

Johnson was deposed on May 23, 2007. Because of a dispute over the timeliness of document production, the Government demanded a second deposition and Plaintiff acquiesced. It was not possible to schedule Johnson's second deposition until after the Government's expert, Ernest Nadel, had produced a report and been deposed. Thus, by the time of Johnson's second deposition, he had read Nadel's report and had attended Nadel's deposition.

Normally any disagreement Plaintiff's expert would have with the specific opinions contained in the report and deposition testimony of Defendant's expert would not surface until trial, whereupon, perhaps in rebuttal, Plaintiff's expert would offer those contradictory opinions. In this case, however, because of the scheduling issues whereby Johnson was deposed both before and after Nadel, Plaintiff had a choice of whether to keep Johnson's contradictory views about Nadel's opinion a secret, thus depriving the Government of the opportunity to depose Johnson on those matters, or whether instead to do what it did, i.e. fully disclose those opinions

---

[4] That report was then corrected prior to the deposition to rectify an arithmetical error.

to the Government in a written report and give the Government an opportunity to depose

Johnson thereon. Not only was the Government not prejudiced by this choice, it was well

served.[5]

As for the Government's so-called <u>Daubert</u> theory of exclusion, it will not withstand even

the most cursory analysis.

First, the utility of the "gatekeeper" function, whereby expert testimony is subjected to a

preclusionary pretrial ruling, is hard to grasp in a bench trial. Is the Court being asked to serve

as a gatekeeper to its own mind? What is the risk against which the Government seeks

protection; that at trial the Court would be persuaded by evidence so lacking in substance as to

not be permitted by the Court to be heard in the courtroom.

The lessened significance of the Court's gatekeeping function in a bench trial was

recognized by the Seventh Circuit in <u>In re Salem</u>, 465 F.3d 767, 777 (7th Cir. 2006) ("where the

fact-finder and the gatekeeper are one and the same -- that is, the Judge -- the need to make such

decisions prior to hearing the testimony is lessened.") The Government has recognized as much

in a publicly available brief in <u>United States v. Oracle Corporation</u> where the Government

argued:

> Although *Daubert* also applies in bench trials, the concern that the fact-finder will be misled there carries little weight. *See Volk v. United States,* 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999) ("[I]t bears noting that the *Daubert* gatekeeping obligation is less pressing in connection with a bench

---

[5] The Government, while acknowledging that it deposed Johnson without limitation as to his second report, it claims prejudice because "it had no opportunity to obtain appropriate expertise to challenge the new opinions he stated therein . . ." Defendant's Memorandum at p.4. However, these "new opinions" were all responsive to the opinions of the Government's expert. As early as October 17 Plaintiff alerted the Government to the fact that it intended to prepare a supplemental report addressing the opinions presented by the Government's expert and, in any event, Plaintiff offered the Government the opportunity to postpone Johnson's second deposition. Exhibits 2a and 2b. Lastly, Government counsel in her Declaration does not contend that she was unable to consult with her expert concerning Johnson's second report prior to his deposition. Nor does she include such an assertion in her statement on the record at Johnson's second deposition objecting to the second report, as to which she examined Johnson in great detail and betrayed a very good understanding of what was in the report. Exhibit 4, Johnson deposition at pp.31-33.

trial."); *In re Bay Area Material Handling, Inc.*, 1995 WL 729300, *6 (N.D. Cal. Dec. 4, 1995) (Walker, J.) ("Given the flexible nature of FRE 702 ... and given the fact that the trier of fact in this case was a judge ... there thus was little risk that the expert testimony would be given undue weight"). Accordingly, in a bench trial, probing the nitty gritty of experts' methodologies under *Daubert* to avoid misleading the court may not be an efficient use of judicial or party resources, because the court can simply hear the testimony and give it the weight it deserves.

Second, to the extent that Oracle's motion is based on objections to the *factual foundation* of Professor Elzinga's opinions, including Oracle's argument that his data set is flawed, nothing in *Daubert* or its progeny changed the fundamental rule that the factual basis of an expert opinion "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir. 1995); *accord Southland Sod Farms v. Stover Seed Col,* 108 F.3d 1134, 1143 (9th Cir. 1997) ("Technical unreliability goes to the weight accorded a survey, not it admissibility") (citations omitted); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807, 809 (3rd Cir.1997) (reversing exclusion of expert based on "insufficient factual foundation" and cautioning that the "trial judge must be careful not to mistake credibility questions for admissibility questions").

Exhibit 3.

Second, the Government's motion affords not a clue as to what specific opinions or conclusions Johnson should be precluded from testifying about. The closest the Government comes is the following rather enigmatic portion of its memorandum:

The question that needs to be answered is whether Plaintiff's accountant, Mr. Johnson analyzed the subject of the carriage of cargo by air with the same intellectual rigor and precision one would expect from an actual expert in that field using an established generally accepted and tested methodology. The clear answer is no. Government's Motion at p.6.

What the Government fails to tell us is what "conclusions regarding the air cargo" are being attributed to Johnson.

In fact, what Johnson had to say about the carriage of air cargo was largely derivative from what Nadel said. Nadel took the position in his report and at his deposition that the amount

of diverted air cargo necessary to produce lost revenue equivalent to Samson's claimed damages by the cost allocation methodology employed by Johnson (an undeniable expert in cost accounting) was so prodigious as to render Samson's damages claim untenable. What Johnson did was to challenge the logic of Nadel's position by using Nadel's assumptions as to the cargo capacity of certain types of aircraft, some internet research and documents produced by the Government.[6]

In sum, there is no "junk science" or "junk expertise" from which a fact-finder, particularly a Judge, must be protected in the interests of justice. The Government's <u>Daubert</u> argument is nothing more than an attempt to elevate what is at most an appropriate area of cross-examination to an in limine theory.

## **CONCLUSION**

For the foregoing reasons the Government's Motions In Limine should be denied.

Respectfully submitted,

/s/ Richard D. Gluck
Dated:  April 17, 2008                          Richard D. Gluck
                                                 Harold G. Bailey, Jr.
                                                 Garvey Schubert Barer
                                                 1000 Potomac Street, NW, 5th Floor
                                                 Washington, DC  20007
                                                 Counsel for Samson Tug and Barge Co., Inc.

---

[6] At p.3 of Johnson's second report (Exhibit E to Government's motion) he states ". . . one can draw some preliminary conclusions concerning the minimum air cargo capacity that was available during the contract period. In doing so I employed the same methodology Dr. Nadel did concerning the cargo capacity of the various types of aircraft, even though, depending on how the cargo was configured, I believe the capacities could be higher than he assumed."

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2008, a copy of Plaintiff's Memorandum in Opposition to Defendant's Motion in Limine was served electronically and by first class mail, postage prepaid to the following:

Jeanne M. Franken, Esq.
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
7-5393 Federal Building
P.O. Box 36028
San Francisco, CA 94102-3463

United States Attorney
Federal Building and U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567

/s/ Richard D. Gluck
Richard D. Gluck