# EXHIBIT 1

WASHINGTON, D.C. OFFICE
fifth floor
flour mill building
1000 potomac street nw
washington, d.c. 20007-3501
TEL 202 965 7880 FAX 202 965 1729

OTHER OFFICES
beijing, china
new york, new york
portland, oregon
seattle, washington
GSBLAW.COM

# GARVEY SCHUBERT BARER

*Please reply to* ROBERT A.W. BORAKS
bboraks@gsblaw.com TEL EXT *1796*

July 20, 2007

VIA ELECTRONIC MAIL AND
FIRST CLASS MAIL

Jeanne M. Franken, Esq.
U.S. Department of Justice Civil Div.
Torts Branch, Civil Division
7-5395 Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102-3463

    Re:    *Samson Tug & Barge Co. v. U.S.*

Dear Jeanne:

    There are several matters pertaining to discovery in the above-referenced case which this letter is intended to address, some of which we have spoken of recently.

    1.    This is to confirm that we set the deposition of Defendant's expert, Ernie Nadel, for August 16, 2007 in San Francisco at 10:00 a.m. PST. We agreed to extend the time for producing his report until July 20, 2007. We will send you a Notice of Deposition in the next couple of days when we are able to confirm the location.

    2.    We agreed that you would spend some additional time – you represented that you anticipated an hour or two – deposing George Johnson. Plaintiff has decided to withdraw its original insistence that there be agreed parameters limited by your stated position that some documents as to which we had claimed privilege had been provided to the expert but not to you prior to the deposition. The only parameter I would anticipate Plaintiff might impose based on the prior deposition would be "asked and answered."

    3.    Plaintiff is unwilling to accede to Defendant's desire to depose Evin Morris. The objection is based on Rule 26(b)(4)(B) in that Morris is not expected to be called as a witness at trial and there are no "exceptional circumstances under which it is impracticable for [Defendant] to obtain facts or opinions on the same subject by other means." While Evin worked under George Johnson's supervision, the opinions and analyses which Plaintiff is offering in this case are those of George, not Evin.

GSB GARVEY SCHUBERT BARER

Jeanne M. Franken, Esq.
July 20, 2007
Page 2

4.  We discussed Defendant's desire to take Richard Gluck's deposition in San Francisco. I told you that we could not agree to his deposition being taken unless it were done here, either by phone or by you coming here. Since then I have done some research into the issue of whether or under what circumstances a party in litigation in the federal courts may take the deposition of counsel of record for an opposing party.

The seminal case is Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986). In that case the court held that deposing opposing counsel should not be permitted as a matter of course, but only upon a showing that three criteria are satisfied:

- no other means exist to obtain information other than to depose opposing counsel;

- the information sought is relevant and non-privileged;

- the information sought is crucial to the preparation of the case.

The Shelton doctrine has been adopted by several other Circuits and has been followed by numerous District Courts. There are a number of District Court decisions within the Ninth Circuit applying the Shelton test.

We cannot see what possible subject matter of any putative deposition of Richard would satisfy the Shelton test. Consequently, we do not agree that he may be deposed.

5.  With respect to the 30(b)(6) Deposition Notice you propounded, as I told you, Plaintiff's position is as follows:

With respect to the "contention" areas of inquiry relating to the merits of the case, as reflected in items 1, 2, 3 and 6 in the Notice, Plaintiff's position is that Defendant has already deposed George Baggen and John Mead, the appropriate Samson designees regarding these matters. I have no doubt that you understood that they were being deposed because of their positions with Samson and that you were free to inquire, and did inquire at length, inter alia, as to their knowledge of the basis for the "contentions" as set forth in the aforesaid paragraphs in the Notice.

As to items 4 and 5 in the Notice, there is no one at Samson who is really in a position to testify meaningfully as to Samson's entitlement to fees and costs under EAJA. In any event, such an exploration is clearly premature at this time. In the event that Samson prevails in this case, I would expect that a petition for fees and costs pursuant to EAJA would be filed with the Court and such matters would be addressed at that time.

