# EXHIBIT 1



G A R V E Y  S C H U B E R T  B A R E R

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

WASHINGTON, D.C. OFFICE
*fifth floor*
*flour mill building*
*1000 potomac street nw*
*washington, d.c. 20007-3501*
TEL *202 965 7880* FAX *202 965 1729*

OTHER OFFICES
*beijing, china*
*new york, new york*
*portland, oregon*
*seattle, washington*
GSBLAW.COM

*Please reply to* HAROLD G. BAILEY
*bbailey@gsblaw.com* TEL EXT *1784*

July 11, 2006

*__Via Facsimile and Regular Mail (415-436-6632)__*

jeanne_franken@justice.usdoj.gov

Jeanne M. Franken, Esquire
Trial Attorney
Torts Branch, Civil Division
West Coast Office
United States Department of Justice
7-5395 Federal Building
450 Golden Gate Avenue
San Francisco, CA  94102-3463

　　　　　Re:    *Samson Tug & Barge Co.* v. *U.S.,*
　　　　　　　　Additional Rule 30(b)(6) Depositions of Government Witnesses

Dear Jeanne:

　　　　I write in response to your letter dated July 3, 2006.   At the outset, let me state that we wish to continue working with your cooperatively to resolve any discovery issues.  However, it is necessary, for the sake of clarity of the record, to register our views on certain of the contentions in your letter, as part of a continuing effort to avoid any dispute which may require the intervention of the Court.

　　　　In response to your point that the areas of inquiry in our Supplemental Notice are not likely to lead to discovery of admissible evidence, we note that they relate to transportation mode decisions that lie at the core of the issues in the case, the identity, existence and whereabouts of records and documents relating to such decisions, and the identity and whereabouts of personnel involved in or with knowledge of such decisions and records. Also, they seek information concerning the spreadsheet data summaries regarding air shipments (also a key issue in the case) the Government produced in response to Samson's discovery (and earlier FOIA) requests.  Thus, we disagree that the areas of inquiry described in the Supplemental Notice lie outside the ambit of discoverability pursuant to F.R.C.P. 26.

　　　　Second, we think your contention that satisfying our requests will require production of "in excess of twenty witnesses," likely exceeding the number of depositions we are permitted to take under F.R.C.P. 30, is inconsistent with the Government's responsibilities in response to a 30(b)(6) notice.



July 11, 2006
Page 2

Before the 1970's amendments to the Federal Rules of Civil Procedure, a party seeking to take the deposition of an organization had to note the deposition of an officer, agent or manager, and hope that the witness had knowledge of the matters of inquiry. This led to the practice of "bandying" the deposing lawyer around the organization's witnesses who, seriatum, each disclaimed knowledge of critical subject matter, and of the identity of specific people who did know. Rule 30(b)(6) was adopted to curb this practice. *See* Advisory Committee Notes, 1970 Amendments, F.R.C.P. 30. There was an element of this, for example, in the testimony given by the Government's first 30(b)(6) witness.

It is simply not necessary or required that a 30(b)(6) witness have personal knowledge of the identified areas of inquiry, as you seem to suggest. If the person designated by the organization does not have personal knowledge of the matters set out in the deposition notice, the organization is obligated to prepare the designee so that he or she may give responsive and binding answers. In other words, the designee under the Rule is required to research the facts beyond his or her personal knowledge, to the full extent of the topic regarding which he or she has been designated to testify under the Rule. If knowledge of the topic in the 30(b)(6) notice must be gleaned from internal documentation, information in the record, and facts obtained from others – any information available to the Government – the Government is obliged to prepare its deponent with this information.

We recognize that it may be necessary to designate multiple witnesses. However, we think the Government's obligation to prepare its designees encompasses an obligation to conduct adequate internal due diligence and investigation, and to avoid forcing Samson to take, multiple, piecemeal, "bandying" depositions of the type the Rule was designed to prevent.

Further, we disagree that the number and nature of topics renders the Supplemental Notice are broad or burdensome. In this regard, we note that the Supplemental Notice resulted from a request from you to be more specific about the topics into which we wanted to inquire in 30(b)(6) depositions. Actually, they are quite limited in scope. We just needed to be thorough and precise in our verbiage, given what we have experienced in the prior 30(b)(6) depositions.

