GREGORY G. KATSAS
Acting Assistant Attorney General
NELSON P. COHEN
United States Attorney
GARY GUARINO
Chief, Civil Division
Assistant United States Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Telephone: (907) 271-5071
Telefax: (907) 271-3224
R. MICHAEL UNDERHILL
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
JEANNE M. FRANKEN
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Building
P.O. Box 36028
450 Golden Gate Avenue
San Francisco, California 94102-3463
Telephone: (415) 436-6644
Telefax: (415) 436-6632

Attorneys for Defendants
United States of America


ROBERT BORAKS
RICHARD GLUCK
HAROLD G. BAILEY
Garvey Schubert Barer
1000 Potomac Street, N.W., Fifth Floor
Washington, D.C. 20007
Phone: Main (202)-965-7880
Fax: 202-965-1729

Attorneys for Plaintiff
Samson Tug and Barge Co., Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SAMSON TUG AND BARGE CO., INC., an Alaska Corporation<br><br>　　　Plaintiff/Appellant<br><br>　　　　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　acting by and through<br><br>the UNITED STATES DEPARTMENT of the | Civil No. A03-006 CV<br><br>IN ADMIRALTY<br><br>JOINT STATEMENT<br>OF DISPUTED ISSUES<br>AND UNDISPUTED FACTS |

| | NAVY MILITARY SEALIFT COMMAND, )<br>and UNITED STATES DEPARTMENT OF )<br>THE ARMY MILITARY TRAFFIC )<br>MANAGEMENT COMMAND )<br>)<br>      Defendants/Appellees )<br>_____ ) |

The parties hereto, through the undersigned consents of their counsel of record, do hereby submit a joint statement of (A) legal issues genuinely in dispute and (B) undisputed facts, as directed by the Court.

A. DISPUTED LEGAL ISSUES:

1.    Whether any cargo which can be shown to have moved outside the Samson contract fell within the definition of contract cargo for purposes of the Samson contract.

2.    Whether the Government breached the contract by shipping what plaintiff characterizes as "barge suitable cargo" by air.

3.    Whether Samson was entitled to carry all military and military sponsored cargo, with certain specified exceptions, which was moving in the Defense Transportation System ("DTS") between Adak and the Continental United States ("CONUS") during the term of the contract, or if Samson was only entitled to carry military and military sponsored cargo, with certain specified exceptions, which was offered to it, for movement by ocean transportation in the DTS, between Adak and Puget Sound, during the term of the contract.

4.    Whether a constructive partial termination for convenience occurred.

5.    Whether the contract is an integrated document.

6.    Whether the contract is ambiguous in any material regard.

7.    Whether contractual provisions should be construed against the drafter.

8.    Whether parol or extrinsic evidence of the parties' intentions should be permitted.

9.    Whether actual authority is required to bind the Government.

10.    Whether the contract covered surface movements between points in CONUS other than the contractor's facility in Puget Sound at Seattle, Washington, and Adak, Alaska.

11.    Whether the contract covered air as well as surface shipments of cargo.

12.    Whether the Government had discretion to determine the appropriate mode of

transportation for its Adak cargo as between air and surface means.

13. Whether the Government had discretion to choose whether material on the island would be left behind for use of the Local Reuse Authority or otherwise, or was somehow obliged to move material off the island.

14. Whether the spoliation doctrine applies to the facts of this case and, if so, the appropriate remedy.

15. Whether plaintiff can prove liability, causation and damages by a preponderence of the evidence.

16. Whether plaintiff sustained any direct damages as a result of the Government's alleged breach and/or the alleged constructive partial termination.

17. Whether plaintiff's damages were de minimus, speculative and/or remote.

18. Whether plaintiff mitigated its damages.

19. Whether Samson should be permitted to present a total cost, or modified total cost, theory of recovery, and, if so, what burden of proof it must meet.

20. Whether plaintiff's proposed expert on damages possesses the requisite experience and background, and has followed an appropriate methodology, in order to be permitted to testify under *Daubert* principles.

21. Whether plaintiff is entitled to attorneys' fees, in the event it prevails.

22. Whether the Contracting Officer's decision was substantially justified and/or erroneous as a matter of law.

23. The appropriate rate of interest to apply in this maritime contract action against the United States, in the event plaintiff prevails.

Plaintiff proposes the following as additional issues, to which the Government does not agree:

24. How damages are to be measured in the absence of complete Government records of air shipments.

25. Whether the contract imposed an obligation of good faith and fair dealing, and, if so, whether the Government breached that obligation.