GSB
GARVEY SCHUBERT BARER

Jeanne M. Franken, Esq.
July 20, 2007
Page 3

To the extent that you are interested in the fees and costs to date, say for purposes of assessing the government's exposure or in order to participate in a mediation, we have committed to providing that information.

In sum, for the foregoing reasons it is Plaintiff's position that the 30(b)(6) deposition you have noticed should not take place and Plaintiff will not appear.

6.  Plaintiff has several concerns about Defendant's Responses to Plaintiff's Third Requests for Production, Second Requests for Admissions and Second Interrogatories.

In general Plaintiff has an issue with the disconnect between a number of the requests and the responses. The obvious purpose of most of the discovery requests related to the failure of the government, beginning with its response to Plaintiff's initial FOIA request in 1997, and numerous subsequent requests over the next several years to produce numerous documents known to have existed at one time. The absence of these documents has made it very difficult, indeed largely impossible, to assess the nature and amount of the cargo shipped by air, obviously a core issue in this case, as has been apparent to everyone since 2001 when Samson filed its claim. Again and again in the discovery requests here under discussion Plaintiff has sought either those documents or specific information as to what happened to them, whether they were destroyed, if so under whose auspices, as well as when and why. In addition, Plaintiff has sought specific information as to the efforts made to locate these documents, including what searches were conducted, where, when and by whom. The discovery responses under discussion provided virtually none of this information relying instead on generic excuses such as the passage of time, agency changes, personnel changes (without identifying any of the personnel), general document retention policy (without specific citations to or producing any documentation reflecting that policy) representations by you as to what is "believed" with no indication of the source or basis of the belief and the like.

Consequently, by way of example, the following was not adequately responded to:

As to requests Nos. 1 and 2, requesting the files of the Contracting, Procuring Contracting and Administrative Officers, you represented and offered some general explanations as to why the files could not be produced as originally maintained but you did not "explain in detail the efforts made to locate said files, including but not limited to, the dates on which searches . . . were conducted, the identities of the persons conducting the searches, the places searched (including computer sites), the location of the documents when they were last known to exist and when that was."

Similarly, with respect to request No. 12, seeking detailed information as to the disposition of documents once known to exist and not produced, the only response is a series of generalities as to personnel changes and the passage of time. While much time has passed since the contract at issue terminated, Plaintiff began seeking them through a series of FOIA requests beginning on June 23, 1997, while the contract was still in force, and after employees of Plaintiff



Jeanne M. Franken, Esq.
July 20, 2007
Page 4

came to believe that cargo was being diverted, when documents regarding cargo transported by air were requested of Greg Dawson and Margaret Sprague. Moreover, the government was on notice as of 2001 that issues were being raised that could result in litigation (as in fact they did) and, consequently, the obligation to preserve records or, failing that, to provide an explanation as to why the records were destroyed or lost and what efforts had been made or were being made to locate and preserve them. You have provided no specific information whatsoever in response to our discovery requests regarding these very important issues. While you represent that "Contemporaneous records of exact dates on which searches were made were not maintained <u>for the most part</u>," implying that there was at least some maintenance, no such records were provided.

The response then attempts to shift responsibility to Samson, suggesting that such records could have been maintained if Samson had so requested when the documents were being sought many years ago. Samson could not have known, however, that the government would someday take the position that the vast majority of documentation relating to Samson's claim of diverted cargo had disappeared. On the other hand, the government could reasonably have anticipated that someday it would be called to account for that disappearance.

With respect to "corrected" discovery request No. 4, spreadsheets were attached as Exhibit 1, and the government was asked, <u>inter alia</u>, whether the spreadsheets showed "all military or military sponsored flights to and from Adak during the contract period." The closest the response comes to answering the question that "Exhibit 1 would appear to produce a significantly complete representation of transportation flights on and off Adak during the subject period." Does this mean that the answer to the posed question is yes it is a complete list of flights, no it's not, or that it remains unknown. Moreover, if the answer is either yes or no, how could you, as the person verifying the answer under penalty of perjury know that? Do you have access to information not provided to us?