Simply put, the Supplemental Notice calls for designation of someone who can testify for the Government, on the basis of knowledge or an adequate internal investigation meeting the Government's 30(b)(6) obligations, about the following topics:

*Topic Number 1: Transportation Mode Decisions Generally*

1(a): What "paper trail" existed or should exist documenting the USG's practices and procedures, and decisions resulting from those practices and procedures, regarding selection of the mode of transportation of military or military sponsored cargo transported within the DTS to and from Adak and CONUS during the period 10/1/95 – 9/30/97. What records were or were supposed to be made and kept, where were/are they stored, where may any and all data contained in them be kept in electronic form now, and what are the applicable policies and procedures re destruction of any such records?



July 11, 2006
Page 3

1(b): What directions, orders, rules, policies, practices and procedures were followed by the USG during the period 10/1/95 – 9/30/97 regarding selection of the particular mode of transportation of military or military sponsored cargo transported within the DTS to and from Adak and CONUS during the period? Were these consistent with past practices dating back to 1/1/93 on?

1(c) What criteria were applied to distinguish cargo that was to be moved by sea or by air, and, within the air category, via commercial or military airlift assets?

1(d) What role did the anticipated closing and turnover of Adak play in such decisions?

1(e) Who made or participated in making such decisions?

*Topic Number 2:  Airlift Decisions Specifically*

Anticipating that there might be a different Government witness better suited to address these same questions specifically as to air movements, topic 2 is essentially the same, but specific to airlift. If one or more witnesses testifies comprehensively as to sea and air movements in a manner fully responsive to Topic 1, we will be satisfied, as Topic 2 is merely a subset of Topic 1. If not, the key issue in the case is air movements, and we need discovery about that. Thus, the same issues re Topic 1, but as to air:

2(a): What "paper trail" existed or should exist documenting the USG's practices and procedures, and decisions resulting from those practices and procedures, regarding selection of air transportation as to military or military sponsored cargo transported within the DTS and from Adak and CONUS during the period 10/1/95 – 9/30/97. What records were or were supposed to be made and kept, where were/are they stored, where may any and all data contained in them be kept in electronic form now, and what are the applicable policies and procedures re destruction of any such records?

2(b): What directions, orders, rules, policies, practices and procedures were followed by the USG during the period 10/1/95 – 9/30/97 regarding selection of the air transportation of military or military sponsored cargo transported within the DTS to and from Adak and CONUS during the period? Were these consistent with past practices dating back to 1/1/93 on?

2(c) What criteria were applied to decide what was to be moved by air, and, within the air category, via commercial or military airlift assets?

2(d) What role did the anticipated closing and turnover of Adak play in such decisions?

2(e) Who made or participated in making such decisions?



*Topic 3: Source of Data Compiled in Data Summaries Obtained via FOIA and Discovery*

The Government has been taking the position that complete records of air shipments do not exist. Yet we obtained under FOIA (and used to support our claim) several charts and spreadsheets in the nature of data summaries which were obviously created using data which probably once was recorded on some form or other original source document. The Government has produced a similar compilation from Elmendorf in discovery. Someone actually had to create these charts and data summaries, and that person was obviously accessing some source record the Government has, to date, failed to produce.

Topic 3 seeks information relating to these charts, an explanation of what they purport to show, who made them or knows how they were made, the source records used to make them, and the rules, policies, practices and procedures that were, or should have been, applied in creating them.

As to the dates of the 30(b)(6) depositions, as the cover letter to our Supplemental Notice plainly stated, they were "placeholders." The dates, times and places you propose for the Eastby and Seaton depositions are acceptable.

We trust this letter assists in your understanding of our position regarding 30(b)(6) depositions, and clarifies the information we are seeking. We will address other issues raised in your letter in separate communications.

Sincerely,

GARVEY SCHUBERT BARER

By

      Harold G. Bailey
      Attorneys for Samson Tug & Barge Co., Inc.