Defendant proposes the following as additional issues, to which plaintiff does not

agree:

26. How Samson's damages, if any, are to be measured given the absence of proof of any of its costs and Samson's apparent failure to segregate its costs between the Government work it performed and the commercial work in which it was engaged at the same time.

27. Whether the damage theory presently being proposed by plaintiff, which is based on an assertion of increased costs and which differs from the approach asserted in its claim and relies on facts not asserted in the claim, was properly certified and presented to the contracting officer as required by the CDA and, if not, whether this Court lacks jurisdiction to adjudicate such a claim.

28. Whether a total cost, or modified total cost, method can be used by Samson to prove causation.

29. Whether claims of bad faith and unfair dealing were presented to the Contracting Officer and, if not, whether this Court lacks jurisdiction to adjudicate such a claim.

30. Whether the Government has waived its immunity for a suit for bad faith and/or unfair dealing.

31. Whether the Samson contract covered transportation of cargo between Adak and all points in CONUS, or only to and from Samson's facility in Puget Sound at Seattle, Washington.

32. Whether the Samson contract covered transportation of cargo between Adak and points outside CONUS, such as Anchorage, Alaska, Japan, Hawaii, Europe, etc.

B. UNDISPUTED FACTS:

1. Beginning in 1986, plaintiff Samson Tug & Barge ("Samson"), a privately held company based in Sitka, Alaska which engaged in the business of hauling cargo by barge, had bid on and contracted with the Military Sealift Command ("MSC"), a part of the United States Navy, to provide ocean cargo transportation services for military and military sponsored cargo, with certain exceptions, at Adak island in Alaska by way of a regularly scheduled tug and barge service that ran between the Continental United States ("CONUS"),

via its facility in Puget Sound at Seattle, Washington, and Adak, Alaska.

2. George Baggen, the principal shareholder in Samson, runs the company, and one of his daughters, Corelle, is now its Chief Financial Officer.

3. By 1994 the Naval Air Station ("NAS"), which had existed on Adak island for many years, had been downgraded to a Naval Air Facility ("NAF"), the number of personnel on the island had been reduced, and the tour of duty became an unaccompanied tour.

4. Typically, although Samson had to reserve a certain amount of room on each barge going to and from Adak for the use of the Government, and to take whatever cargo the Government offered, it also carried larger volumes of commercial cargo between Seattle and other destinations in Alaska, and between Alaska ports, during each voyage it was also making to Adak to pick up or drop off the Government's military cargo.

5. Samson's service at Adak was one small part of the overall Defense Department's Transportation System ("DTS"), comprised of the Air Mobility Command ("AMC"), the Military Sealift Command ("MSC") and at that time the Military Transportation Management Command ("MTMC"), whereby a military agency "customer", at Adak it was primarily the Navy, could arrange to have military or military sponsored cargo moved from one location to another by way of air or surface (land or sea) means.

6. Given that Adak is an island, the only option for surface carriage to and from it was obviously by sea.

7. Commercial and military planes carried persons and materials to and from Adak over the years of Samson's contracts with the Government to serve Adak island by barge.

8. Although Samson's contract was negotiated with MSC, a part of the Navy, it was administered by MTMC, later re-designated the Surface Deployment and Distribution Command ("SDDC"), both of which were Army Commands.

9. In 1995, the Government proposed changing the contract for ocean liner services at Adak from a "requirements"-type contract, which had been employed on that route and for that service by Samson for many years, to an "indefinite delivery, indefinite quantity"-type contract ("IDIQ"), which would have provided a guaranteed minimum amount

of cargo to the successful carrier unlike the requirements type contract.

10. In March of 1995 MSC issued a Solicitation (Request for Proposal), N62387-94-R-8530, for cargo hauling barge/tug and intermodal service between CONUS via the contractor's facility in Puget Sound at Seattle, Washington, and Adak, Alaska.

11. At the time of the Solicitation, Samson was still operating under a previous Government requirements type contract to haul surface cargo between CONUS via the contractor's facility in Puget Sound at Seattle, Washington, and Adak, Alaska.

12. During the time Samson was preparing its bid for the last contract, it sought and obtained the right to reduce the frequency of its port calls at Adak under the prior contract from approximately every 17-days to about every 28-days.

13. Closure of the Base at Adak was formally announced before Samson entered into the last of its Adak barge contracts.

14. On April 6, 1995 a pre-proposal conference was held by the Government with respect to the Solicitation, and Samson, its competitors and Government agency representatives attended that conference.