Indeed, there are several instances where you have made averments under penalty of perjury where the information must have come from unidentified sources. For example in response to request No. 5 regarding Exhibit 2, a response to an FOIA request, it is stated that:

> when the FOIA request was received, the data then existing which reflected Adak as a point of origin or destination, was produced. The source of the data was from manifests which had been transmitted electronically to AMC. It is believed [by whom, based on what information or investigation?] the source documents were destroyed in the ordinary course at the end of the agency's normal retention period. It is further believed [by whom, based on what information or investigation?] that during the period of the subject barge contract, the Air Force maintained manifest records, in accordance regulations, policies and/or procedures for only one current and one subsequent year



Jeanne M. Franken, Esq.
July 20, 2007
Page 5

Assuming this is so, specific information other than your broad brush summarizations should have been provided in response to discovery request No. 12. Moreover, the quoted explanation is perplexing since, on its face, Exhibit 2 is dated March 21, 2001 and is entitled "FOIA Request for Adak, Alaska Movement," suggesting it was not an existing document, but a compilation of data from other documents that have never been produced, and whose disappearance has never been explained.

Please provide proper discovery responses in the next week or two.

Lastly, when last we spoke I told you I would provide the names of three mediators for the government's consideration. They are:

- James Laflin (San Francisco – jlaflin@concillium.net)

- Judge Rosselle Pekelis (Seattle - jdrllc.com/pekelis.asp)

- Judge Terrence Carroll (Seattle – jdrllc.com/carroll.asp)

Let me know if any or all of these are acceptable to you. If not, please give us three names.

Thank you for your attention.

Sincerely,

Robert A. W. Boraks

cc: William Royce, Esq.
Harold G. Bailey, Esq.
Richard D. Gluck, Esq.

**EXHIBIT 2a**

## Bob Boraks

**From:** Franken, Jeanne (CIV) [Jeanne.Franken@usdoj.gov]
**Sent:** Wednesday, October 17, 2007 4:58 PM
**To:** Bob Boraks
**Subject:** RE: Samson case-continuation of George Johnson deposition

I am not aware of any extension in the deadline for submission of your expert's report, nor for supplementing reports to address issues not covered originally. I will consider whether to question him regarding improperly and untimely disclosed items. Jeanne

**From:** Bob Boraks [mailto:BBORAKS@gsblaw.com]
**Sent:** Wednesday, October 17, 2007 1:35 PM
**To:** Franken, Jeanne (CIV)
**Cc:** Richard Gluck; Buzz Bailey; roycelaw@alaska.net
**Subject:** Samson case-continuation of George Johnson deposition

Dear Jeanne-

This is to give you a heads up that George Johnson is planning to prepare a supplement to his expert report. We expect to have that in your hands by October 26, 2007. The primary focus of George's supplemental report will be to address a portion of Dr. Nadel's report and testimony regarding the amount of cargo that would have had to have been diverted to result in a level of lost revenue consonant with the damages calculation George previously reported on and testified about.

                                              Best regards, Bob Boraks

# EXHIBIT 2b

Case 3:03-cv-00006-JWS   Document 78-2   Filed 04/17/2008   Page 9 of 18

## Bob Boraks

**From:** Franken, Jeanne (CIV) [Jeanne.Franken@usdoj.gov]
**Sent:** Tuesday, November 06, 2007 7:16 PM
**To:** Bob Boraks
**Subject:** RE:

I am available tomorrow to discuss anytime after 10 our time.   Jeanne

---

**From:** Pam Germas [mailto:PGermas@gsblaw.com] **On Behalf Of** Bob Boraks
**Sent:** Tuesday, November 06, 2007 3:49 PM
**To:** Franken, Jeanne (CIV)
**Cc:** Richard Gluck; Buzz Bailey; roycelaw@alaska.net
**Subject:**
**Importance:** High

Dear Jeanne:

   I am once again standing in for Buzz who had a death in the family and is out of town for a few days. We need to address with you an issue with regard to the continuation of George Johnson's deposition, presently scheduled for November 16, 2007.