15. Samson was eventually permitted to bid on the contract in the alternative, i.e. either as an IDIQ or as requirements type contract, and it was eventually again awarded another requirements-type contract for the Adak barge service.

16. The rates Samson bid on the requirements type contract were overall lower than the rates it had bid on the IDIQ type contract.

17. The contract, N62387-95-D-8503, was awarded to Samson for barge service between CONUS via the contractor's facility in Puget Sound at Seattle, Washington and Adak, Alaska.

18. The last Samson barge contract for Adak initially covered a term of one year, from October 1, 1995 through September 30, 1996.

19. The contract contained an option for the Government to extend its term, and it was in fact extended first for a six month period and then month to month for an additional six months.

20. Operational closure of the Base occurred on March 31, 1997, and on April 1,

1997 the Base was turned over to a Government caretaker contractor.

21. The Samson barge contract for servicing Adak finally expired on September 30, 1997.

22. The amount of cargo shipped with Samson exceeded the Government's cargo projections.

23. Alaska Airlines ran a channel service for the Government from and to Anchorage, Alaska, which called on Adak island. It ended in January of 1997, and was not resumed. Military flights also called on the island over the years. The origination and final destination points of these flights varied. Reeve Aleutian Airways also provided a commercial air service to and from Adak during the years of the Samson contracts. Private planes also landed at the Adak airport.

24. After base closure was announced, a Local Reuse Authority ("LRA") was formed by the native Aleut Corporation, and eventually the base was slated to be turned over to the LRA for its use in a planned redevelopment of the island, pursuant to the Base Realignment and Closure Act ("BRAC").

25. On December 10, 2001, Samson submitted a claim, pursuant to the Contracts Disputes Act, 41 U.S.C. §601, et seq., to the Contracting Officer requesting an equitable adjustment and alleging breach of contract and constructive partial termination of the contract for the convenience of the Government.

26. The claim was certified by the president of Samson, George Baggen.

27. The claim was subsequently denied by letter dated January 15, 2002.

28. The plaintiff's complaint appeared to name the "Navy Military Sealift Command" and the "Department of the Army, Military Traffic Management Command" as defendants in addition to the United States of America, but the parties stipulated to the dismissal of those agencies, they were dismissed, and the case is now proceeding solely against the United States of America.

29. In 1996 one of the daughters of George Baggen, the owner of this closely held business, was murdered. In the summer of 1997 the person accused of the crime was tried and acquitted. These events occurred during the pendency of the last Adak barge contract.

30. The Government has located and produced at least four computer print outs of data for military flights which landed at Adak during the subject contract, and those prints outs contain cargo data. In 2001 the Air Force had produced some flight information pursuant to a FOIA, including two of those printouts. The Government has not located air cargo manifests for military flights. Samson did not subpoena records from Reeve Aleutian Airways or Alaska Airlines for their flights to and from Adak during the relevant period.

31. In 2007 Samson upwardly adjusted the amount of money it was allegedly paid by the Government under the last Samson barge contract to the sum of $7,653,104.00, a larger amount than it had represented it earned in the claim it had submitted to the Contracting Officer in 2001.

32 Over the years Samson provided barge service at Adak, it submitted at least three claims to the Government in addition to the claim which is at issue in this case.

33. This action was filed on January 14, 2003.

Dated: July 11, 2008.

GREGORY G. KATSAS
Acting Assistant Attorney General
NELSON P. COHEN
United States Attorney
GARY GUARINO
Chief, Civil Division
Assistant United States Attorney
R. MICHAEL UNDERHILL
Attorney in Charge, West Coast Office
Torts Branch, Civil Division

 /s/Jeanne M. Franken
JEANNE M. FRANKEN
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice

Attorneys for Defendant
United States of America

Dated: July 11, 2008

Garvey Schubert Barer

/s/ Richard Gluck

RICHARD GLUCK
ROBERT BORAKS
HAROLD G. BAILEY

Attorneys for Plaintiff
Samson Tug and Barge Co., Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July  11 , 2008, a copy of the foregoing JOINT STATEMENT was served electronically on:

Richard D. Gluck, Esq. And Robert Boraks, Esq.
Garvey Schubert Barer

William G. Royce, Esq.
Law Office of William G. Royce

Attorneys for Plaintiff
Samson Tug and Barge Company, Inc.


/s/Jeanne M. Franken
———————————————
JEANNE M. FRANKEN