   The issue stems from the fact that the handling of expert discovery has been atypical in our case. Normally the Plaintiff's expert tenders his report and his deposition is completed before the Defendant's expert tenders his report and is deposed. Originally this was the process ordered by the court and what the parties planned to do. Because you had complaints about the materials you were provided and the timing thereof in connection with George Johnson's deposition, we agreed that you could conduct a further deposition inquiry. Because of scheduling difficulties, we ended up receiving Dr. Nadel's report and taking his deposition before the continuation of George Johnson's deposition.

   Mr. Johnson reviewed Dr. Nadel's report and attended his deposition. After discussion, we determined that we wanted Mr. Johnson to address and analyze one of the points made by Dr. Nadel, which appears at p.40 et seq. of his report, i.e. that Mr. Johnson's analysis was anomalous because when translated to lost revenues through diverted cargo, in order for that computation to approach Mr. Johnson's damages calculation by his different methodology, the amount of cargo diverted would have had to have been so large as to be, for practical purposes, impossible. While the records produced to us are incomplete and internally inconsistent so that it is not possible to determine how much cargo was in fact diverted, it was, in Mr. Johnson's opinion, possible to see that there was enough capacity and utilization of air transportation to dispel Dr. Nadel's point.

   While if things had proceeded typically, Mr. Johnson would simply have given that testimony as rebuttal at trial without any additional report or deposition on the subject, since, the way things evolved, he was to be deposed again, we determined that he would supplement his report to set forth his analysis on the issue discussed above, and provide you with that supplemental report prior to his continuation deposition. Your response to our informing you that that was our intention was to observe that there was nothing in the rules or the court's order allowing for such a supplementation and you would decide when you received it whether to read it. I was frankly perplexed by that response since we thought the decision to provide you with a supplemental report prior to Mr. Johnson's deposition rather than save his testimony on the subject matter thereof for rebuttal at trial was, if anything, fairer to the Defendant's interests. We also thought that providing the supplement to the report and giving you an opportunity to depose Mr. Johnson as to its contents would facilitate the mediation that both sides have expressed a belief should occur at the appropriate time.

   As Mr. Johnson was putting the finishing touches on his report, you informed Buzz that additional documents (computer stored information) showing flight information were located in New Orleans. How they got to New Orleans and why they are just surfacing now I'm not sure anyone understands. In any event we are not willing to conclude Mr. Johnson's analysis without seeing those documents.

   While I was drafting this Buzz called me and said he had spoken to you. He said you told him that you had the documents and they were being Bates stamped. He said you also implied that there wasn't much to them. If you can get them to us promptly, I believe Mr. Johnson can finish his report and get it in your hands in short order. If not, it seems to me we have two options that are reasonable, and we will go along with whichever one you prefer. One is that we have Mr. Johnson's deposition as scheduled, knowing he will not have finally completed the analysis which was to be the subject of his report. When we receive the documents from New Orleans he would complete his report and send it to you, but we would not agree to any further depositions of Mr. Johnson.

   The other option is that we postpone Mr. Johnson's deposition until after we receive the documents from New Orleans and he is able to complete his report.

   Please let me know your thoughts.


   Best regards, Bob

This e-mail is for the sole use of the intended recipient(s). It contains information that is confidential and/or legally privileged. If you believe that it has been sent to you in error, please notify the sender by reply e-mail and delete the message. Any disclosure, copying, distribution or use of this information by someone other than the intended recipient is prohibited.



PAM GERMAS
*pgermas@gsblaw.com*
*Legal Assistant*

GARVEY SCHUBERT BARER
GSBLAW.COM
*fifth floor*
*1000 potomac street nw*
*washington, dc 20007-3501*
TEL 202 965 7880 x<1781>  FAX 202 965 1729

11/7/2007

**EXHIBIT 3**

**Bob Boraks**

| | |
|---|---|
| **From:** | Benjamin Lambiotte |
| **Sent:** | Tuesday, April 15, 2008 2:54 PM |
| **To:** | Bob Boraks |
| **Subject:** | U.S. DOJ Brief Taking Position that Policies Underlying Daubert Carry Little Weight in Bench Trial Setting, Citing 9th Circuit US District Court case |

This document is available in two formats: this web page (for browsing content), and PDF (comparable to original document formatting). To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

Claude F. Scott, Esq.
Pam Cole, Esq. (CA Bar No. 208286)
U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION
450 Golden Gate Avenue, Rm. 10-0101
San Francisco, CA 94102-3478
(415) 436-6660
(415) 436-6683 (Fax)

*Attorneys for Plaintiff the United States of America*

*Also filed on behalf of 10 Plaintiff States (See signature block)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ORACLE CORPORATION,<br><br>Defendant. | CASE NO. C 04-0807 VRW<br><br>Filed June 8, 2004<br><br>Hearing Date: June 10, 2004 at 2:00 PM<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PROFESSOR KENNETH ELZINGA**<br><br>**PUBLIC VERSION** |

## INTRODUCTION

Oracle has moved to exclude the testimony of Plaintiffs' economic expert, Professor Kenneth Elzinga, under the authority of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. At bottom, Oracle simply disagrees with Professor Elzinga's conclusions, which is not the proper focus of a *Daubert* inquiry, *see* 509 U.S. at 595, and its motion should consequently be denied.

Professor Elzinga is one of the nation's leading antitrust authorities. He has served on the faculty of the University of Virginia since 1967, and most of his academic career has been devoted to teaching and research in antitrust economics. He has served in the Antitrust Division of the Department of Justice (DOJ) at the policy level, and has been (and currently is) a consultant to the Federal Trade Commission. Professor Elzinga has lectured to federal judges on antitrust economics, and has recently served as a special consultant to Judge Lewis A. Kaplan in the Christie's-Sotheby's Auction Houses Antitrust Litigation. Professor Elzinga has testified in many antitrust cases and has written numerous scholarly papers on antitrust economics. There is no question here of Professor Elzinga's qualifications.

There is also no question that his opinions are relevant to the disputed issues in the case and probative on those issues. Using the record available, he provides economic analysis and opinions regarding market definition, entry conditions, and the effect the merger would have on competitive conditions in the markets. There is nothing methodologically exotic about this: it is what economists do in every antitrust case, and it is very similar (if not identical) to what Oracle's own economists do here.

## ARGUMENT

### I. The *Daubert* Standard for Admissibility Focuses on Relevancy and Reliability, Not Factual Issues in Dispute

Oracle's summary of the *Daubert* standard is correct as far as it goes, but omits some important qualifications.

First, the Supreme Court decided *Daubert* in the context of toxic tort litigation, where arguably the most pressing policy concern was that juries would be misled by experts offering novel, untested theories, or even "junk science." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595-97 (1993) (new standard will prevent "befuddled juries"); *Elsayed Mukhtar v. Cal State Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002) (*Daubert* guards against "junk science" and "is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony"); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) (scientific evidence must "not mislead the jury"). In contrast, Dr. Elzinga's opinions in this case rest on economic methodologies over which there is no serious dispute.

Although *Daubert* also applies in bench trials, the concern that the fact-finder will be misled there carries little weight. *See Volk* v. *United States,* 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999) ("[I]t bears noting that the *Daubert* gatekeeping obligation is less pressing in connection with a bench trial."); *In re Bay Area Material Handling, Inc.,* 1995 WL 729300, *6 (N.D. Cal. Dec. 4, 1995) (Walker, J.) ("Given the flexible nature of FRE 702 ... and given the fact that the trier of fact in this case was a judge ... there thus was little risk that the expert testimony would be given undue weight"). Accordingly, in a bench trial, probing the nitty gritty of experts' methodologies under *Daubert* to avoid misleading the court may not be an efficient use of judicial or party resources, because the court can simply hear the testimony and give it the weight it deserves.

Second, to the extent that Oracle's motion is based on objections to the *factual foundation* of Professor Elzinga's opinions, including Oracle's argument that his data set is flawed, nothing in *Daubert* or its progeny changed the fundamental rule that the factual basis of an expert opinion "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir. 1995); *accord Southland Sod Farms* v. *Stover Seed Co.,* 108 F.3d 1134, 1143 (9th Cir. 1997) ("Technical unreliability goes to the weight accorded a survey, not its admissibility") (citations omitted); *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 807, 809 (3d Cir. 1997) (reversing exclusion of expert based on "insufficient factual foundation" and cautioning that the "trial judge must be careful not to mistake credibility questions for admissibility questions").

Understood in light of all of the relevant law relating to exclusion of expert testimony under *Daubert,* Oracle's motion does not pass muster.

## II. Oracle's Geographic Market Complaints Are Appropriate Subjects for Cross Examination, Rather than a *Daubert* Motion

*Daubert* is about the admissibility of an expert's testimony, not the weight that testimony should carry with the trier of fact. Oracle dresses up its upcoming cross examination of Professor Elzinga as a *Daubert* motion in an attempt to have the court exclude testimony that would otherwise be helpful to the Court in its analysis of the relevant markets in this case. The economic principles and methodologies applied by Professor Elzinga are the ones cited by Oracle in its court papers, and, under the law should be admitted.

Consistently with the *Merger Guidelines* and the case law, Professor Elzinga identified the relevant geographic area in which a hypothetical monopolist could profitably raise prices. He explains that foreign vendors that do not have a presence in the U.S. would not be able to intervene if a hypothetical monopolist or cartel were operative in this country. "The geographic market extends to the 'area of effective competition' ... where buyers can turn for alternative sources of supply," *Oltz* v. *St. Peter's Cmty. Hosp.,* 861 F.2d 1440, 1446 (9th Cir. 1988). In addition, he chose the narrowest workable market that would fit this test, again consistent with the law cited by Oracle (Oracle Mem., at 2-3).

**EXHIBIT 4**

George Johnson                                                          November 16, 2007

### Page 29

1  Q. No, my question is, is it part of the continental
2  United States?
3  A. It is on the North American continent. I'm not
4  sure what your calculations -- the military calculations,
5  but for the purposes here those flights were believed to be
6  CONUS. The cargo that's carried for the barges is -- has to
7  be CONUS cargo. We have treated that as CONUS cargo and
8  barge eligible.
9  Q. Do you know how the federal government defines
10 CONUS?
11 A. I'm not sure if they define it only as North
12 America or if they include Alaska.
13 Q. Do you know whether the barge contract -- the
14 Samson barge contract included carrying cargo from Anchorage
15 to Adak and/or back?
16 A. I don't believe that Samson stopped in Anchorage.
17 Q. No, my question is, do you know whether the
18 contract to carry cargo on the Samson barge included running
19 between Anchorage and Adak?
20 A. I don't believe it did because Samson did not stop
21 at Anchorage. But for cargo that was to go to the
22 continental U.S, Seattle for example, it did consider that.
23 Q. Do you have any idea where any of these people
24 and/or cargo that went from Anchorage -- or strike that --
25 from Adak to Anchorage went on to?

### Page 30

1  A. I don't know where all those people went on to.
2  Q. In fact, for all you know every one of them got on
3  an airplane in Rhoda, Spain to a Navy base; isn't that true?
4  A. I don't know where those people went.
5  Q. You understand that the United States Navy has a
6  worldwide presence; isn't that right?
7  A. Yes, I do.
8  Q. You understand that Naval planes out of Elmendorf
9  fly to places other than the lower 48 states of the United
10 States, don't you?
11 A. Yes, I do and we've excluded those flights.
12 Q. How do you know where the cargo and the
13 individuals who got off those B37 -- 737s from Adak that
14 landed in Anchorage, how do you know what their ultimate
15 destination was?
16 A. I do not know what their ultimate destination was.
17 Q. In fact, every piece of freight or cargo on those
18 planes could have gone to Europe for all you know; true?
19 A. I don't know where the cargo on the planes went.
20 I should -- I should add to that. We have tracked that the
21 cargo on those planes ultimately went to a CONUS
22 destination. We have excluded flights that went, for
23 example from Adak to Guam or Okinawa. If it went -- if it
24 went from McCord to Adak and then from Adak back to a Air
25 Force base in the continental U.S. those in fact are

### Page 31

1  included. If the destination on those flights was outside
2  of the continental U.S. for example, as I said Guam or
3  Okinawa, those in fact were excluded from our calculations.
4  Q. But you don't know what happened to anything once
5  it got to Anchorage, do you?
6  A. I don't know what happened once it got to
7  Anchorage or when they got to McCord Air Force Base.
8  Q. What was your understanding of the route -- did it
9  go for the 737s? Did they go directly from Anchorage to
10 Adak and back to Anchorage?
11 A. There -- I don't know if they went out to Shemya
12 for example or I think that was shut down and very small but
13 I don't know. I believe they went from Anchorage to Adak
14 and returned, but I don't know.
15     MS. FRANKEN: Now, I'm going to comment on the
16 record before I mark this that I don't believe that counsel
17 has a right to provide another report or to supplement the
18 opinions of its expert. That this is beyond the many
19 extensions that were granted with regard to providing expert
20 testimony and that certainly my client is prejudiced in not
21 being able to respond and that we would move to exclude all
22 of this testimony at the appropriate time. Nevertheless,
23 for purposes of identification I will ask the court reporter
24 to mark this late-produced report which bears a date of
25 November the 9th of 2007 as next in order. And I believe

### Page 32

1  that we are at number 130. I don't know if anyone wants to
2  correct me but I guess not so we're going to mark it as
3  number 130.
4      (Whereupon, Mr. Johnson's Analysis Relating to Dr.
5  Nadel's Report was marked Exhibit 130 for identification.)
6      MR. ROYCE: And I would like to make a brief
7  statement after the court reporter has marked.
8      This is Bill Royce, counsel for Samson Tug. The
9  analysis which has been marked as 130 came about in response
10 to a new issue identified in Dr. Nadel's report which has
11 been explained or described by the witness in this morning's
12 deposition. The analysis in Dr. Nadel's report was
13 essentially that it was improbable or highly unlikely that
14 air cargo to or from Adak could have reached the amount
15 implied in the damage analysis of Mr. Johnson. In response
16 to that Mr. Johnson has done some work -- supplemental work
17 which is reflected in Exhibit 130. The topic of this
18 additional work was communicated to counsel for the
19 government in various telephone conversations and e-mails
20 and specifically including an e-mail of November 6th of 2007
21 sent on behalf of Bob Borax in which we discussed this
22 analysis and provided options to the government as to
23 whether to go forward with the deposition or seek to
24 continue it to a later date. It's -- it's our view that
25 this additional work is something that would come in at

8 (Pages 29 to 32)

Naegeli Reporting Corporation

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR       Seattle, WA       Spokane, WA       Coeur d'Alene, ID
503.227.1544       206.622.3376      509.838.6000      208.667.1163

Court Reporting    Trial Presentation    Videoconferencing    Videography

### Page 33

1  trial in the form of rebuttal. It is only through the
2  anomaly by which we find ourselves with the two sessions of
3  plaintiff's expert witness scheduled on either side
4  chronologically of the government witness, it's only through
5  that anomaly that we determined that it was best practice
6  and most fair to the government to provide a written
7  document so the government could fully explore Mr. Johnson's
8  analysis of Dr. Nadel's report.
9       MS. FRANKEN: Okay, I don't recall being given an
10 option regarding extensions. I know that counsel certainly
11 didn't seek any extensions nor solicit an agreement from
12 myself that expert deadlines once again be continued. So
13 I -- I really think that's not a correct statement.
14      Secondly, that there is nothing new in Dr. Nadel's
15 report that would have led to this being some kind of
16 alternate or supplemental theory of recovery or
17 justification for the work that was previously done by
18 Mr. Johnson. The documents he appears to have relied upon
19 here have been available for quite a long time. And should
20 he in his expert opinion have decided that he should compare
21 the figure he was coming up with to what actually transpired
22 on the island that was some work that he could have done
23 really at any time. But with all that self-serving stuff
24 said on both sides I think we can just proceed.
25      Q. Did you, Mr. Johnson, consult with any individuals

### Page 34

1  in order to do this additional analysis?
2       A. I believe that Mr. Morris talked to George Baggan
3  and Corey Baggan.
4       Q. Mr. Morris was previously identified as being the
5  person who did much of the leg work on your initial report
6  and my efforts to depose him were rejected by counsel.
7  Exactly what was Mr. Morris's role with regard to preparing
8  this additional analysis?
9       A. Mr. Morris worked with me to do this analysis.
10      Q. And what does that mean?
11      A. That means that we would meet and discuss what
12 needed to be done and in some cases he constructed models
13 which we reviewed, analyzed, and modified.
14      Q. Does Mr. Morris have some background with flight
15 data different than your own, which apparently is--
16      A. Mr. Morris is--
17      Q. -- nonexistent.
18      A. I'm sorry?
19      Q. I'm done.
20      A. Mr. Morris is a financial analysis and has a CPA
21 and a CFA and other designations and works regularly with
22 financial records and reviewed the records.
23      Q. Did you consult with any experts on air cargo?
24      A. No. We also -- we used research on the Internet
25 regarding these specific planes. And we also used and

### Page 35

1  confirmed and used information reported by Dr. Nadel in his
2  report.
3       Q. When you say you did research on the Internet on
4  planes, is that information contained in the box of
5  documents you've labeled box 3?
6       A. It is in box 1 or 2. That information was also
7  available for the first report -- first work and it was
8  available at my deposition so it's in the earlier box.
9       Q. Did you have occasion to actually do any
10 investigation into the actual configuration of the actual
11 airplanes that were calling on Adak during the relevant
12 period?
13      A. I don't have that information.
14      Q. Did you make any effort to obtain that
15 information?
16      A. The only way to obtain that information would be
17 from government records and I do not have any government
18 records that have been provided that have that information
19 on there.
20      Q. You stated that you believed that Alaska Airlines,
21 not a government entity, operated the 737s; is that right?
22      A. That's correct.
23      Q. Did you contact Alaska Airlines and make any
24 inquiries of Alaska Airlines about the configuration of its
25 planes?

### Page 36

1       A. The configuration of its planes on each and every
2  one of those flights during that period of time, ten to
3  twelve years ago, on Adak, no.
4       Q. Are these spreadsheets and other calculations to
5  be found in box 3 that went into your analysis, Exhibit 130?
6       A. Yes.
7       Q. At your first deposition other than Mr. Baggan's
8  testimony as I recall you did not review any of the
9  depositions. Have you done so since that time?
10      A. I'm not sure your statement was correct. At -- I
11 don't recall my testimony but we have Mr. -- we have
12 excerpts and things from Mr. Halko, we have other deposition
13 files that were in our files originally. So I'm not sure
14 specifically what you're referring to.
15      Q. Have you ever read Mr. Peterson's deposition?
16      A. I don't believe I have Mr. Peterson's deposition
17 in the box. I would be happy to look. I have not read it.
18 I may have read the extracts from it if it's in there but I
19 don't recall.
20      Q. Have you ever read Mr. -- you yourself ever read
21 Mr. Clark's deposition?
22      A. No.
23      Q. Are you an expert on the carriage of cargo by air?
24      A. No.
25      Q. In -- in your first deposition you testified that

9 (Pages 33 to 36)

**Naegeli Reporting Corporation**

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR       Seattle, WA       Spokane, WA       Coeur d'Alene, ID
503.227.1544       206.622.3376      509.838.6000      208.667.1163

Court Reporting    Trial Presentation    Videoconferencing    Videography